## STATEMENT OF THE ISSUES

Issue I.      Whether Amodeo was legally competent to enter a plea as a result of a state court determination of incompetency?

Issue II.     Whether Amodeo was actually incompetent to enter a plea as a result of mental illness and use of antipsychotic and mood-altering medication?

Issue III.    Whether Amodeo's plea is invalid because of essential infirmities which render a contract void: such as fraudulent inducement, lack of capacity, failure of consideration or mutual mistake?

Issue IV.     Whether Amodeo's guilty plea was not knowingly and voluntarily entered as a result of Amodeo's attorneys' actual conflicts of interest, Amodeo's attorneys' actual conflicts of interest, Amodeo's attorneys' inaccurate and ineffective advice or the Government's unfulfilled promises.

Issue V.      Whether the district court's failure to provide Amodeo an unconflicted counsel at sentencing or any counsel at all with regards to motion to cancel plea is an unconstitutional deprivation of counsel?

Issue VI.     Whether the magistrate's order forcing Amodeo to be medicated violated Amodeo's rights to due process and a fair trial?

## STATEMENT OF THE CASE

### Introduction; Statement of Case

The underlying conduct and the plea agreement are the result of a convergence of factors which led to a cascade of events. The result was to make a conglomeration of mistakes and negligent judgment appear criminal. The converging factors include: Amodeo's illness, attorneys' conflicts of interest and a media conscience government (how to explain that 181 million dollars in taxes were reported but not collected and the IRS although aware of the obligations took no action).

### Amodeo's Illness

Amodeo's illness is undisputed. The government admitted the existence of the disease and the disease's impact on Amodeo's competency during a bankruptcy proceeding on June 12, 2006. The Assistant United States Attorney, I. Randall Gold, Esq. (Deputy Chief of Orlando Division) acknowledged personally having witnessed the disease manifest itself during the change of pleas hearing in September 2009 and finally the government stipulated to the existence of the disease at sentencing. Additionally, the government stipulated to the validity of the McLean Hospital Report (Harvard Evaluation) and utilized the incompetency to the government's advantage in the collateral bankruptcy proceedings.

Amodeo has axis 1 bipolar disorder with psychotic episodes and permanent delusions. An excellent synopsis of the disorder is available from the American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV Revised Edition). An understanding of the symptoms of the disease is necessary to fully understand how the disease impacted the case.

The disease, except at the extremes, does not affect Amodeo's (or anyone suffering from it) intelligence or memory.  In Amodeo's case Amodeo's intelligence is heightened during the hypomanic phase and declines during the manic or depressive cycle.  As many of the doctors and therapists have noted, since Amodeo is so high-functioning and is a rapid cycler, Amodeo is often able to mask the full onset of the disease from the casual or limited observer.

Amodeo manifests many of the other common characteristics of the bipolar; Amodeo is very charismatic during the manic phases of the disorder while easily irritated and highly irritable during the depressive phases. Amodeo, when cycling or in manic phases, will display rapid speech, racing thoughts and an inability to concentrate or focus, especially on emotionally sensitive matters.  Amodeo, like all manics, will not recognize Amodeo is ill while in the manic phases, mixed states, or while cycling and probably will not recognize during the depressive phase.

A bipolar individual does not believe he or she is sick.  Often the bipolar is addicted to the manic experience, because of the perceived ability to think so much better and faster than normal.  A bipolar person cannot cure himself. Bipolars usually, cannot even recognize the disease is manifest. To treat a bipolar, intervention is required.

A prominent symptom of the bipolar disease is a tendency to engage in spending and purchasing sprees.  In Amodeo's case this tendency manifests itself in the spending of professional fees.

Amodeo and the related companies spent over 12 million dollars in fees; not including the internal professional staff, during the two-year period of the alleged offense.

## Actions and Advice of Accountant's and Attorney's

The consequence of this spending spree was to provide the professionals with a strong incentive to ensure the proverbial "goose laying the golden eggs" did not get cooked.  In other words, if the professional had "discovered" the crime or warned Amodeo and certain other key personnel of a possible duty with regards to the payment of the taxes; then the lucrative engagements, employment contracts, bonuses, etc ... would have ended.  It was common knowledge that without the liquidity provided by the PEOs (either Professional Benefits Solutions, Inc. or AEM, Inc.); [which entity owes the tax is still undecided], it would have been impossible to pay for the professional contracts or maintain the substantial level of compensation for the internal professional staff.

The result was that the professionals, through both advice and behavior confirmed and condoned the legitimacy of deferring the payroll taxes. Deferring the tax payments in order to reorganize the corporate taxpayer.  Especially, paying the professionals.

This approach was particularly effective because of Amodeo's disease.  Amodeo's disease may not have a chronic effect on Amodeo's intelligence but it does effect Amodeo's perception of reality and risk.

Amodeo's belief in the legitimacy of the tax-deferment strategy was not new; Amodeo had utilized similar strategy before and the IRS had not only accepted the strategy but provided accolades to Amodeo.

The primary difference in this case, causing Amodeo to seek out professional advice, was that Presidion Corporation was publicly traded and Amodeo had no experience with public companies or the securities laws.

The secondary factor (in Amodeo seeking assistance) was Amodeo's initial consulting partners: Eddie Curry, Esq., Robert Curry, CPA, Dan

Myers, CPA, Jason Carlson, MBA, etc … imposed certain requirements on assisting Amodeo with the "Presidion case." The restrictions involved when fees were collected, disbursement of funds and due diligence, including utilizing outside attorneys.

Carlson and Curry were especially concerned about the involvement and hidden agenda of the Presidion Corporation principals including but not limited to: Craig Vanderburg, James Baier, Esq., John Burcham, Chris O'Connor, CPA, David Firestone and the Millennia Group and the representatives of Ken Hendricks (Forbes 400).

As a result of these two concerns, Amodeo elected to retain three prominent firms to advise Amodeo and Amodeo's consulting company, AQMI Strategy Corporation: the law firm of Berman, Keane and Riguera; the accounting firm of Rachlin, Cohen and Holtz; and the law firm of Buchanan and Ingersoll.

The principals of these firms, Richard Berman, Esq., Laurie Holtz, Esq., and Hans Beyer, Esq., joined with Edie Curry, Esq. in persuading Amodeo to stop performing accounting and legal activities for the various consulting companies; since they [Berman, Beyer, et. al.] were the licensed professionals and Amodeo was not. Furthermore, these advisors emphasized Amodeo was the "visionary" and Amodeo needed to focus on sales, motivation and expanding the vision, not the operations.

Nothing could have been better "music to Amodeo's (or any bipolar-manic) ears". Amodeo was perceived and treated as the great leader; able to identify a strategy or project, then turn over development or implementation of the project to others. In this case, the others were exceptionally well credentialed professionals of considerable experience and renown. (An

- 6 -

Kilpatrick. Each of these individuals had extensive support staff all who were experienced PEO operators and many of whom were licensed accountants and attorneys.

The external group consisted of the national accounting firm UHY, LLP, the prominent securities law firm of Kilpatrick and Lockhart and the prestigious tax law firm of Kostelanetz and Fink.

This does not even include the professional advisors to the other principals: the billionaire Ken Hendricks, and the exclusive Californian hedge fund and the investment bank of the Millennium Group. It is inconceivable that these professionals would have allowed their clients to participate, indeed facilitate a massive tax crime; exposing their substantial clients and their own firms to civil and criminal penalties.

Since Amodeo insisted Presidion Corporation and its principals obtain and maintain separate counsel, Amodeo became increasingly convinced of the greatness of the strategy; never entertaining any notion the plan was wrong. If any of the prominent firms or Presidion professionals had believed the plan would not work, let alone be against the law, surely these professionals would have intervened or at least terminated their representation.[ii]

Since no one raised any concerns nor terminated their contracts of employment, Amodeo's belief system was reaffirmed. Again it is significant that every transaction involving the unpaid taxes was directed or executed by Schumacher or O'Connor, up to May, 2006 (More than 120 million dollars in tax, exclusive of interest and penalty).

### Internal Revenue Service

The second enhancing factor was the Internal Revenue Service. The IRS had conducted a two year investigation of Presidion Corporation

between 2004 and 2006. This investigation was done in conjunction with the Organized Crime Task Force out of Detroit.

At the time this investigation ended, Presidion Corporation, or more accurately Presidion Corporation's consolidated subsidiaries, owed $52 million in taxes, penalties and interest.

The AUSA for the Task Force – Keith Corbett, Esq. – and IRS Special Agent Patterson; issued a letter for public dissemination confirming Presidion Corporation and affiliates were not going to be charged with any crimes and had been cleared of any wrong doing. Further, Criminal Investigation Division Special Agent Patterson told James Baiers, Esq. that "the unpaid taxes were not his (Patterson's) concern as delinquent taxes were a civil and not a criminal matter".

This position of the IRS was reinforced when officer Pace McNealy told Amodeo's power-of-attorney, Dan Myers, CPA, that he (McNealy) and the IRS were surprised when Amodeo paid back the payroll taxes on two companies previously owned by Amodeo. The surprise was because Amodeo would not have been liable for the tax since Amodeo did not receive a direct personal benefit.

In addition, IRS collection officer Judy Berkowitz, who handled another Amodeo case involving a bankruptcy, not only was satisfied with the handling of that case (which included the use of payroll taxes for other purposes), Berkowitz affirmatively asked for the Sunshine cases (names of Presidion Corporation subsidiaries).

Berkowitz even went so far as to tell Amodeo in January of 2005 to change the corporate address of the Sunshine companies to the same private mailbox used by Amodeo's company in the prior case. This change of

address would result in the Sunshine cases being automatically assigned to Berkowitz.

It is important to note, at this point, that the IRS had failed to identify a 52 million dollar tax liability in the prior criminal investigation. Amodeo affirmatively and voluntarily went to the IRS and disclosed the debt and mistake. (This meeting and the professionals in attendance are more thoroughly discussed in the Statement of Facts entered and stipulated to by the government at the sentencing hearing, the revised somewhat more comprehensive version of the Statement of Facts was filed separately in this case and the district court case).

After this meeting, and for the next 18 months, the IRS met on many occasions with the accountants and attorneys employed by Amodeo or the corporations. The principal IRS agent, Berkowitz, and Amodeo's representative, Myers, communicated so often by telephone and fax that they took to referring to each other as Dan and Judy. More than 150 contacts and communications took place. Jose Marrero, of Rachlin, Cohen and Holtz, Sharmilla Kharokar, CPA, of the same firm, Myers and Hans Beyer, Esq. assured Amodeo and others that everything was going well with the IRS.

In February of 2006, Amodeo informed Berkowitz that the successor entity to the Sunshine companies (PBS) had accrued a 71 million dollar payroll tax liability in 2005 as part of the reorganization plan.

Berkowitz, in the hundreds of communications after the letter nor in Berkowitz's meeting with Beyer, Khanokar and Myers ever expressed concern over the unpaid tax; even though PBS's situation was part of her inquiries and discussions.

At or about the same time, Craig Vanderburg, President of Presidion Corporation, was contacted by the FBI, first as a person-of-interest, then as a

- 10 -

One of the main issues discussed at this meeting was how a note and security-interest had been created by certain of the entities. This resulted in an income stream which could be levied upon by the IRS. The IRS followed Amodeo's recommendation and began receiving weekly payments of $150,000 as well as being able to "piggy-back" on the preexisting security interest. As a result, the IRS now had a secured position where previously the IRS claim was unsecured.

The IRS received these payments for the rest of the year until the allocation of payments was altered because of an agreement between Amodeo, the USAO and CI Division of the IRS.

Even while these payments progressed, the professionals continued to work with the IRS producing thousands of pages of documents and answering all questions.

These communications ended after the grand jury investigation commenced.

At this point, the original pattern of convergence has been identified: Amodeo's belief in the legality of the tax deferment plan is increasingly solidified by the actions of the corporate executives, the advice of the professionals and the acquiescence as well as apparent affirmance from the IRS and other government agencies. This merges with the personal incentives and enthusiasm of the hundred or so executives and professionals.

The explanation for the actions and advice of many (possibly most) of the executives was provided by Special Assistant United Stated Attorney, Theresa Boatner.

Boatner told Amodeo she realized that what was happening was a vicious spiral. Beyer told Amodeo this was OK, Amodeo told Myers, Myers told Stanley, Stanley told Glover, (the names were different, but the point is

the same). Glover then tells Myers and Myers then tells Beyer. In effect everyone began to reinforce the beliefs of each other.

All the while the senior advisors like Berman (who became general counsel) and Holtz (who became chairman) blithely ignored the conduct and misperceptions: quite possibly because of the large fees being made by Berman's firm (estimated at over 60% of their annual billings) and the anticipated gigantic wealth expected by Holtz (See April 19, 2006 video of discussion between Laurie Holtz and his son Stephen – partially transcribed in the Statement of Facts).

Amodeo's disease made Amodeo particularly susceptible to these influences.

### Harrison Slaughter Becomes Involved

Into this environment enters Harrison "Butch" Slaughter. Slaughter introduced to Amodeo as the most prominent defense attorneys in Orlando and one of the most politically connected. Slaughter represented both Mayor Buddy Dyer and Mayor Richard Crotty in various criminal investigations.

Amodeo originally retained Slaughter to represent Amodeo in being readmitted to the Georgia Bar Association.

In the midst of this representation, the United States Trustee's Office believed Amodeo was engaged in some sort of misconduct in the Community Health Service bankruptcy case. Slaughter quickly began to defend Amodeo in this proceeding.

Slaughter, after reviewing this case and the prior three bankruptcy cases where Amodeo utilized a similar tax deferment strategy, determined Amodeo had not done anything wrong. In fact it appeared the various debtor's prior owners had actually taken advantage of Amodeo in these

cases and (had taken advantage) of Mirabilis Ventures, Inc. in the
Community Health bankruptcy.

At the conclusion of the Community Health case, the bankruptcy
judge, on her own motion, told the trustee's office they owed Amodeo an
apology for the false accusations.

Slaughter continued to represent Amodeo; examining Amodeo's past
and current activities and reviewing the very detailed white paper prepared
by George Duke a senior investigator for the state wide prosecutor of the
State of Florida.

On August 29, 2006, Slaughter attended a town-hall styled meeting
now referred to as the "Mock Deposition." It is referred to as the "Mock
Deposition" because Amodeo was sworn, a court reporter transcribed the
meeting, the "depo" was professionally videotaped and the format involved
Berman asking questions and Amodeo answering.

Slaughter's name was prominently displayed on the sign-in sheet and
Slaughter was visible on the videotape.[iv]

During this "Mock Deposition," Amodeo clearly discussed the history
and reasons for the unpaid taxes. On pages 86 and 87 of the transcript (and
on video), Amodeo discussed how, by not paying the taxes, funds were
made available for buying other businesses.

Even after this explicit and simple statement by Amodeo, Slaughter
did not warn Amodeo to stop the tax deferment strategy; nor tell Amodeo to
disassociate Amodeo's self from any company (AEM, Inc.), then collecting
and not paying the taxes.

Not only did Slaughter not say anything, nor did Berman, Holtz,
Beyer, Curry, Stanley, Khanokar, Paul Glover, CPA, Brian Nugent, Esq.,

Kelly Tomeo, Esq., Thomas Sadaka, Esq., or any of the nearly 50 professionals or experts in attendance.

Again if this duty to pay tax was so clear, how is it so many professionals failed to identify the duty? Always remembering it was these professionals who handled the money, prepared corporate governance, prepared the various contracts and actually executed the transactions.

Roughly two weeks after the grand jury subpoenas were received, Slaughter finally approached Amodeo about the legality of deferring the payment of payroll taxes.

Slaughter now recounts, including at the sentencing hearing, how Amodeo was shocked (in December of 2006) that the tax deferment was illegal. Slaughter tells how Amodeo did not believe Slaughter until Amodeo independently confirmed the law over the weekend. Amodeo asked Slaughter how Slaughter could have a view so different from all the accountants and attorneys already involved with the tax strategy.

Ironically, if Slaughter, as now purported, was actually a prosecutor of tax cases for the U.S. Attorney in the past, why did Slaughter not raise this issue earlier?

Slaughter had Amodeo's confidence, now, because Slaughter had proved his reputation. After the initial grand jury subpoenas were issued, and once it became apparent that neither Mirabilis nor AEM, Inc. were going to act quickly. Amodeo told Slaughter what was going on. Slaughter told Amodeo not to worry. He (Slaughter) knew Gold and had an excellent relationship with the United States Attorney's Office. Slaughter contacted Gold and instead of serving the subpoenas on the companies and witnesses, Gold sent them to Slaughter to give to Amodeo.

Amodeo was made responsible for distributing the subpoenas.

Amodeo promptly paid a couple hundred thousand additional dollars to Slaughter and ninety thousand to Robert Panoff, Esq. (tax expert; member of the IRS advisory board).

### Cooperation

During the first six months of 2007 Amodeo provided hundreds of thousands of documents, compiled and organized financial data, assured an orderly shut down and liquidation of the Mirabilis companies, and conducts seven undercover operations for the government.

Amodeo was told by Gold that in exchange for these efforts, Amodeo would get a "Tampa letter", should Amodeo ever be convicted. A Tampa letter meant at least a five level sentencing reduction and possibly as much as a ten level reduction.

By May of 2007, the government made a deal with Amodeo to allow Amodeo to close certain businesses and sell the assets. Further, the government said Amodeo had already "earned his credit" and would only need to be available to provide documents in the future.

As it turns out Amodeo provides considerably more assistance to the government; including locating, reviewing and explaining 27,000 hours of audio/video recordings of the corporate facilities.

Amongst these meetings were many hours of very explicit discussions about the unpaid taxes, the tax controversy and the corporate decision makers.

Based on all of this assistance, plus the preservation of tens of millions of dollars of assets, Herb Hoelter the sentencing expert hired by Amodeo, believed Amodeo should receive 10 to 15 levels reduction on any sentence. The sentencing expert was recommended by Slaughter.

Amodeo also hired many other Slaughter recommendations during this time: forensic psychiatrist, another attorney, Brian Phillips, etc, spending at least another $250,000. All told – Slaughter and Slaughter's associates received over 1.25 million dollars from Amodeo.

During this entire period Amodeo continued to assert Amodeo's innocence. Amodeo made it clear, Amodeo never intended to defraud the IRS or anyone else.

Amodeo was told by Slaughter, Panoff and Phillips that conspiracy only required an agreement and an act; it did not matter whether Amodeo intended to assist in a fraud or knew Amodeo was participating in unlawful conduct.

Even with considerable pressure mounting from Amodeo's attorneys to enter a plea, Amodeo flatly refused to admit any wrong doing. Instead Amodeo insisted upon taking a polygraph examination to prove Amodeo was telling the truth and had no intent to mislead the IRS or anyone else.

While the polygraph was being arranged, Amodeo was presented with a plea agreement that contained a set of facts which was blatantly false. Amodeo refused to sign the agreement.

Amodeo was so distressed by the surprise plea agreement (Amodeo was unaware Slaughter and Panoff had been negotiating a plea) (Panoff asserted Slaughter was supposed to have told Amodeo over a month before), Amodeo could not even make comments about the proposed agreement.

Amodeo asked two former staff attorneys to review the facts in the proposed plea agreement and send back a correct version to Phillips. (Phillips was doing the writing for Panoff and Slaughter).

The staff attorneys drawing upon their personal knowledge from experiencing some of the events and two years of researching the documents

and recordings for the plethora of civil actions pending (See litigation list in the Statement of Facts), had so many "red lines" in the version of the purposed plea they were trying to edit. That the staff attorneys believed it was impossible to correct simply rewrote the proposed plea facts.

Amodeo requested the staff attorneys not only send the red lined version, but also send the rewritten and accurate factual statement to Panoff, Phillips and Slaughter.

Discussions between Amodeo and the staff attorneys made it clear the criminal defense attorneys would be committing a serious ethics violation if they permitted Amodeo to sign the original factual statement; because Slaughter et. al. should be aware that the proposed factual statement is materially untrue.

Shortly thereafter, Amodeo was summoned to Slaughter's office. The purported reason was to meet the polygrapher and schedule the polygraph examinations. When Amodeo arrived at Slaughter's office, Slaughter told Amodeo about a conference call with Panoff [v] (Panoff's office is located in Miami, Florida; Amodeo's office and Slaughter's offices are located in Orlando, Florida). Brian Phillips was present at Slaughter's office.

As soon as Panoff came on the telephone, Amodeo was presented with a new plea agreement. This plea agreement contained a factual statement essentially the same as the one the staff attorneys had told Slaughter was untrue and that no attorney could ethically permit Amodeo to sign.

## Prosecutorial Threats

Amodeo protested even reviewing the agreement. Panoff then told Slaughter to show Amodeo the email from Gold.

The email from Gold said: Amodeo had to sign the plea agreement without any changes or else the deal was off. The only deal point specified in the email was the promise by Gold to protect the attorneys' fees from seizure and forfeiture. The email also gave the attorneys until Monday (the meeting was on a Thursday) to get Amodeo to sign the plea agreement without any changes.

Amodeo said no. Amodeo had never lied under oath. Amodeo was not going to start lying under oath now.

Phillips, a comparatively recent departure from the Middle District's US Attorneys Office, then told Amodeo, "If you do not sign the plea agreement, the government will immediately arrest you, seize your assets, take away the money set aside for your handicap stepson's survival, embarrass and humiliate your family and deprive you of counsel by taking our (attorney) fees."

Further, Phillips said the government will get a conviction because the government will not hesitate to get perjured testimony from all of the bad guys. The bad guys who will escape justice by helping the government get you: the "low-hanging fruit."

Phillips then went on to explain to Amodeo, Amodeo would not really be lying by agreeing to the factual statement since all Amodeo was really admitting to was, "what the government could prove at trial even if only by perjured testimony."

Amodeo said, "Fine, the United States has just declared war on the Empire. I hereby renounce my citizenship. I will not be part of a country which forces its citizens to lie to protect their families and how could anyone try and harm my sick parents (father a cancer victim; mother recovering from a stroke) or damage Gentry (stepson, raised by Amodeo, with Down

syndrome amongst a variety of other chronic diseases). Ok, I will sign it. I
do not need to read it (plea agreement). It is completely false but obviously
this does not matter. God, this is not an oath before you." Amodeo then
signed the plea agreement and went to meet with the polygrapher.

After finishing with the polygraph, Amodeo went to the offices of
Matt Mokwa and asked Mr. Mokwa to arrange for a court reporter to take a
video statement from Amodeo so Amodeo could memorialize the events and
have a recording of Amodeo's demeanor contemporaneously completed.
(Appendix 2).

Slaughter and Phillips visited Amodeo and told Amodeo not to worry;
this plea agreement would not actually be used. They said Gold needed the
plea agreement to circumvent the dual approval process in Washington, DC.
This process was what gave Gold authority to prosecute.

Amodeo said this was good because as soon as Amodeo gets in court,
Amodeo intends to tell the judge and the media everything about this
process, including the agents not wanting exculpatory evidence on the other
targets.

Slaughter said to "settle down" that it would "work out" like
Slaughter had predicted. Slaughter reminded Amodeo, Slaughter's other
predictions had been right. Slaughter reaffirmed two years was worst case
and that was less time than a trial would take.

Also, Amodeo would not have to lie to the court, the facts would be
reworked. Finally, Slaughter asked Amodeo to remember the polygraph was
scheduled for next week and to be ready.

## Amodeo Passes the Polygraphs

Amodeo took the first polygraph examination. Slaughter went to
meet with the polygrapher alone and then came back in to see Amodeo.

Slaughter had an awful look on his face.  Slaughter told Amodeo, "You passed.  Nobody ever passes."

Slaughter then told the polygrapher there were more questions to be asked.  The polygrapher [vi] told Slaughter, "only four questions a day and preferably one test per day."

A plan was designed for a series of tests.  Amodeo took the test and much to the surprise of Slaughter, Amodeo passed all four examinations.

Slaughter wanted more tests but the polygrapher, former FBI, said no, we have done enough.  "I think we should go tell Randy (Gold) this man did not commit any crimes.  Maybe they should set up their own (government) polygraph tests."

## Amodeo Declared Incompetent

Slaughter had a different idea.  Slaughter told Amodeo, based on an email from Amodeo's wife, Amodeo should go see Jeffery Danzinger, MD again.  Also, Slaughter told Amodeo he should definitely take Amodeo's new medication (Seroquel) before going.  Slaughter had recently seen Amodeo on a full dose of the Seroquel.  Slaughter and Panoff were amazed at how quiet and compliant Amodeo became while on the medication (only a third of a dose that day).

At the meeting with Danzinger, Amodeo reiterated Amodeo's long standing belief that Amodeo would ultimately conquer the world and become Emperor of the Earth.  This was not the first time Danzinger had heard about the "Emperor" belief; actually Amodeo had spoken of it on every occasion Amodeo had met with Danzinger (Amodeo actually was never shy about this belief, Amodeo regularly told everyone and all the executives and staff at Mirabilis, Amodeo's goal was to control the world and make obsolete all existing governments).

Danzinger, however, had a different response this time. Danzinger after speaking with Slaughter, decided Amodeo was too insane to take care of himself. Slaughter suggested it would be appropriate to commence a competency hearing and get a guardian appointed.

Slaughter initially tried to get Amodeo's wife, and then Amodeo's father to petition the court. Both refused.

Slaughter then arranged for a guardian, a petitioner and a judge to have the hearing. Next, Slaughter called Jim Luesner from the local newspaper and invited Luesner to attend. Slaughter had his staff member [and client] Andy Dinda drive Amodeo to court and make sure Amodeo took a full dose of Seroquel (Slaughter had seen that Amodeo was not only compliant with a full dose as opposed to a partial dose of Seroquel, but actually began to slobber, stagger and actually fall asleep).

Slaughter's old friend, Judge Perry, held the hearing in a conference room as opposed to open court. Amodeo sat, slobbering, without talking. Judge Perry ruled Amodeo incompetent and appointed Harvey Morre, Ph.D. as the temporary plenary guardian and told Slaughter that Amodeo would need to be evaluated by a panel of psychologists to confirm the incompetency.

Slaughter and Danzinger facilitated the evaluations. Slaughter had Dinda drive Amodeo and ensure Amodeo took a full dose of Seroquel before the first appointment. Dinda also confirmed Amodeo took the Seroquel before the second evaluation which took place at Amodeo's townhouse. Both psychologists (one was also a psychiatrist) determined Amodeo was completely incompetent and should not be allowed to make decisions. Even decisions such as where to live, what type of medical treatment to receive and who to visit.

As soon as Slaughter heard the news, Slaughter told Amodeo, "That's it for the plea agreement. I think Randy will have to tear it up."

Amodeo, on the non Seroquel days, continued winding up Amodeo's business affairs. Expecting a long fight with both the bipolar disease and the government (trial estimated at eight months with ten months preparation).

Next, Slaughter told Amodeo to go and get a full in-patient treatment at a mental health hospital. Danzinger recommended Amodeo go to McLean in Boston, Massachusetts. McLean is affiliated with Harvard University and Massachusetts General Hospital. McLean is recognized as the leading mental health facility in the world.

Danzinger and Jeffery Krotenberg, DDO - Amodeo's treating psychiatrist – pulled some strings and Amodeo was admitted in early August.

While at McLean, the United States indicted Amodeo; the United States agreed to allow Amodeo to continue the in-patient evaluation and then return to Orlando and submit to arrest upon completion of the program.

### The Carrot & Stick Plan To Get Amodeo's Plea Bargain

During the stay at McLean, Slaughter introduced Amodeo to Kenton Sands, Esq. Slaughter said that because he (Slaughter) could not take any more fees, because of the SUNZ [vii] Insurance issue, and because Amodeo did not seem to get along very well with Phillips. Slaughter felt it appropriate to bring in another attorney.

Slaughter, Sands and Phillips flew to Boston to visit Amodeo and told Amodeo it would cost another 1.2 to 1.5 million dollars to try the case. The money must not come from Amodeo because the government would seize the money as soon as Amodeo paid the fees to the attorneys.

If Amodeo did not have someone else who could put up the fees, then maybe Amodeo would like to revisit the plea agreement. Amodeo had provided so much substantial assistance, Amodeo would not be looking at an insurmountable sentence.

On a telephone call, Sands was asked by Slaughter to compute the sentence assuming Amodeo only received the four level reduction Gold had the authority to grant. Sands calculated the worst case sentence at 144 months with a 4-level reduction.

Slaughter pointed out this did not include: any credit for the money collected, any additional downward departure the judge might give or could result if the Tampa letter came through, did not include three levels for acceptance of responsibility; and did not factor in any mitigation because of the role played by the professionals or the diminished capacity. With all of these factors Slaughter foresaw two years possibly probation.

Amodeo said ok, but Amodeo still could not agree to admit to the false factual statement. Also, Amodeo would insist upon a full hearing at sentencing where Amodeo could tell Amodeo's story, showing that Amodeo lacked any unlawful intent or evil motive.

Slaughter said this should not be a problem; that Amodeo could plea guilty without mentioning intent and further sentencing would take several weeks of court time and the court dates would be spread out over months, so Amodeo could get a full hearing and create a comprehensive record.

Amodeo returned to Orlando and made an initial appearance and entered a not guilty plea.

Slaughter told Gold a plea agreement was in the making but Slaughter would only enter a limited appearance because if Amodeo did not plea – Slaughter did not want to be stuck in the case.

Throughout the month of September a battle waged between the government and the defense over the plea language.

Although Amodeo was wilting under the pressure from Amodeo's own counsel to enter a plea, Amodeo flatly refused to admit intentional wrongdoing or knowing participation in a conspiracy.

### Slaughter And Gold Misinform Amodeo About The Facts

Ultimately, Amodeo agreed to plea to being reckless because Amodeo should have read the memorandum prepared by the Berman law firm in February of 2006. According to Amodeo's attorney if Amodeo had read the memorandum, Amodeo would have been made aware of the law against deferring payroll taxes and of Amodeo's duty to ensure payment of the taxes. Even though Amodeo was not a shareholder, director, officer, bank account signer, check signer, manager, employee or consultant of the company collecting the tax.

Amodeo agreed it was reckless to not read the memorandum even if Amodeo's disease made such a task physically impossible.[viii]

Again, according to Amodeo's attorney recklessness was the equivalent of willful blindness, and willful blindness was the same as specific intent.

Therefore if Amodeo would plead guilty to being reckless in not reading the memorandum, he (Slaughter) and Gold could slip the plea by the magistrate and Amodeo would get the benefit of all the time and money spent on the substantial assistance to date.

In addition, Amodeo would stay out of prison for many months and get a chance to provide even more assistance. In this way Amodeo would get closer to Herb Hoelter's estimate of a fifteen level reduction.

Amodeo acquiesced. The next hurdle was Amodeo's insistence that no fraud had been committed.

Slaughter told Amodeo the problem with not being able to plea to some kind of fraud was because of what Phillips had pointed out earlier: no forfeiture exists for violation of §7202.

Therefore something had to be concocted to permit a plea of guilty which permits forfeiture.

Amodeo said no, I never – never had any intent to defraud, I cannot plea; then Slaughter came up with an idea. Slaughter pointed out that Amodeo had known it was illegal from sometime in early December, 2006.

After that date, Amodeo did not approve a transfer of funds to cover net paychecks and healthcare claims of the employees – Amodeo said yes. Slaughter said that should be enough for the wire fraud charge.

Slaughter told Amodeo all that was needed was the wire transfer, it was irrelevant that the transfer occurred in 2007 or that the company which made the transfer paid the related taxes soon after the wire was completed or that Amodeo had no legal authority to authorize or stop the transfer. It still counted as wire fraud (as wire fraud only required the actus reas not mens rea).

Amodeo now realizes neither the factual statement in the plea nor the charges alleged in the indictment cover the time period of the admitted wire transfer.

Finally, the government told Amodeo's counsel the plea had to provide some cover for the IRS's ineptitude.

Amodeo said the only activity which remotely "smacked" of misleading the IRS would have been the advice rendered by Eddie Curry,

Esq. and Hans Beyer, Esq. at the break in between the two sessions of the "Mock Deposition".

Curry and Beyer told Amodeo, the story has to be presented chronologically otherwise the IRS may interpret the events as if "we planned them". As opposed to the reality where each event was an "ad hoc" response to the "crisis de jure".

Amodeo agreed to change the presentation during the second session of the "Mock Deposition". Amodeo told Myers and Khanokar to use the chronological presentation with the IRS in the future.

This was the factual basis in the plea for the interference with agency charge.

Interestingly enough the government has confirmed, neither Myers or Khanokar ever had an opportunity to present the story to the IRS.

Further, Amodeo is now convinced having thoroughly reviewed the audio/video recordings after the plea agreement that Curry and Beyer's were correct. Presenting the story chronologically provides a more accurate understanding of the events.

Amodeo agreed to plea guilty, the facts as described above, because Amodeo's attorney told Amodeo intent was not required to commit obstruction of an agency and it did not matter whether the accountants had actually told the IRS the chronological story.

Amodeo is now aware from Amodeo's post-incarceration research; this was not an accurate recital of the elements of the crime necessary for a conviction. If Amodeo had known the real elements then no plea would have been entered.[ix]

Even more ironic is the willful blindness plea to the three §7202 charges. Remember, Amodeo pled guilty because Amodeo was reckless in not reading the memorandum.

It appears that neither Slaughter, Gold, any of the agents or Amodeo's defense team bothered to read the memorandum either.

Because when Kenton Sands, eight months after the plea was entered, read the memorandum; Sands discovered the memorandum did not reference any duty which would apply to anyone in Amodeo's status; nor did the memorandum state the tax deferment strategy was illegal.

Further, a careful reading of the memorandum revealed the memorandum implied the conduct was completely legal.

The memorandum stated that it was only illegal to defer payroll taxes if the IRS had provided notice pursuant to section §7515 requiring the collected funds to be segregated.

Obviously, it was not reckless for Amodeo to have not read the memorandum. If Amodeo had read the memorandum, the memo would have simply confirmed the conduct was legitimate.

In some sense this is not surprising since Berman's firm wrote the memorandum. Berman's firm represented Presidion, AQMI Strategy Corporation, AEM, Inc, PBS, Amodeo individually, and many of the other persons involved in these transactions.

Berman became a director, officer and general counsel of the principal investment company. This company, Mirabilis, was the sole owner of the company which actually collected and failed to remit the taxes.

Berman's trust account was used to manage tens of millions of dollars of the unpaid taxes.

Berman nor the attorneys in Berman's firm would have taken these actions – risks – if Berman's memo had identified the activity as criminal.

It was not reckless for Amodeo to not read the memo. The memo did not state what Slaughter and Gold claimed the memo stated.

Amodeo admitted to facts in the plea agreement which were not a crime.

## Amodeo Is Medicated

The plea agreement was signed the day of the change of plea hearing. Amodeo's disease was raging; Amodeo could not read the agreement.

Slaughter was worried Amodeo might "spout off" and cause the magistrate to reject the plea.

Slaughter told Amodeo to take, and made sure Amodeo took, a partial dose of Seroquel in order to insure Amodeo was controlled at the hearing; explicitly so Amodeo would not deviate from the script.

Slaughter emphasized if Amodeo messed up the plea by talking about intent, Amodeo would be stuck with a third-rate appointed attorney, would lose the tremendous benefits of acceptance of responsibility and substantial assistance and the trial would take several years; i.e. the trial would be longer than the sentence on the plea.

Amodeo having taken a full dose of Depakote (3000 mg/150% maximum recommended dosage), a full dose of Geodon, and a half dose of Seroquel and a full dose of Labetol was able to maintain the charade during the plea colloquy; never explaining to the judge what the admitted facts meant.

Slaughter told Amodeo it was a great performance and not to worry at sentencing the whole story would be revealed. The district court judge might even dismiss the counts once the polygraphs and recordings were

disclosed, but under any circumstances the substantial assistance benefits were preserved.

Further, Slaughter said the government would start aggressively pursuing the real culprits. Since Amodeo had pled, the culprits would no longer be able to use their willingness to testify against Amodeo to shield themselves from the government.

## Pretense Continues

Over the next seven months, Amodeo continued to assist the government. Amodeo reviewed the recordings and provided both snippets and an index of the recordings to the government.

Amodeo disposed of assets and paid the funds over to the IRS. When the government did not have the budget to transcribe the undercover tapes, Amodeo paid for the transcription. Amodeo met on several occasions with the agents about this case as well as other cases involving the PEO industry.

On one of those occasions, Sands told the agents not to "blame me (Sands)" about some delay. Sands was mostly acting pro-bono, others (Slaughter, Panoff, and Phillips) had gotten their fees and it seemed only he (Sands) was working the cases. The agents acknowledged this as fact. The agents further said they were upset with the amount and source of the fees the other defense attorneys had been paid.

A dispute occurred at this meeting because the agents said Amodeo was back-sliding on Amodeo's admissions. Sands corrected the agents, telling the agents, the agreement was Amodeo would be allowed to present Amodeo's view of the case at sentencing in its entirety.

The agents contacted Gold who confirmed this condition to the plea agreement and reminded the agents of a prior conversation. In the conversation the agents were told to take it easy, the plea was on both shaky

ground and a slippery-slope. If Amodeo was pushed too hard, Amodeo would go over the edge and this case could go on for a decade.

During this time, because of the abandonment of the case by Slaughter, Panoff and Phillips, Sands went about preparing a "position paper" i.e. Statement of Facts, (referred to as Stipulated Statement of Facts in the endnotes).

In the process of preparing the "position paper", Sands took time to read the memorandum and discovered Amodeo had been misinformed about the contents of the memorandum.

Sands also began to get nervous when Sands discovered that Slaughter told Amodeo to get twenty or thirty subpoenas to be served on prospective witnesses for the sentencing hearing.

Sands nervousness first arose because Amodeo was being asked to serve Amodeo's own subpoenas and second because Amodeo believed that thirty witnesses would present testimony at sentencing.

In addition, Sands was concerned because the government had not yet filed a substantial assistance motion and the probation office was claiming the acceptance of responsibility was to be taken off the hypothetical guideline sentence not the statutory cap.

Amodeo pointed out to Sands the deal was Amodeo would plea to the "make believe charges" supported by the "multi meaning" facts based on some very specific promises:

1) Reduction in time for all money recovered,

2) Minimum 4 level substantial assistance reduction and open-ended opportunity to argue for more,

3) 3 level acceptance of responsibility downward departure; and

4)    The opportunity to present the entire case at sentencing.

If any of these were missing then there was no deal, Amodeo would simply go tell the truth regardless of the consequences.

Sands said Sands understood this but Sands was not counsel at the time of the agreement.

Sands did confirm all the defense counsels agreed the case was such a close call that except for the substantial assistance and acceptance of responsibility it would not make any sense to plea.

On the eve of the sentencing the government informed Sands that no motion regarding substantial assistance would be filed, the acceptance of responsibility would be opposed and Slaughter had an actual conflict of interest. The government did not wish to proceed unless Amodeo agreed to waive the conflict of interest.

### Amodeo Was Deprived of Unconflicted Counsel

Amodeo never agreed to waive the conflict. Amodeo requested the Court permit Amodeo time to get an attorney to advise Amodeo on the conflict. The Court said no.

The Court asked Sands if Sands could advise Amodeo on the conflict or represent Amodeo at sentencing. Sands said he was not properly prepared to represent Amodeo at sentencing. Sands told the Court he (Sands) would have a conflict advising Amodeo about Slaughter's conflict and the implications of the conflict or Amodeo waiving the conflict.

The Court ordered the proceeding to commence without Amodeo waiving the conflict.

Contrary to the promises made to Amodeo regarding presenting Amodeo's case at trial or the time available to properly prepare during the sentencing hearing dates. Sentencing did not take weeks, spaced out over

months, (if it had the videos would have been converted to the court's technology format), [sentencing actually took three and one half days spread out over 10 days] nor did Amodeo get an opportunity to present Amodeo's entire case.

## Plea Agreement Is Breached, Amodeo Wants Plea Withdrawn

Amodeo told Amodeo's attorneys to announce the breach of the plea agreement and withdraw the plea.

Sands and Slaughter told Amodeo to at least wait until the sentencing hearing was over before doing this: "we might as well see what happens."

Several issues arose at sentencing, the judge commented on how he was observing Amodeo's behavior. Particularly, Amodeo's control of the defense attorneys.

After this Slaughter told Sands and Amodeo again how the magistrate's order requiring Amodeo to be medicated was hurting the case.

This because Judge Antoon was seeing Amodeo substantially controlled by the medication; therefore could not properly appreciate how the disease unchecked impacted the offense conduct; i.e., the judge would dramatically underestimate Amodeo's diminished capacity during the offense conduct time period.

The Court also "warned" Amodeo and Amodeo's attorneys about how much control Amodeo was asserting over the proceedings. This fueled the defense attorneys' concern about withdrawing the plea.

Sands however did object that the governments' failure to grant a true three level reduction was a breach of the plea agreement. Sands pointed out the consideration was illusory since the downward departure was not received in full and what was received had no impact on the sentence.

The government turned over Jencks material and it turns out the witnesses all confirmed that when issues concerning the taxes were being discussed, at least one and usually more than one attorney or certified accountant, was present.

None of these professionals advised the conduct was illegal; none refused payment or terminated their employment, because the client was involved in continuing criminal activity and most became officers and directors of the various businesses, benefiting from the conduct or performing the purportedly illegal conduct.

Other witnesses having subsequently told Amodeo and others that everyone told the government the same thing, but did not reveal this to Amodeo or others because they were threatened with criminal prosecution.

Amodeo attempted to introduce a considerable amount of audio/video recording evidence at sentencing. Between Amodeo's counsels fear of antagonizing the Court, the Court's own comments and the incompatible audio/visual equipment at the court house, these presentations were minimized to only a couple of hours viewed and about twelve entered into the record.

If the Court would have reviewed a significant portion of the tapes, the impact of Amodeo's disorder and the role the professionals played would have become apparent.

Most significantly, the Court did not permit the playing of an undercover tape where Dr. Robert Pollack recounts being present on two different occasions, once in the summer of 2005 when tax determent strategy was beginning and once in December of 2005 when phase one was ending and phase two was being planned.

Pollack states that on both these occasions Amodeo described the plan. Pollack confirms the attorneys stated the plan was "perfectly" legal. Pollack then proceeds to identify some of the accountants and attorneys present.

Because of faulty courthouse equipment and Amodeo's attorneys dread of having the plea vacated thus being required to go to trial without further remuneration[x], this evidence was not introduced.

Evidence which bears initially on Amodeo's intent then on Amodeo's good faith reliance on professional advice[xi] and finally upon the level of mitigation based on the roles of the professionals.

Amodeo's counsel advised Amodeo not to file the motion to cancel the plea because the clear indication was the judge understood Amodeo was ill. Amodeo's attorneys' said wait until sentencing is concluded; then you can file, it does not hurt to see what the judge has on his mind.

Amodeo prepared a motion to cancel the plea and filed it anyway.

The government responded to the motion, but Sands had filed a notice of appeal based upon the original judgment and government's breach of the plea agreement.

Amodeo in the meantime was sent to the Orange County Jail.

Orange County Jail determined Amodeo needed to be in the Acute Mental Health Unit, solely based upon the quantity of medication Amodeo was taking. An amount which was less than two thirds of what Amodeo was taking at the time of the plea hearings. (HMHU made this decision and did not even factor in the Seroquel).

Acute Mental Health is a special facility where the inmate is not permitted to leave the cell, is forbidden from using the telephone even to call his attorney and is watched twenty-four hours per day because of his mental

condition.  No reading materials, no writing materials, no cups, etc …
complete isolation.

After being in Acute Mental Health for three days, Sands and
Slaughter arrived telling Amodeo they needed to withdraw because they
were going to be witnesses.

Amodeo did not realize at the time the irony of this in Slaughter's
case.  Slaughter was going to be a witness from day one.  Only by making
Amodeo enter a plea could Slaughter hope to avoid the conflict, of Slaughter
being a witness to the purported crime, becoming and issue.

If the conflict had became an issue, Slaughter and Slaughter's
colleagues multimillion dollar civil and criminal fees would be at risk.[xii]

Amodeo said Amodeo could not be without counsel especially being
incarcerated.  Sands and Slaughter said no problem, the Court would appoint
an attorney.

And it did not matter about Amodeo's pending motion because as
soon as Sand's filed the notice of appeal the District Court lost jurisdiction
of the case.

### Amodeo Totally Deprived Of Counsel

The Court permitted Sands and Slaughter to withdraw.  Appointed the
well-intentioned but resourceless Thomas Dale to represent Amodeo on the
appeal.

Dale visited Amodeo at Orange County Jail and told Amodeo that he
(Dale) was appointed solely for the purpose of the direct appeal.

Amodeo was moved to the Federal pod at Orange County Jail, then to
the Coleman Federal Correction Complex.

Dale's budget authorization did not even permit Dale to come and discuss the case with Amodeo at Coleman prison located 40 miles from Dale's office.

It was impossible for Dale to have done anything near an adequate review of one of the most complex cases ever on Dale's restricted budget.

Dale did appear at a status conference in the case of the United States v AEM, Inc. et al on or about August 29, 2009; case number 6:08-cr-231-Orl-28KRS.

Dale wanted again to bring to the Court's attention that Amodeo was declared incompetent by the State of Florida and that in Dale's opinion Amodeo's continuing behavior raised serious issues about Amodeo's grasp on reality.

## Motion To Cancel Plea Is Denied

Amodeo was eventually returned to Coleman Federal Correction Complex – Low on or about October 7, 2009. Amodeo was shocked by the sudden denial of the motion to cancel plea by the District Court which had supposedly been divested of jurisdiction.

The order was signed September 27, 2009. In order to not miss the ten day time limit, Amodeo that day filed both a motion for reconsideration which remains pending at the District Court (Court has now denied the motion based exclusively on lack of jurisdiction) and the notice of appeal which commenced this proceeding.

Amodeo remains without counsel at both the District Court level and in this appeal.

## SUMMARY OF ARGUMENT

Amodeo argues Amodeo is actually innocent of the crimes of which Amodeo has been charged and to those which Amodeo pled guilty.

The meaning Amodeo ascribed to the factual statement in the plea was different than the meaning conveyed to the Court and as such no factual predicate exists for the plea.

The cause of this conduct is a convergence of factors including Amodeo's mental illness, the conflicts of interest of Amodeo's attorneys and imperatives of the Internal Revenue Service.

This combination of factors resulted in Amodeo entering a plea; even though: (1) Amodeo was actually and legally incompetent; (2) the plea agreement was not a valid contract having been induced by unfulfilled promises of the government; and because the plea agreement lacked the essential elements necessary for an enforceable contract; (3) Amodeo lacked effective assistance of counsel; (4) Amodeo did not understand the charges against Amodeo or the consequences of the guilty plea, and (5) the Court deprived Amodeo of counsel at critical stages in the criminal proceeding as well as (6) forcibly medicating Amodeo to the disadvantage of Amodeo's defense.

## **ARGUMENT**

## **Introduction (A); Actual Innocence**

Amodeo asserts Amodeo's actual innocence from all the charges in the indictment. Each and every charge of the indictment includes an element of, at least, specific intent and the tax counts include subjective intent.

In order to commit a tax crime, you must subjectively be aware of the law and know you are breaking it. *Cheek v. United States,* 492 U.S. 192 (1991); *Bryan v. United States,* 524 U.S. 184, 118 S. Ct. 1939, 141 L. Ed. 2d 197 (1988).

This case is simply about unpaid taxes. The Government became aware that the evidence, (including statements from dozens of people and hundreds of hours of recordings) indicated at least Amodeo, and possibly everyone[xiii] was, operating under a mistake of law, mistake of fact or in reliance upon the Internal Revenue Service's actions. The Government had to try to convert the case into a wire fraud case.

This because the Government had no authority to forfeit assets for a violation of 26 U.S.C. §7202[xiv]; therefore to ensure the United States Attorney's Office instead of the Internal Revenue Service got credit for recovering and thus control over the millions of dollars, the USAO had to concoct an extra crime which permitted forfeiture.

As a salve to the Internal Revenue Service, the USAO promised to get some conviction which would provide a plausible excuse for the Internal Revenue Service's embarrassing conduct of allowing the tax liability to reach such astronomical levels over two years.[xv] This also helped cover up the statements credited to Special Agent Patterson, an IRS agent, assigned to the Michigan Organized Crime Strike Force.

Mr. Patterson told the general counsel of the taxpayers, Presidion Solutions, Inc. I through VII, not to worry; that the nonpayment of taxes was a civil matter not a criminal matter.[xvi]

The case is replete with such representations from the IRS. Agent Pace McNealy of the IRS told Amodeo's CPA and Power of Attorney that he and the IRS were surprised when Amodeo chose to pay hundreds of thousands of dollars on behalf of certain corporate taxpayers. The reason for the surprise was since Amodeo did not get a direct personal benefit from the taxes, the IRS had determined Amodeo was not personally responsible.[xvii]

Hundreds of communications between the IRS and Amodeo's or the taxpayer's accountants or attorneys were consistent with foregoing expressions of the IRS.[xviii]

In order to placate the IRS, the USAO needed to give the IRS something - thus the manufactured charge of interference with an agency. Gold complained on several occasions Gold was refereeing a feud about who got credit for the money.

Ultimately, the USAO realized this was at best a tax case, if not just a cascade of mistakes, and that the USAO would need both a plea and some contrived charges to seize assets and placate the badly embarrassed IRS.

A tax crime requires specific intent and subjective knowledge of the law being violated. *Cheek v. United States,* 492 U.S. 192 (1991).

The fraud and interference crimes set forth in the indictment require knowledge of the fraud or schemes, the intentional and voluntary participation in the facilitation the schemes. In particular, the fraud requires obtaining money or property of another through a scheme or artifice involving false promises, premises or representations.

Amodeo never attempted or admitted to any such conduct. Amodeo was told Amodeo was liable for the acts of others and the conspiracy charge required no intent.[xix]

Amodeo willingly submitted to four separate polygraph examinations. Each examination was designed to determine if Amodeo had any fraudulent intent or engaged in any fraudulent conduct. Amodeo passed all four examinations. The examinations were conducted by Richard Kiefer, the former Senior Polygrapher for the FBI.[xx] (See polygraph results and Kiefer's qualification in Addendum F to Amodeo's affidavit of October 14, 2009.)

The undercover tapes produced evidence of the lawyers being informed of the unpaid taxes[xxi] and the use of the funds. As well as affirmatively telling Amodeo the conduct was legal[xxii] (Pollack undercover tape at or near minute 7 regarding August 2005 advice and then again at what Amodeo remembers as minute 17 regarding the extensive discussion with outside and inside counsel in December 2005.).

The February 6, 2006 legal memorandum from Berman, Keane and Riguere indicated the conduct was legal absent prior notice from the IRS to cease the activity and segregate the funds.[xxiii]

Copy of the interview notes of the Presidion general counsel, where Edith Curry, the initial attorney involved in the matter, reiterated in October 2005, it is not illegal to not pay the taxes, it just creates civil liability.[xxiv]

The April 18, 2006 Chairman's (Laurie Holtz, CPA, one of the world's leading forensic accountants) meeting where the senior executives of Mirabilis Ventures openly discussed the $144,000,000 in payroll tax liability including certain penalties and interest (see video recording entered in part into the record and available in total upon request).[xxv]

The statement of Tom Sadaka, of Berger and Singerman formerly state-wide prosecutor for the State of Florida and RICO expert, where Sadaka doing a risk review for the security subsidiary analyzed all interactions including the Presidion transactions and determined no illegality or similar risks.[xxvi]

The town hall meeting attended by approximately 50 professionals, including accountants, human resource experts, etc. is known as the 'Mock Deposition' which was professionally video taped and transcribed by a court reporter.[xxvii]

Amodeo described in detail the planned and use of funds.[xxviii] (See page 86 &87 of the transcript for one of the more explicit discussions.)

None of the attorneys present, including Amodeo's lead criminal defense counsel raised concerns about the purportedly illegal (and continuing) conduct. Further, each avidly supported marketing the strategy as a marketing tool to get more cases.

This included creating a production grade video to support plans for a marketing presentation to be handled not by Amodeo, but by Mark Middleton and Sharmilla Khanokar, CPA.

All of the foregoing examples are evidence of why any person, let alone a bipolar like Amodeo, would believe the tax deferment strategy and related conduct lawful.

Specific intent is an element of each of the charges alleged in the indictment. The tax charges which are the true essence of the case have an even higher standard of subject belief as applied to specific intent. Criminal intent is an essential element of criminal liability. *Morisette v. United States,* 342 U.S. 246, (1952); Conspiracy Crimes require 'knowing and voluntary' participation. *United States v. Andrews,* 953 F. 2d 1312 (11th Cir. 1992);

Conspiracy crimes all have an element of specific intents. *United States v. Ettinger,* 344 F. 3d 1149 (11th Cir. 2003); *United States v. Jenkins,* 779 F. 2d 606 (11th Cir. 1986); *United States v. Davis,* 583 F. 2d 190 (5th Cir. 1978).

The Government has the burden of proving this beyond a reasonable doubt.

The polygraphs and circumstantial evidence indicates Amodeo lacked specific intent and subjectively believed Amodeo's conduct as well as the conduct of Amodeo's colleagues was legal.

Further, Amodeo relied upon the advice of counsel and the accountants (equivalent of counsel with regard to tax matters). This reliance is an absolute defense to the charges in the indictment. *United States v. Eisentien,* 731 F. 2d 1540 (11th Cir. 1984); *United States v. Condon,* 132 F. 3d 653 (11th Cir. 1998); Even failure to give a jury instruction on good faith reliance is error. *United States v. Goss,* 650 F. 2d 1336 (5th Cir. 1981); *United States v. Williams,* 728 F. 2d 1402 (11th Cir. 1984).

Alternatively, the attorney's advice and Amodeo's own bankruptcy experience resulted in Amodeo operating under a mistake of law. Mistake of law is also an absolute defense to the charges in the indictment. *United States v. Green,* 296 Fed. Appx. 820 (11th Cir. Nov. 25, 2008); *United States v. Jacoby,* 955 F. 2d 1527 (11th Cir. 1998); *United States v. Metz,* 608 F. 2d 147 (5th Cir. 1979); *United States v. Ansaldi,* 372 F. 2d 118 (2nd Cir. 2004); *United States v. Fuller,* 162 F. 3d 256 (3rd Cir. 1998).

Amodeo also has available the defense of 'entrapment by estoppel' because of the statements of Special Agent Patterson, FBI Agent Sputo and the Fort Lauderdale AUSA (not previously described), IRS Officer McNealy and the actions of the IRS Collection Officer Judy Berkowitz, the IRS

Plantation Florida Office and the statements of IRS District Counsel Jon Lordi. Lordi told Amodeo the matter was civil and not criminal.[xxix] Sputo and Fort Lauderdale AUSA told Craig Vanderburg not to worry about the tax issue because payments were being made.[xxx]

The representations of the Government's agents was sufficient to allay any concerns of all involved; especially Amodeo, the bipolar-manic. And was interpreted not only as authorization but encouragement of the conduct.

Entrapment by estoppel excuses the accused's conduct. The doctrine focuses on the actions of the Government officials not on the defendant's predisposition. *United States v. Hedges*, 912 F. 2d 1397 (11th Cir. 1990); *United States v. Funches*, 135 F. 3d 1405 (11th Cir. 1998); *United States v. Johnson E.*, 139 F. 3d 1359 (11th Cir. 1998); *United States v. Faton*, 179 F. 3d 1328 (11th Cir. 1999); *Cox v. Louisiana*, 379 U.S. 559 (1965).

Amodeo lacked the essential intent elements for any of the indicted crimes. The charging of anything but the tax charges was an improper contrivance of the U.S. Attorney's Office. Amodeo had available the defenses of mistake of law, reliance on advice of counsel and entrapment by estoppel, any of which results in a determination of not guilty and actual innocence on all counts in the indictment.

## Introduction (B); Actual Innocence of the Charges in Plea Agreement

The question of how a person can be innocent and still plea guilty is obvious. Amodeo admitted under oath certain facts. The United States and the defense counsel both new the facts had different meanings to each side. As long as the Court did not know what Amodeo thought the words meant, the Court would accept the statements as a factual predicate for the plea.

If the Court had known the truth the plea would have been rejected.

If Amodeo had not been medicated Amodeo would have disclosed the truth.

The Courts were suspicious as it was based on certain inquiries the judge's made during the proceedings.[xxxi]

A trial court cannot accept a guilty plea unless there is a sufficient factual basis for the plea. _United States v. Gobert_, 139 F.3d 436 (5th Cir. 1998); _United States v. Johnson R._, 194 F.3d 657 (5th Cir. 1999). A denial of a critical element of the charge has the consequence that a guilty plea cannot be accepted. _McCarthy v. United States_, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969).

In order for a plea to be accepted and not be void because of lack of a factual basis; the defendant must possess an understanding of the law in relation to the facts. _United States v. Guichard_, 779 F.2d 1139 (5th Cir. 1986); _United States v. Palmer_, 456 F.3d 484 (5th Cir. 2006).

Amodeo agreed to plea guilty to a very specific set of facts. The statement of facts was specifically crafted by counsel for Amodeo and the AUSA in order to keep Amodeo from having to expressly admit specific or subjective intent.

The facts were also crafted so that Amodeo knew the facts to mean one thing, but so the Government would be able to present the facts to the Court in such a way as to mask the true meaning from the Court.

Amodeo was prepared by counsel after taking the Seroquel to insure Amodeo did not stray from the path during the colloquy.[xxxii]

Amodeo was assured that during the 'several weeks' of the sentencing hearing; Amodeo would get a chance to clarify the meaning of the facts to the Court and for the record.

Amodeo was told Amodeo was pleading guilty to having <u>recklessly</u> <u>failed to read the memorandum</u> of the Berman law firm dated February 2006.

This was because the Berman memo, according to Amodeo's lead defense counsel and the U.S. Attorney, would have informed Amodeo of the illegality of the tax deferment strategy and that Amodeo personally had the duty to ensure payment of taxes.

Apparently, like Amodeo, neither AUSA Gold nor Mr. Slaughter (lead counsel) had ever read the memo. Approximately, seven months after the change of plea hearing, Kenton Sands, Esq. actually read the memo [seems Sands is the first person to do so in April 2009 - three years and two months after the memo was actually completed].

The memo did not identify the conduct as illegal[xxxiii]; the memo actually indicated the conduct was legal. Further, the memo made no mention of any duty Amodeo or someone in Amodeo's status would have to ensure the payroll taxes were paid.[xxxiv]

Amodeo plead guilty to nothing because the contents of the memo were not what Amodeo was told.[xxxv]

In other words, Amodeo was led to believe that Amodeo could be considered willfully blind because Amodeo was reckless in not reading the memo.

Had Amodeo read the memo, it would not have told Amodeo that Amodeo had a duty and would have told Amodeo the conduct was legal.

This reading is consistent with the actions of Richard Berman, Esq., whose firm authored the memorandum.

Richard Berman did not tell Amodeo or the corporations (who Berman separately represented) to cease this action or else Berman (and his

firm) would be required to withdraw, because ethically they could not represent a client in a continuing crime.

Instead, Berman became the full-time general counsel of Mirabilis Ventures, Inc. and Berman was also a director of Mirabilis. Mirabilis owned the company actually collecting the taxes and not remitting the taxes to the IRS. Berman's law firm represented not only Amodeo, but Amodeo's company AQMI Strategy Corporation, Presidion Solutions, Inc., Presidion Solutions VII, Inc. (Professional Benefits Solutions, Inc. -- one of nonpaying corporate taxpayers), AEM Inc. (the other nonpaying corporate taxpayers) and many other of the related entities.

Berman did not believe the activities to be illegal, nor did the Berman memo refer to the conduct as illegal. This is why Berman continued to represent Amodeo, the various entities, remained a director and officer of the companies, and permitted Berman's trust accounts to be used to transfer the monies.

Amodeo would not have pled guilty to the three section 7202 charges, had the memo been read before the plea because the memo did not identify a duty for someone in Amodeo's position and the memo indicated the strategy was legal.

This was the exact opposite of what Amodeo was lead to believe at the time of the plea – contrary to Amodeo's attorney and the AUSA's representations the memo supports Amodeo's claim of actual innocence.

As to the interference with an administrative agency, Amodeo agreed that Edie Curry[xxxvi], Esquire and Hans Beyer[xxxvii], Esquire approached Amodeo during the break of the town hall styled 'mock deposition'.[xxxviii]

Curry and Beyer told Amodeo that by not presenting the 'Presidion story' in a chronological order, someone may interpret the events as a

premeditated plan.[xxxix] Instead of a series of separate decisions reacting to the crisis de jure. Amodeo agreed to tell the accountants to present the story chronologically.

The accountants never presented the story to the IRS or anyone else, chronologically or otherwise.

Amodeo, once released from the drug induced stupor, asked counsel how this could be interference with an agency when the agency was never told.

Amodeo's attorney told Amodeo no requirement of specific intent was involved in either an interference or conspiracy case. Further, Amodeo was told it did not matter what Amodeo thought because some of his colleagues (conspirators) could have had intent to hamper the Internal Revenue Service. As addressed below these facts are insufficient to predicate a conviction.

First, the position formulated by Beyer and Curry was true and thus would not have misled the IRS but actually assisted the IRS in reaching the truth.

Second, absent some direct or indirect communication with the IRS, it is impossible that the advice could have hampered the investigation.

Third, the facts as applied to the law do not support the conclusions that a crime was committed. A defendant must be convicted on his own proven conduct, association is not enough. 'Mere association with conspirators or knowledge of illegal activity is not a crime. *United States v. To*, 144 F.3d 737 (11th Cir. 1998); *United States v. Gonzalez*, 921 F.2d 1530 (11th Cir. 1991); *United States v. Ellict*, 570 F.2d 880 (5th Cir. 1978). All conspiracy crimes must be knowingly and voluntarily entered into by the accused including knowledge of the underlying crime; all required specific intent. *United States v. Ettinger*, 344 F.3d 1149 (11th Cir. 2003); *United*

_States v. Andrews_, 953 F.2d 1312 (11th Cir. 1992); _United States v. Jenkins_, 779 F.2d 606 (11th Cir. 1986); _United States v. Davis_, 583 F.2d 190 (5th Cir. 1978). Amodeo never conveyed this (or any) misleading information to the IRS, therefore no factual basis exists for the conviction.

As to the wire fraud charge, Amodeo admitted to wiring money to cover net payroll checks and health care claims one time. This occurred after Slaughter had told Amodeo that the conduct was illegal (early December 2006) and Yaniv Amar had confirmed with Amodeo that 'Asklaw.com' had a criminal statue §7202 which dealt with the nonremittance, collection and accounting for a payroll taxes.

This wire to cover the net payroll cost did not occur until 2007. This after the time period of the conspiracy alleged in the indictment. These taxes for the period of the wire were paid shortly after the transfer.

This wire and tax obligation arose from AEM, Inc.'s ownership of the employee-leasing accounts in 2007.[xl] Amodeo and CID (Criminal Investigation Division of the IRS) worked together in 2007 to insure the taxes were paid during 2007.

In other words, Amodeo has plead guilty to a wire fraud charge for a wire which took place after the conduct to which Amodeo plead guilty.

The meaning of the facts as understood by Amodeo when applied to the law reveal that Amodeo is actually innocent. The facts do not support a guilty plea. Legal innocence is a reason to withdraw a plea. _United States v. Salgado-Ocamp_, 159 F.3d 469 (5th Cir. 1998); if statement of facts is insufficient, the Court cannot accept the plea. _United States v. Dukes_, 139 F.3d 469 (5th Cir. 1998); Court must reverse a conviction where the evidence is insufficient to convince a reasonable jury that a crime has been committed. _Jackson v. Gobert_, 117 F.3d 262 (5th Cir. 1997); _United States_

*v. Carr*, 740 F.2d 339 (5th Cir. 1984). It has been held that an appellate court will only uphold a conviction if there is substantial evidence from which a rational trier of fact would have to find all the essential elements beyond a reasonable doubt. *United States v. Alarcon*, 261 F.3d 416 (5th Cir. 2001); *United States v. Dean*, 59 F.3d 1479 (5th Cir. 1995).

Ambiguities in plea facts or agreements are to be determined in favor of the understanding of the defendant. Any ambiguity, including the facts in a plea agreement should be 'construed strictly against the Government in recognition of the Government's superior bargaining power'. *United States v. Aleman*, 286 F.3d 86 (2nd Cir. 2002); *United States v. Dudden*, 65 F.3d 1461 (9th Cir. 1995); *Rowe v. Griffin*, 676 F.2d 524 (11th Cir. 1982).

Amodeo and the Government did not agree on the facts which underlined the plea.[xli] Amodeo's beliefs differed significantly from those of the Government. Amodeo was led to believe these issues would be clarified at a full trial-like sentencing. The impression of guilt, as well as the facts being 'vaguely drafted'[xlii], was intentionally created by the prosecution, in order to hide the discrepancy in understanding from the Court, insuring the Court did not reject the plea.

There is no factual basis for the guilty plea and if a plea is without a factual basis it must be vacated. *United States v. Andrades*, 169 F.3d 131 (2nd Cir. 1999); Factual error is justification for vacating plea. *United States v. Guess*, 203 F.3d 1143 (9th. Cir. 2000).

According to Amodeo's understanding of the facts and application of those facts to the elements of the crime, no crime was committed. The plea agreement should be vacated.

## Effect Of State Court Judgment Of Incompetency

Amodeo was not legally competent to enter into a plea agreement at the time the plea agreement was executed.

Amodeo was not legally competent to change Amodeo's plea at the change of plea hearing.

Amodeo is indisputably bipolar with certain psychotic features. On or about May 18, 2009 Amodeo was declared incompetent by Judge Perry in the Circuit Court of Orange County.[xliii]

Amodeo's incompetency was affirmed by two licensed psychologists, one of whom was also a psychiatrist, appointed by the Circuit Court pursuant to Florida law.[xliv]

The determination of the Florida Court resulted in Amodeo being deprived of most of Amodeo's rights including Amodeo's right to contract.[xlv]

Amodeo could not enter into any agreement without the consent of the guardian and the prior approval of the Circuit Court. Florida Statute 95.051(1).

Amodeo's legal infirmity could not be removed until Amodeo was physically brought back before the Circuit Court to attend a hearing where the Court and the panel psychologists decided Amodeo was again competent.

At the time of the plea agreement and the change of plea hearing Amodeo had not been before the State Court, nor had the Florida Court lifted the legal infirmity or judgment of incompetency. The judgment of incompetency was binding upon the Federal Court, thus at the time of the plea agreement and change of plea Amodeo was incompetent.