An incompetent person cannot enter a plea of guilty. *Wheat v. United States*, 486 U.S. 153 (1988); *United States v. Day*, 949 F. 2d 973 (8th Cir. 1991); *Pierce v. United States*, 705 A. 2d 1086 (D.C. Cir. 1997).

Conviction of an incompetent violates due process whether by trial or plea. *Pate v. Robinson*, 383 U.S. 375 (1966); *Stinson v. Wainwright*, 710 F. 2d 743 (11th Cir. 1983); *Fallada v. Dugger*, 819 F. 2d 1564 (11th Cir. 1987); *United States v. Masher*, 538 F. 2d 721 (D.C. Cir. 1976).

The District Court was required to give full faith and credit to judgment of incompetency issued by the state court.

Pursuant to 28 U.S.C. §1738 the full faith and credit clause of the United States is made applicable to Federal Court.

Giving full faith and credit to State Court determination is as ancient a doctrine as any in American law. The ancestry of 28 U.S.C. §1738 can be traced to the Act of 1790 which gave to State Court judgments preclusive effect in Federal Courts.

The Supreme Court has upheld this doctrine for over 200 years. *Mills v. Duryee*, 11 U.S. 481, (1813); *D'Arcy v. Ketchum*, 52 U.S. 165, (1851); *Christmas v. Russell*, 72 U.S. 290, (1866); *Cooper v. Newell*, 173 U.S. 555 (1899). *American Surety Co. v. Baldwin*, 287 U.S. 156, (1932); *Durfle v. Duke*, 375 U.S. 106, (1963); *Kramer v. Chemical Construction Corp.*, 456 U.S. 461 (1982); *Demosthenes v. Baal*, 495 U.S. 731 (1990).

**Amodeo Was Actually Incompetent Not Just Legally Incompetent**

The Florida Court determination of incompetency was binding on the Federal Court and the United States; therefore Amodeo was legally incapable of signing a plea agreement or entering a guilty plea; therefore the plea should be cancelled.

Amodeo was legally incompetent and the district court was bound by this determination. In addition, Amodeo was actually incompetent.

Amodeo has a mental disease. The disease is biological.[xlvi] The existence of the disease is undisputed.[xlvii] Amodeo is an <u>axis 1</u> bipolar with psychotic features. This disease was a contributing factor to both the events resulting in the charges and the subsequent events which resulted in the plea agreement.[xlviii]

Amodeo's illness is particularly insidious, since the bipolar person is unable to recognize the illness when the symptoms are most pronounced.[xlix] In most cases, including Amodeo's, the bipolar will not only deny existence of the disease, but refuse medication or treatment.[l]

Bipolars, such as Amodeo, relish the manic high when in this state of mind, a manic does not foresee any consequences of his actions; nor believe any chance of failure exists.[li]

The manifestation of the disease in Amodeo's case has some particularly severe results because Amodeo's intelligence is not significantly impacted by the disease, except at the extreme of the mood-swings. As a result Amodeo is able to mask, from the casual observer, Amodeo's completely distorted sense of reality.

This masking ability has led to reinforcement of certain deeply ingrained delusions. Delusions which the McLean hospital psychiatrists believe are a mechanism to alleviate a chronic depression.[lii]

As a result of this chronic depression, Amodeo is often in a mixed state of manic-depressive condition. The condition is evident because of the rapid fluctuations or "cycling" between the manic or depressive states.[liii]

These mood swings are so pronounced even nonprofessionals can recognize the changes.[liv] The changes often occur within minutes.

These rapid mood swings are, in part, what account for the far above maximum dosage of Amodeo's prescribed medication.

Amodeo was prescribed a variety of medications including 3000 mg of Depakote, 100 mg of Geodon, and 600mg of Labetalol.

The Depakote was designed to help control the mood swings. The Geodon was supposed to break down Amodeo's resistance to therapeutic suggestions, in order to facilitate a change in Amodeo's belief system.

In other words, the Geodon would make Amodeo compliant and malleable - subject to suggestion.

This would assist therapist's breakdown, over an extended period of time of Amodeo's delusion of being destined to be <u>Emperor of Earth</u> and the attendant beliefs associated with this perceived destiny.

The unintended consequence of the medication was to make Amodeo susceptible to pressure and suggestion of Amodeo's attorneys.[lv]

Amodeo's attorneys were desperately trying to convince Amodeo to enter a plea bargain and forego Amodeo's adamant insistence on Amodeo's innocence.[lvi]

Geodon helped Amodeo's attorneys persuade Amodeo to enter the plea. However, even under the influence of Geodon, Amodeo would still "boil up" at the thought of admitting to having been so reckless as to constitute willful blindness or that Amodeo was a coconspirator with certain colleagues; and that the colleagues committed "intentional" crimes.

In order ensure Amodeo's cooperation, Amodeo's counsel insisted Amodeo take a full dose of medication on any day Amodeo interacted with the court and/or the government.

Amodeo's very freedom was at risk should Amodeo's attorneys tell the Court Amodeo was not compliant with the medication.[lvii]

Amodeo's attorneys insisted Amodeo take a dose of the medication Seroquel on the day the plea agreement was completed and on the day of the change of plea hearing.

This even though Amodeo's attorneys knew Amodeo was already taking 150% of the maximum dosage of Depakote, and 33% more than the level of Geodon prescribed for treatment. This was to ensure that Amodeo did not lose control and say something which would cause Judge Kelly to not recommend the plea be accepted.

On top of this Amodeo's blood pressure and allergy prescriptions had a sedating effect. Even with the combined sedating effect of the foregoing medication, Slaughter required Amodeo to take a Seroquel capsule.

Slaughter was aware that Seroquel was known to make Amodeo "zombie-like". Seroquel also made Amodeo completely controllable.

Seroquel is a very powerful antipsychotic drug. Amodeo had previously been prescribed Seroquel by Dr. Jeffery Krotenberg. At the original dosage prescribed, Amodeo would begin to slur words, drool at the mouth and suddenly fall asleep.[lviii]

Even a single capsule made Amodeo incapable of driving a car and/or using a computer. James Luesner, a newspaper reporter for the Orlando Sentinel, observed Amodeo on Seroquel during the state court incompetency hearing. Luesner could not believe how different Amodeo's behavior was at the hearing and how easily directed he was.

The level of medication Amodeo was forced to consume would eventually reach near toxic levels in Amodeo's blood stream, resulting in an emergency call from the reviewing psychiatrist to immediately cease the drugs and then reduce the consumption.[lix]

Amodeo, during the entire plea negotiation, was on the toxic level of prescribed drugs and on the relevant court dates this was augmented with Seroquel.

This combination resulted in Amodeo having an even greater distortion of Amodeo's perception of reality than during Amodeo's manic episodes.

Even worse the drugs magnified a weakness in Amodeo's character about avoiding conflicts which might burden other people. This character flaw resulted from Amodeo's belief Amodeo was superhuman having been destined by God to be Emperor. This belief in destiny was such that Amodeo believed Amodeo could handle anything; no matter how difficult a situation Amodeo would always prevail. A genuine good guy, Amodeo never wished to burden others including Amodeo's attorneys, thus agreeing to plea might make the attorneys' life easier.[lx]

The exacerbation of the flaw caused by the suggestive effects of the drugs resulted in Amodeo's acquiescence to entering a guilty plea, even against Amodeo's ardent belief in Amodeo's innocence.

Amodeo's belief in Amodeo's innocence has been confirmed in four separate polygraph examinations, as well as thousands of pages of documents and hundreds of hours of audio/video recordings.[lxi]

Amodeo was persuaded by Amodeo's counsel to overdose on the medication so Amodeo could be controlled at court and perform the choreography during the plea colloquy as rehearsed, regardless of Amodeo's true beliefs or feelings.

Amodeo's plea was executed in violation of the express orders and treatment plan developed by the Harvard/McLean psychiatric team.

The Harvard/McLean psychiatric team, arguably the best team in the world, told Amodeo it would be several years before Amodeo could hope to function in reality, fully understand Amodeo's environment and dispose of the delusions.[lxii] The psychiatric team prescribed a strict regimen of treatment including taking the medication, regular rigorous exercise and therapy sessions more than once per week.

Further the psychiatrists told Amodeo to not make any important decisions without at least three days respite. This was because, even medicated, the rapid cycling aspect of disease and the ever present delusions could at anytime impact Amodeo's judgment rendering Amodeo incompetent to make decisions.

Amodeo could not obtain a treating psychologist or therapist during the time period of the plea discussions because all the psychiatrists and psychologist in the Orlando area felt treating Amodeo entailed too much legal exposure and potentially unwanted publicity. Amodeo eventually was able to receive some therapy, because Dr. Peter Choras of the McLean team finally agreed in or about November 2008 to treat Amodeo over the telephone.

On top of the lack of therapy, the magistrate's conditions on Amodeo's bail and house arrest prevented Amodeo from exercising as prescribed. The exercise component was essential to the medicine's efficacy.

A final consequence of Amodeo's disease is Amodeo's inability to focus on even moderately lengthy documents or processes.

Without being in full compliance with the treatment plan (exercise, therapy and 3 day waiting period) any chance Amodeo had of making competent decisions was extinguished and this without regard to the undue influence of the defense counsel because of the antipsychotic medication.

Amodeo's mental illness made Amodeo incompetent to enter a plea; Amodeo's incompetency was exacerbated by the overdose of the antipsychotic medications Amodeo was then consuming.

It is well established that conviction of an incompetent violates due process. *United States v. Masher*, 538 F.2d 721 (D.C. Cir. 1976); *Fallada v. Dugger*, 819 F.2d 1564 (11th Cir. 1987); *Stinson v. Wainright*, 710 F.2d 743 (11th Cir. 1983); *Pate v. Robinson*, 383 US 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

An incompetent person cannot validly enter a guilty plea. Such a plea must be vacated even post sentencing. *Pierce v. United States*, 705 A.2d 1086 (DC. Cir. 1997); In case of the mentally ill, proceedings must appear fair as well as be fair. *Wheat v. United States*, 486 US 153, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988); An incompetent defendant may not make a valid guilty plea. *United States v. Day*, 949 F.2d 973 (8th. Cir. 1991).

Amodeo's mental illness made Amodeo incompetent to enter a guilty plea. Amodeo's excessive consumption of mind altering medication, at the direction of Amodeo's attorneys, made Amodeo not competent to enter a guilty plea. Amodeo's guilty plea must be vacated.

## Invalidity of Plea Agreement as a Contract

Even if Amodeo had been competent, this plea agreement would still be invalid under either traditional contract analysis or because the plea was not knowingly or voluntarily entered.

A plea agreement is interpreted pursuant to the principles of contract law. *United States v. Howle*, 166 F. 3d 1166 (11th Cir. 1999); *United States v. Padilla*, 186 F. 3d 136 (2nd Cir. 1999); *United States v. Yemiton*, 70 F. 3d 746 (2nd Cir. 1995); *United States v. Ringling*, 988 F. 2d 504 (4th Cir. 1993).

In applying traditional contract analysis to plea agreements, the determination of whether a plea agreement has been breached will always be judged according to the defendant's understanding, out of recognition of the United States vastly superior bargaining power. *United States v. Taylor*, 77 F. 3d 368 (11th Cir. 1996).

If any of the standard criteria of a contract are missing, the plea agreement is void or voidable. The United States is subject to an even stricter scrutiny because of the constitutional rights surrendered by the defendant. *United States v. Kahn*, 920 F. 2d 1100 (2nd Cir. 1990); *Innes v. Dalshiem*, 864 F. 2d 974 (2nd Cir. 1988).

Just as in traditional contract analysis, a threshold examination must be made as to whether the plea agreement was fraudulently induced or whether promises made to induce the agreement have been violated.

### Fraudulent Inducement

The United States is bound not only by promises made in the agreement, but any promise made to induce the defendant to enter the plea agreement. *Santobello v. New York*, 404 U.S. 257 (1971); *United States v. Kerdachi*, 756 F. 2d 349 (5th Cir. 1985). This includes oral as well as written promises. *Bemis v. United States*, 30 F. 3d 220 (1st Cir. 1994).

Amodeo's situation is somewhat unique in that Amodeo provided an extraordinary amount of investigative support in the period before Amodeo was declared incompetent.[lxiii] This support was both financial and personal in nature including seven undercover operations and the recovery of essential records both covertly[lxiv] and overtly.[lxv]

The level of assistance provided was termed by sentencing expert Herb Hoelter[lxvi] as the most extensive Hoelter had experienced. Amodeo's attorneys Harrison Slaughter and Robert Panoff confirmed Hoelter's opinion.

The United States Attorney's Office and the Internal Revenue Service Criminal Investigation Division (hereinafter CID) supported this position when Special Agent Richard Smith and Assistant United States Attorney Gold told Amodeo and Slaughter, "we are going to get Amodeo a letter from Tampa" for all Amodeo has done to date (May 2007).

When Amodeo queried, "why Tampa?" Smith and Gold said because Gold could only grant a certain amount of credit for assistance and with a "Tampa letter" the amount of credit could be considerably greater.

Attorney A. Brian Phillips[lxvii] explained to Amodeo that Gold had authority for a four level reduction, but Tampa had authority for as much as ten levels.

Based on this promise, Amodeo continued Amodeo's efforts to assist in a comprehensive and thorough investigation. Included among those activities was the organization of two warehouses containing fifteen million pages of documents; assembling over a terabyte of electronic information on a central computer server with a specialized data base; recovering and editing 27,000 hours of audio/visual recordings and assembling detailed notebooks on all key personnel.[lxviii]

Beyond this Amodeo engaged in a massive litigation effort designed to preserve and recover assets for the benefit of the United States.[lxix]

Amodeo and Amodeo's attorneys were led to believe that because of Amodeo's substantial assistance would result in a corresponding substantial sentence reduction if a sentence was forthcoming.

Absent the expectation of receiving this benefit none of Amodeo's attorneys would have recommended Amodeo enter into the plea agreement.

Further, Amodeo would never have even contemplated entering a plea agreement and being unable to reveal the truth discovered during this

investigation, without not only the above promise but four others made by the government to induce the plea agreement: (1) in addition to the foregoing reduction for substantial assistance, the opportunities to argue for even more of a reduction from the court and the possibility for reduction by further assistance, (2) a three level reduction for acceptance of responsibility, (3) "time credit" for all money collected from any source and (4) an opportunity to present Amodeo's entire case at sentencing.[lxx]

None of these promises were fulfilled by the government; as soon as the plea agreement was signed the government began ignoring the commitments.

At one post plea meeting in Amodeo's townhouse, Kenton Sands, Esq. called the agents out on one of these points (Amodeo's holding a different view of the facts than the government and being able to present this alternative view even if it was contrary to the government's position regarding the facts in the plea agreement).

The agents called Gold, who confirmed Amodeo was allowed and going to present a different view. This confirmation was given undoubtedly only out of respect for Sands.[lxxi]

According to a witness for the government, at the same time Gold was telling Slaughter about all the benefits Amodeo was to receive, Gold told the witness during a debriefing Amodeo was not getting anything but the maximum sentence.[lxxii]

This would seem to indicate an even more malevolent motive than false or misleading inducements to get Amodeo to enter the plea agreement. None the less, the failure to honor the promises which caused Amodeo to enter the plea invalidates the plea agreement. Without these promises,

Amodeo would not have spent the extraordinary effort in assisting the government nor would Amodeo have entered into the plea agreement.

Where the government fails to fulfill any of the government's promises (from the defendant's perspective and understanding), the contract (plea) should be vacated. Santobello supra. *United States v. Horsfall*, 552 F. 3d 1275 (11th Cir. 2008); *United States v. Taylor*, 77 F. 3d 368 (11th Cir. 1996).

The government must adhere to the promise as the defendant (Amodeo) understands the promises or the plea is invalid. *United States v. Harvey M.*, 791 F. 2d 294 (4th Cir. 1986); *United States v. Harvey J.*, 869 F. 2d 1439 (11th Cir. 1989); *United States v. Weiss*, 599 F. 2d 730 (5th Cir. 1979).

The next level of the contract analysis is whether any of the essential elements of a contract are missing from the plea, if any of these contract criteria fail; the contract is considered breached therefore void or voidable. *Devlin v. Ingrum*, 928 F. 2d 1084 (11th Cir. 1991).

The elements necessary for a valid contract are: (1) an agreement, (2) with consideration, (3) between two or more contracting parties, (4) with a legal object and (5) legal capacity. Devlin Id.

In this case, there is a serious question of whether an agreement actually existed or whether it was a mutual mistake (criteria 1), whether the consideration failed or was illusory (criteria 2) and whether Amodeo had legal capacity to contract (criteria 5).

## **Mutual Mistake**

The parties never agreed on the essential factual predicate of the plea agreement[lxxiii], the parties never agreed upon the exact type of consideration

to be exchanged and Amodeo was not legally competent to enter into the contract.

Amodeo and the United States had a complete misunderstanding of the meaning of the facts in the plea agreement; Amodeo had very specific meaning as to what the facts meant[lxxiv]. The government must have had a different understanding. If not, then the government's actions were more nefarious than simple mistake (intentionally fraudulent actions against both Amodeo and the Court).

## Lack of Consideration

Amodeo did not receive the promised consideration from the government who breached the plea by failing to provide for any acceptance of responsibility, let alone acceptance which was not purely illusory.

Sands objects and argues at sentencing that the government breeched the agreement[lxxv] because the government agreed to a three level downward departure for acceptance of responsibility and the defense understood this departure to be from the statutory cap on the sentence not from a hypothetical sentence developed in the PSI.

Obviously, if acceptance was applied only to reduce a hypothetically higher sentence down to the statutory cap, the benefit of the acceptance would be nonexistent. This is the classic "illusory" consideration.

Further, Amodeo was supposed to receive a benefit from the millions of dollars collected. Again, the defense perceived this credit to be a reduction in time for any sentence Amodeo received.

No such reduction occurred. If the government should claim Amodeo is getting credit for the money against Amodeo's restitution, the government's position is at best disingenuous. No one could believe that, ex ante, Amodeo would repay 181 million dollars and the law would require

application of any of the collected funds to the amount owed by Amodeo for the unpaid taxes.

Therefore, as a practical matter, Amodeo had to understand the credit for the efforts collecting the monies to be for a time reduction.

Amodeo would receive no practical benefit from the collected amounts being applied to the 181 million since it was not foreseeable that Amodeo could repay the balance which went unpaid.

Further, Amodeo would receive no other benefit from anything but a "time credit" because the law would have applied the collections to Amodeo's debt anyway.

Whether because of Amodeo's different understanding or due to the illusory nature of the government's promises, the consideration fails.

Lack of consideration, failures of consideration or illusory consideration are all basis for cancelling a plea agreement (voiding a contract). *Blackledge v. Perry*, 417 U.S. 21 (1974).

## Lack Of Capacity

Amodeo lacked the legal capacity to contract. Amodeo was declared incompetent by the State of Florida in a formal court proceeding which included a review and examination by an independent state appointed panel of psychiatrists.

This declaration of incompetency occurred on or about May 18, 2008. The consequence of this proceeding is Amodeo was appointed a plenary guardian. Further, Amodeo lost virtually all of Amodeo's rights including, but not limited to, the right to chose where Amodeo would live, the right to procure medical treatment, and the right to contract. Florida Guardianship Law; Florida Statute 95.051.

At the time Amodeo entered the plea and up until today, Amodeo is unable to enter into a contract including a plea agreement.

Amodeo was and is currently deprived of Amodeo's right to contract. Absent prior approval of the guardian and the Florida Circuit Court, no contract entered into by Amodeo is valid, including the plea agreement.

As a matter of law, Amodeo is not able to contract; therefore Amodeo is ineligible to enter a plea of any kind, let alone a plea of guilty.

Until such time as the State Court, upon application and after a hearing with the incompetent person present withdraws the infirmity, no contract is valid.

As Amodeo was incompetent at the time of the plea agreement and since the plea agreement did not receive the prior approval of the State Court Judge, the plea agreement is invalid.

## Contract Analysis Summary

The government's actions in misleading Amodeo and Amodeo's attorneys in order to induce Amodeo into entering the plea and the infirmities in the essential elements of the plea, whether by mistake or intention, warrant vacating the plea. *Mabry v. Vaughn*, 67 F. 3d 909 (11th Cir. 1995). Prosecutor's conduct held to the most meticulous standards. *United States v. Lawlor*, 168 F. 3d 633 (2nd Cir. 1999). When a plea rests on a promise, so that it can be said to be either part of the inducement to enter or part of the consideration for executing the plea, the promise must be fulfilled for the plea to be a valid contract. *San Pedro v. United States*, 79 F. 3d 1065 (11th Cir. 1996); *United States v. Jones*, 58 F. 3d 688 (D.C. Cir. 1995); *United States v. Kurkculer*, 918 F. 2d 295 (1st Cir. 1990).

Amodeo was induced into entering the plea by false and unfulfilled promises. The plea which was entered was fatally flawed because of mutual misunderstanding, failure of consideration, or Amodeo's lack of capacity.

For any of the foregoing reasons the plea is invalid and should be vacated.

## Plea Was Not Knowing And Voluntary

Even if a defendant is competent and the plea meets the necessary criteria for a contract, a plea may still be invalid.

A plea must be knowingly and voluntarily entered into by the defendant in order to be valid. *United States v. Ruiz*, 536 U.S. 622 (2002); *Boykin v. Alabama*, 395 U.S. 238 (1969); *Stan v. Dugger*, 921 F. 2d 1125 (11th Cir. 1991).

Furthermore, even when the defendant has admitted the plea is "freely entered" in both a plea agreement and during the plea colloquy, the validity analysis is not limited to such admissions. *Kercheval v. United States*, 274 U.S. 220 (1927); *Blackledge v. Allison*, 431 U.S. 63 (1977); *Martin v. Kemp*, 760 F. 2d 1244 (11th Cir. 1985).

"Knowingly and Voluntarily" is a term of art which has various specific meanings in different contexts.

In analyzing whether a plea is invalid, despite the Rule 11 colloquy and admissions of voluntariness by the defendant, the analysis requires examination of various extrinsic issues. To determine whether the plea is truly voluntary, the defendant understands the nature of the charges and the consequences of the plea. "A plea does not qualify as intelligent unless a criminal defendant first receives real notice of the true nature of the charges against him; the first and most universally recognized requirement of due

process. _Bousley v. United States_, 523 U.S. 614 (1998); "[A] plea of guilty is constitutionally valid only to the extent it is 'voluntary' and 'intelligent.' Id.

Amongst the numerous (knowing and voluntary) concerns are the following, which are present in this case:

1. Ineffective assistance of counsel due to an actual conflict of interest makes a plea not "knowingly and voluntarily" entered.

2. Ineffective assistance of counsel resulting from such deficient performance by the defendant's attorney so as to prejudice the defendant's defense makes a plea not "knowingly and voluntarily" entered.

3. Where the defendant does not have a proper understanding of the law regarding the alleged crimes or the defendant does not have a proper understanding of how the facts relate to the elements of the crime, the plea is not "knowingly or voluntarily" entered.

4. Where the government fails to fulfill the government's promises, as those promises are understood by the defendant, the plea is not "knowingly and voluntarily" entered.

5. A plea is not knowingly and voluntarily entered where the cumulative mistakes of counsel render the counsel's overall performance deficient and such deficiency prejudices a client by even as much as a single extra day of imprisonment.

### **Actual Conflicts of Interest**

Amodeo's attorneys had two types of actual conflicts: (1) Harrison Slaughter, Esq. was a witness to a material event of the purported offense conduct[lxxvi] and (2) all the defense counsels, especially Slaughter, developed an adverse financial interest to Amodeo.

Slaughter was representing Amodeo in a bankruptcy proceeding and in re-obtaining Amodeo's bar license.

Slaughter was invited to the "Mock Deposition" in order to gain a better understanding of how (Amodeo's) 'The Empire' developed so quickly.

During the "Mock Deposition", Amodeo explained about the history of Presidion and how the plan was implemented to use the payroll taxes to rehabilitate and reorganize the business.[lxxvii] Amodeo explained how an essential part of the reorganization plan was to acquire or invest in businesses which would then become customers of the rehabilitated employee-leasing company.

Slaughter often commented on how if Slaughter had attended the April 19, 2006 chairman's meeting conducted by Laurie Holtz;[lxxviii] Slaughter would have jumped out of his seat and been dialing 9-1-1.[lxxix] This reaction was because of the discussion regarding the unpaid payroll taxes.

Slaughter did not express any concern over Amodeo's Presidion story (or unpaid taxes). Slaughter actually began to suggest attorneys that Amodeo could use to represent the various entities in the Offer-In-Compromise with the Internal Revenue Service.[lxxx]

The government would eventually charge Amodeo with a conspiracy to interfere with an investigation by an administrative agency.[lxxxi] The event which is the basis of the charge is the "Mock Deposition." Slaughter, by being in attendance was a witness to the very event which was the basis of Amodeo's alleged crime.

Several of the potential targets have purportedly asked how they could be targets of the investigation when Slaughter was not being investigated. This, especially, since Slaughter was a criminal law attorney and a former tax prosecutor for the United States Attorney's Office.

No answer has come forth from the United States Attorney.

Finally, Slaughter was a witness to Amodeo actually being made aware that the deferring of tax was illegal.[lxxxii] Slaughter himself delivered the news to Amodeo in December 2006.

An attorney who is a witness to a crime has a conflict of interest. Even where the attorney is not called as a witness, the attorney can still be disqualified, "since his performance as an advocate can be impaired by his relationship to the events in question." _United States v. Locascio_, 6 F. 3d 924 (2nd Cir. 1993), cert. denied, 511 U.S. 1070 (1994).

Slaughter had to be aware as the investigation progressed that Slaughter was a material witness both for the government and for Amodeo. Such a conflict is irreconcilable and unwaiveable. Id. at 934.[lxxxiii]

Further, Slaughter was now in a position similar to many other persons in the "Mock Deposition." Slaughter had been made explicitly aware that many of the related business entities were receiving investments from funds which could have been used to pay payroll taxes. Slaughter, as did the others, continued to take payments (hundreds of thousands of dollars from these entities) for fees.

Slaughter's only chance to avoid the conflict was to gain a favorable relationship with the United States Attorney's Office and receive the United States protection for the money received and Slaughter's role in the events.

Slaughter did receive this protection. In the midst of the investigation Slaughter was e-mailed by AUSA Gold and told Slaughter's fees would no longer be protected from seizure and forfeiture unless Amodeo signed a plea agreement, without changes, within four days.[lxxxiv] The bankruptcy estate of Mirabilis Ventures, Inc. was told by the United States that in order to get the United States to vote for confirmation of a plan, the plan must contain a

provision which expressly excludes the fees of Amodeo's attorneys from any avoidance or preference action.[lxxxv]

In addition, until Amodeo pled guilty, the United States refused to insulate the millions of dollars of contingency fees that Slaughter and other civil attorneys expected to receive in the malpractice cases against the firms which advised Amodeo on the legality of the tax determent strategy.

Slaughter knew Slaughter had a conflict because of Slaughter's role as a witness. Slaughter's financial interests were in direct conflict with Amodeo's adamant insistence of Amodeo's innocence.

Slaughter's personal and financial conflict resulted in considerable pressure by Slaughter to "find some crime" to which Amodeo could plea.

Slaughter even influenced Amodeo's civil attorneys. These attorneys had separately realized that Amodeo's good faith, subject belief that taxes, as long as reported, may be deferred was a defense to intent.  Also, Amodeo's apparent lack of legal duty and IRS actions were indicators of Amodeo's lack of intent.

Slaughter told these attorneys the government would not hesitate and all the "culprits" would readily agree to lie if needed. And Amodeo would not have much chance against the perjured testimony of dozens of accountants and attorneys.

Slaughter intimidated the attorneys into not voicing their opinion with regards to Amodeo's lack of intent.  And thus the reason for not entering a plea of guilty.

Slaughter's conflicts resulted in Amodeo not receiving effective assistance of counsel within the requirements of the Sixth Amendment.

The right to effective assistance of counsel encompasses the right to representation free from actual conflict with defense counsel. *Lightbourne v.*

*Dugger*, 829 F. 2d 1012, 1022 (11th Cir. 1987) cert. denied 488 U.S. 934 (1988). *Burden v. Zant*, 871 F. 2d 956 (11th Cir. 1989).

Where an actual conflict exists between a defense attorney and the attorney's client, a situation occurs where it is possible to presume prejudice. The presumptive prejudice is sufficient to violate a defendant's constitutional right to counsel where it affects the adequacy of an attorney's performance. *Wood V. Georgia*, 450 U.S. 261 (1981); *United States v. Cronic*, 466 U.S. 648 (1984); *Bell v. Cone*, 535 U.S. 685 (2002); *Florida v. Nixon*, 543 U.S. 175 (2004).

The Sixth Amendment requires not only the provision of counsel, but assistance which is to be for the accused's defense and which ensures "the prosecution's case survives the crucible of meaningful adversary testing." *Cronic supra*; *Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Conklin v. Sheffield*, 366 F. 3d 1191 (11th Cir. 2004); *United States v. Novation*, 271 F. 3d 968 (11th Cir. 2001); *Chandler v. United States*, 218 F. 3d 1205 (11th Cir. 2000).

Slaughter's involvement as a witness and a potential target sufficiently hampered the adequacy of Slaughter's representation to render Slaughter's counsel ineffective.

The risk, to the fees of Slaughter and the other defense attorneys, if Amodeo did not enter a guilty plea but instead went to trial, is a situation which not only creates an appearance of conflict but creates a conflict so fundamental as to extinguish any notion that the adversarial process is testing the prosecution's case.

The plea was not knowingly and voluntarily entered because of these actual conflicts of interest and should be vacated.

## **Understanding the Nature of the Charges (Tax Counts)**

A plea agreement is not "knowingly and voluntarily" entered where the defendant does not understand the nature of the charges entered against him.

Amodeo was instructed incorrectly about the elements of the crime and how the facts applied to those elements.

Amodeo was told that Amodeo's ex post realization that Amodeo was reckless in not reading the Berman memorandum of February, 2006 was sufficient to constitute deliberate ignorance and that deliberate ignorance constitutes specific intent.

Leaving aside the tenuous logic of this position, Amodeo's attorneys misstated the doctrine of deliberate ignorance.

"Deliberate ignorance amounts to a half-step between the highest standard of "knowledge" and the lower standards of "recklessness" and "negligence." "It denotes a conscious effort to avoid positive knowledge of a <u>fact</u> which is an element of an offense charged the defendant choosing to remain ignorant so he can plead lack of positive knowledge in the event he should be caught." *United States v. Lara-Velasquez*, 919 F. 2d 946 (5th Cir. 1990) (quoting *United States v. Restrepo-Granda*, 575 F. 2d 524 (5th Cir. 1978).

The key aspect of deliberate ignorance is the <u>conscious</u> action of the defendant--the defendant [must have] [sic] <u>consciously</u> attempted to escape confirmation of conditions or events he strongly expected to exist. Id; *United States v. DeLuna*, 815 F. 2d 301 (5th Cir. 1987).

Deliberate ignorance is a doctrine to be rarely used, because of the potential that the jury may be confused about the degree of "deliberateness" required to convert ordinary, innocent ignorance into guilty knowledge.

A district court should only permit the "deliberate ignorance" instruction when there is significant evidence of the deliberate ignorance. Lara-Velasquez, Supra; *United States v. Skilling*, 554 F3d 529 (5th Cir. 2009).

Amodeo's attorneys improperly conflated the "knowingly mental state" with the "willfully" element. Amodeo's attorneys advised Amodeo that the deliberate ignorance doctrine applied to Amodeo's specific intent (knowledge of the law) to violate a known legal duty as opposed to (factual) knowledge of the criminal acts.

Amodeo was aware the taxes were not being paid. Amodeo was not aware the conduct was illegal; nor was Amodeo aware that Amodeo had a duty to ensure the corporations paid the taxes.

In other words, the deliberate ignorance doctrine is inapplicable since Amodeo was not consciously avoiding knowledge of the facts.

Amodeo was reckless because Amodeo's disease prevented Amodeo from reading the memorandum.[lxxxvi]

However, as subsequently discovered, the memorandum only addressed issues of law not fact. The memorandum did not state that the tax deferment strategy was illegal. The memorandum can actually be read to confirm the legality of the tax deferment plan. Also, the memorandum makes no mention that Amodeo or someone of Amodeo's status or in Amodeo's position vis-à-vis the taxpayer has a duty to pay the taxes or ensure the business pays the taxes.

Amodeo's counsel had, at the time of the plea, not even read the memorandum.

Amodeo's counsel misinformed Amodeo as to the meaning of deliberate ignorance and the applicability of the doctrine to the elements of the crime.

Had Amodeo known deliberate ignorance required a conscious act and that a reckless action was insufficient, Amodeo would not have pled guilty.

Had Amodeo known the actual contents of the memorandum, Amodeo would not have pled guilty. (<u>Amodeo did not plead guilty to recklessly avoiding knowledge of the facts or even being reckless in learning the law, but only in being reckless for not having read the memorandum</u>).

Stated differently, for emphasis, had Slaughter (and AUSA Gold) not misinformed Amodeo of the contents of the memorandum Amodeo would not have pled guilty.

As to the counts of conviction regarding nonpayment of taxes, Amodeo did not understand the elements of the crime, nor how the facts applied to those elements therefore the plea was not knowingly and voluntarily entered.

A guilty plea is not valid when a defendant has been misinformed about critical elements of the charged offense. *Henderson v. Morgan*, 426 U.S. 637 (1976) *United States v. Brown N.*, 117 F. 3d 471 (11th Cir. 1997).

Further, the performance of Amodeo's counsel fell below an objective standard of reasonableness and resulted in the guilty plea.

Where counsel's representation falls below an objective standard of reasonableness and but for counsel's deficient performance the defendant would have gone to trial; the plea is not knowingly and voluntarily entered because of ineffective assistance of counsel. This level of ineffectiveness

violates the defendant's rights under the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668 (1984).

The failure by Slaughter to read or comprehend the memorandum before having advised Amodeo to plea guilty is inadequate representation.[lxxxvii] The failure of Slaughter to properly understand the doctrine of deliberate ignorance or the applicability of the doctrine to the facts is also inadequate representation.

Where counsel fails to understand both the facts and the law before advising a defendant to enter a guilty plea, the counsel's representation is deficient and prejudicial.

A tactical or strategic decision is unreasonable if it is based on a failure to understand the law. *Horton v. Zant*, 941 F. 2d 1449 (11th Cir. 1990); *Nelson v. Hargett*, 989 F. 2d 847 (5th Cir. 1993); *Brown v. Butler*, 811 F. 2d 938 (5th Cir. 1987); *Young v. Zant*, 677 F. 2d 792 (11th Cir. 1982). Lack of due diligence on the part of counsel to discover material evidence is objectively unreasonable. *Avila v. Guarteman*, 2009 App. LEXIS 3250 (February 17, 2009 at footnote 9); *Rector v. Johnson*, 120 F. 3d 551 (5th Cir. 1997).

Amodeo was not reasonably informed of the elements of the charges against Amodeo. Amodeo was not informed of the factual basis of the charges against Amodeo. Amodeo was not informed of the relationship between the law and the facts; thus Amodeo's plea was not knowingly and voluntarily entered. *United States v. Guichard*, 779 F. 2d 1129 (5th Cir. 1986); *LoConte v. Dugger*, 847 F. 2d 745 (11th Cir. 1988); *Stinyard v. Dugger*, 1989 U.S. Dist. LEXIS 16526 (11th Cir. 1989); *United States v. James*, 827 F. 2d 1469 (11th Cir. 1987).

## Understanding the Nature of the Wire Fraud and 18 USC 1505 Charges

(Conspiracy, Wire Fraud, and Interference with a Government Investigation)

Amodeo did not understand the elements of the wire fraud or interference with an agency charge.

Amodeo was misinformed with regards to the elements of the crime of conspiracy by Slaughter and Phillips.

Amodeo's attorneys stated all three crimes conspiracy, wire fraud and interference with a government agency were general intent crimes. Actually all three have elements of specific intent.

The elements of wire fraud are: (1) the intentional participation in a scheme to defraud; and (2) use of the wires in furtherance of the scheme. *United States v. Ross*, 131 F. 3d 970 (11th Cir. 1997). A scheme to defraud requires proof of material omissions or concealment of material facts. *Neder v. United States*, 527 U.S. 1 (1999).

In order to commit a conspiracy to commit wire fraud, the government must show specific intent to defraud. "Mail fraud under 18 U.S.C. §1341 is the intentional participation in a scheme to deprive another of money or property, and use of the mails in furtherance of that scheme." *United States v. Ethridge*, 948 F. 2d 1215, (11th Cir. 1991). The specific intent required to convict an individual of conspiracy to commit mail or wire fraud is the intent to defraud another, not the specific intent to use the mail or wire systems. *United States v. Simon*, 839 F. 2d 1461, 1469 (11th Cir.), cert. denied, 488 U.S. 861; 109 S. Ct. 158, 102 L. Ed. 2d. 129 (1988); *Marshall v. City of Atlanta*, 195 B.R. 156, 175 (N.D. Ga. 1996). See *United States v. Parker*, 839 F. 2d 1473, 1478 (11th Cir. 1988) (finding insufficient evidence that salespersons had conspired with the principals).

Interference with a government agency requires knowing efforts to hamper the government's legitimate purposes, not inadvertent actions which may have affected the agency's functions.

Amodeo has consistently denied knowingly violating a duty or law. Amodeo's polygraph results indicate the same, the "Position Paper" (written by Kenton Sands) submitted at sentencing and stipulated to by the government supports Amodeo's belief.[lxxxviii] The affidavit sworn to and submitted to both this court and the district court affirms Amodeo's lack of specific intent. As do the multiple documents and recordings provided to various civil and criminal attorneys;[lxxxix] (in other words Amodeo's proclamation of not having specific intent has been continuous from the beginning of the investigation).

If Amodeo's attorneys or the court had instructed Amodeo that the crimes of wire fraud or "interference" required intentional, voluntary participation in the unlawful activity Amodeo would not have pled guilty.[xc]

Amodeo's lawyers told Amodeo, that to be guilty of a conspiracy all that is required is an agreement to do something that even if legal, was in furtherance of the crime even if you are unaware the conduct is unlawful.

At no time did Amodeo's attorneys ever tell Amodeo conspiracy requires specific intent, knowledge of the unlawful activity and voluntary participation in unlawful activity.

Slaughter and Phillips in an attempt to convince Amodeo that Amodeo was guilty arranged a second "mock deposition."

At this "second mock deposition" Amodeo argued vehemently with Phillips about whether Amodeo was a participant in unlawful activities.

Amodeo eventually, exasperated, broke down (emotionally) because Amodeo could not believe the law would punish someone for doing something accidentally or by mistake.

Amodeo has tried to obtain the transcript and video of the "deposition", but according to the court reporter, Slaughter instructed her to destroy all copies.[xci]

At this session Slaughter and Phillips made it "clear" that wire fraud was the intentional use of the wire as opposed to the intentional participation in a scheme to deprive another of property or money from intentional misrepresentations, omissions or false premises. Completely opposite of the actual interpretation of the law.

If Amodeo had properly understood the elements of the crimes, Amodeo would not have entered a guilty plea.

### Inaccurate Advice As To Severity Of Sentence

Amodeo was persuaded to skirt the truth because the actual sentence would be so short that it would be dishonorable and cowardly to put family and friends through years of suffering while Amodeo tried the case just to prove a point.

Approximately nine months into the investigation, Amodeo told Slaughter, a member of the Department of Justice had spoken with Amodeo's wife and told her the sentence for Amodeo would be ten years with cooperation and twenty without cooperation.

Slaughter shook Slaughter's head no and held up two fingers. Slaughter went on to explain that if Amodeo pled guilty, the sentence would be no more than two years due to the substantial assistance Amodeo had rendered and the acceptance of responsibility credit.

Slaughter even discussed how two years would be less time than it would take to try this case to completion.

Slaughter, pointedly over the next eighteen months, reminded Amodeo how all the predictions Slaughter had made about the process of the case had come true. This included predictions about how long various stages would take.

Slaughter had Sands speak with Amodeo concerning the benefits to Amodeo of getting Gold's four level reduction.

This made the maximum sentence 160 months (85% of 188); although Amodeo's memory of the telephone call with Sands confirmed it at 144.

Slaughter then told Amodeo "by the time you get credit for the money collected, additional substantial assistance, acceptance of responsibility and mitigation for being crazy your sentence will be right where I predicted".

Slaughter told Amodeo "you need to find some way to plea guilty so you can get the benefit of all these things".

Slaughter reminded Amodeo what Phillips said, "a plea is not what you actually think but only what the government can prove at trial, even if the government uses witnesses who commit perjury".

Sands referred to these witnesses as government "prostitutes." Slaughter and Phillips confirmed the use of witness "prostitutes" is common to ensure convictions.

Finally, Slaughter reiterated Amodeo's reputation was already tarnished by the newspaper, disbarment and prior conviction, so another conviction would not matter that much.

Emphasizing the advice of Panoff that "the U.S. public does not really care about tax crimes" so "you [Amodeo] should not worry much about it".

Where an attorney substantially misstates the severity of sentence, the advice may rise to the level of ineffective assistance of counsel. *United States v. Grammas*, 376 F. 3d 433 (5th Cir. 2004); *United States v. Gordon*, 156 F. 3d 376 (2nd Cir. 1998).

If Slaughter had not told Amodeo the probable sentence after all circumstances were accounted would be two years, Amodeo would not have pled guilty. (Even if Amodeo may have gone through parts of the process because of the drugs. Amodeo would have eventually rebelled at any sentence longer than the predicted time of trial).

If Slaughter et. al. had not told Amodeo the government would have suborned perjury to obtain Amodeo's conviction, and that such a practice was common for the government, Amodeo would not have pled guilty.

## Government's Failure To Fulfill Promises

The government made a series of promises to Amodeo to induce Amodeo's cooperation during the investigation.[xcii]

The government promised by May 2007; over 15 months before the plea that Amodeo would get a "Tampa letter" for the assistance Amodeo had already provided including but certainly not limited to seven undercover operations.[xciii]

A "Tampa letter" was necessary because AUSA Gold only had the authority to grant a four level reduction while with a Tampa letter Amodeo could receive up to 10 level reduction.[xciv]

The government made clear Amodeo would not be expected to testify, Amodeo's assistance was to collect and organize the evidence, plus explain the various technical matters arising out of extremely complex situation.

Between the time of this initial promise and the time of the plea, Amodeo not only organized and collected millions of documents and more

than a terabyte of electronic data but also located and recovered 27,000 hours of audio and video recordings from the surveillance cameras which recorded most of the public areas and conference rooms in the various companies' offices.[xcv]

By the government's own admission, Amodeo met with them dozens and dozens of time between the May-promise and sentencing.[xcvi]

In addition to the "Tampa letter" the government also promised Amodeo was to get credit for all the funds recovered and remitted to the government.[xcvii]

This promise took place the same time Lou Pearlman was granted a one month reduction in his sentence for each million dollars paid. Amodeo was lead to believe the arrangement would be at least as good as Pearlman's, if not better.

Amodeo has assisted in the collection of tens of millions of dollars with tens of million more if not a hundred million still in process.[xcviii]

Absent these promises, Amodeo would have had no reason to spend three years and millions of dollars assisting the government's investigation and collection; nor would Amodeo have agreed to plea guilty to something - Amodeo did not believe Amodeo did, had Amodeo known that the government would renege on the government's promises.

Finally, at the time of the plea agreement the government made four additional promises. (1) The government promised Amodeo would receive a three level reduction for the acceptance of responsibility; (2) Amodeo would be permitted to argue for more substantial assistance than the four levels AUSA Gold could authorize; (3) Amodeo could present the mitigation evidence resulting from Amodeo's mental illness; and (4) Amodeo would be permitted all the time necessary at sentencing to present Amodeo's view of

the facts including clarifying those set forth in the plea agreements. Absent these promises, Amodeo made it clear Amodeo would not enter into any type of plea agreement.

The government did not fulfill these promises.

The government did not consent to an extended proceeding to allow Amodeo to present Amodeo's factual case. Instead the government tried to eliminate Amodeo's acceptance of responsibility and did get the departure reduced to two levels instead of three.

Further, the government made sure Amodeo received no benefit from the acceptance by having it apply to the hypothetical sentence in the PSI which was above the statutory cap for the crimes even after taking into account the 2 level reduction.

The government also did not agree to extend the sentencing hearing to permit the psychiatric experts from McLean Hospital and Harvard to testify to the extent of Amodeo's mental illness. Included in this testimony would have been significant facts, which based upon the Court's subsequent comments would have had significant impact on the sentencing decision: These are:

> 1.) Amodeo, like any bipolar, when in the midst of the disorder does not recognize they, are sick. Absent outside intervention a bipolar, like Amodeo, will not seek help;
>
> 2.) Because of a pervasive chronic depression underlying the mania Amodeo would never have been able to focus on or comprehend the memorandum; and
>
> 3.) Amodeo, as do all manics, becomes oblivious to reality and interprets the actions and conduct of Amodeo advisors as affirming of Amodeo's actions and delusions.

The government failed to fulfill either the government's preplea promise which induced Amodeo's cooperation or the government's additional promises used to induce Amodeo into entering a guilty plea after the indictment. Absent the benefits of these promises Amodeo would not have entered a guilty plea.

The Supreme Court, the Eleventh Circuit and the other Appellate Courts have made it crystal clear that the government must fulfill any promises made to induce or incorporated within a plea agreement.

*Marchibroda v. United States*, 368 U.S. 487, 7 L.Ed. 2d 473, 82 S.Ct. 510 (1962); *Memba v. Rhay*, 389 U.S. 487, 19 L.Ed. 2d 336, 88 S.Ct. 254 (1967); *Santabello v. New York*, 404 U.S. 257, 30 L.Ed. 2d 427, 925 S.Ct. 495 (1971); *Blackledge v. Allison*, 431 US 63 (1977); *United States v. Kerdachi*, 756 F.2d 349 (5th Cir. 1985); *United States v. Kurkculer*, 918 F.2d 295 (1ˢᵗ Cir. 1990); *United States v. Jones*, 58 F.3d 688 (D.C. Cir. 1995); *San Pedro v. United States*, 79 F.3d 1065 (11th Cir. 1996) ; *United States v. Aleman*, 286 F.3d 86 (2nd Cir. 2002); *United States v. Dudden*, 65 F. 3d 1461 (9th Cir. 1995).

In addition, the Courts are to analyze the promises and inducements from the understanding of the defendant, *United States v. Taylor*, 77 F.3d 368 (11ᵗʰ Cir. 1996); *United States v. Boatner*, 966 F.2d 1575 (11th Cir. 1992); *Smith v. Blackburn*, 785 F.2d 545 (5th Cir. 1986); *United States v. Horsfall*, 552 F.3d 1275 (11th Cir. 2008), *United States v. Harvey J.*, 869 F.2d 1439 (11th Cir. 1989) ; *United States v. Weiss*, 599 F.2d 730 (5th Cir. 1979); *Bernis v. United States*, 30 F.3d 220 (1st Cir. 1994).

Furthermore, even if the Defendant has been shown to be competent, (which is certainly not the case with Amodeo), and the defendant has admitted the plea is freely entered, it is not sufficient to limit the analysis to

such admissions. *Blackledge v. Allison*, 431 U.S. 63 (1977); *Martin v. Kemp*, 760 F.2d 1244 (11th Cir. 1985); *Kercheval v. United States*, 274 U.S. 220, 71 L.Ed. 1009, 475 S.Ct. 582 (1927).

In this instance, Amodeo's understanding of the government's promises (all which went unfulfilled) or the benefit received from such promises were illusory. Absent such promises, not only would Amodeo have refused to plea guilty, Amodeo's attorneys would not have recommended Amodeo enter a guilty plea. Where the government fails to fulfill the promises made to a defendant a plea is void and should be vacated.

The government failed to fulfill many promises to Amodeo; therefore the plea agreement should be cancelled, withdrawn, and vacated.

## Inadequate Advice Independently and Cumulatively

This subsection deals with a variety of issues which may individually or cumulatively reach the level of ineffective assistance of counsel sufficiently prejudicial to constitute a violation of Amodeo's Sixth Amendment rights.

Amodeo recognizes many of these issues are more properly brought on collateral attack; none the less Amodeo raises these here in order to protect against any interpretation that failure to raise these claims constitutes a waiver of the claims or forfeiture of the claims.

## Failure To Investigate

Amodeo's attorneys never inspected or reviewed the evidence accumulated by the government. Amodeo's attorneys interviewed only a few of the key witnesses in the case and these interviews corroborated Amodeo's view of the case.

If Amodeo's attorneys had inspected the government's evidence or interviewed the key witnesses, the attorneys would have discovered

considerable evidence supporting a defense of good faith reliance and no evidence of specific intent or deliberate ignorance.[xcix]

Failure to conduct these investigations is performance so deficient to constitute ineffective assistance of counsel. _Washington v. Smith_, 219 F. 3d 620 (7th Cir. 2000); _Rios v. Rocha_, 299 F. 3d 796 (9th Cir. 2002); _Crandell v. Bunnell_, 144 F. 3d 1213 (9th Cir. 1998); _Code v. Montgomery_, 799 F. 2d 1481 (11th Cir. 1986); _Nelson v.Hargett_, 989 F. 2d 847 (5th Cir. 1993).

"It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." ABA Standards For Criminal Justice 4-4.1 (2d Ed. 1982 Supp).

Slaughter's failure to inspect the government's records or interview key witnesses was inadequate representation, as a result of this lack of performance Amodeo's rights were violated and Amodeo pled guilty instead of going to trial.

## Character Witnesses

The Court obviously placed great emphasis upon a belief that Amodeo had "bad character."[c] Amodeo's attorneys did not believe character would matter at sentencing, so Amodeo's attorneys did not raise various character issues or call character witnesses.

No report was made on Amodeo's lack of vices and Amodeo's generosity was understated.

Amodeo has never smoked, had a drink of alcohol, said a swear word, gambled, or cheated on Amodeo's wife. As the investigators were told, Amodeo's word and handshake are far more reliable than any written contract. This is nothing like the person the judge described in justifying the sentence. [ci]

Amodeo's generosity not only extended to the victims of Katrina, but to the abused children of Africa,[cii] the disadvantaged children of the United States, the recently widowed, and the physically and mentally handicapped.[ciii]

Amodeo's character witnesses included high ranking members of various law enforcement agencies. These individuals were involved with Amodeo during and after the time period of the alleged offense conduct.

Included among these character witnesses are:

| | |
|---|---|
| Brian Taylor | Former senior supervisor of the F.B.I.'s Organized Crime Task Force in New York City; |
| Joe Robinson | Captain of the City of Orlando Police Force and SWAT team expert. |
| Kevin Billings | Former head of the secret services Presidential Protection Unit. |
| Frank Lacitognola | Former and current officer in the Defense Intelligent Agency. |

Also to testify are persons from a variety of walks of life including:

| | |
|---|---|
| Sister Maureen Kane | Principal of Bishop Moore Catholic High School |
| Sister Elizabeth Murphy | Principal of St. John Vianney School |
| Charles McBurney, Esq. | State Representative |

George Stuart                    Former Secretary of Florida Office Business
                                 and Professional Regulation

Staff and personnel of various businesses Amodeo frequented-such as
Carol's Family Restaurant, Boheme Restaurant, Parcel Post and Acme
Cleaner.

Further, many of Amodeo's staff, who are the individuals most
intimately aware of what occurred before, during and after the offense
conduct, would have testified on Amodeo's behalf. These include:

1. Jodi Jaiman
2. Shane Williams
3. Jay Stollenwork
4. Dana Shult
5. Tessah Ivey
6. Luis Ramos
7. Jason Brownell
8. Aaron Bates, Esq.
9. Matt Mokwa, Esq.
10. Scott Goldberg, Esq.

A more thorough list of potential witnesses is listed in the appendix
"3".

These witnesses would have testified as to Amodeo's good character,
generosity (if anything "generous to a fault"), and the role of the
professionals in the events and the impact of Amodeo's disease on
everything which happened.

Since the Court put such emphasis on Amodeo's general character at
sentencing[civ] and since mitigation, because of Amodeo's illness was so
important in the case; failure to call these witnesses was such deficient

performance as to render counsel's performance ineffective within the meaning of the Sixth Amendment. *Collier v. Turpin*, 177 F. 3d 1184 (11th Cir. 1999); *Thomas v. Kemp*, 796 F. 2d 1322 (11th Cir. 1986); *Blade v. Kemp*, 758 F. 2d 523 (11th Cir. 1985).

As an example of how important money is to Slaughter, Slaughter refused to serve the subpoenas on even a smaller group of witnesses for the sentencing hearing because of the cost.

Instead, Slaughter told Amodeo to serve the subpoenas. At the time Amodeo was on house arrest and taking the medication which resulted in the toxic concentrations in Amodeo's blood.

Failure to subpoena witnesses or relying upon your mentally ill client, (who's freedom is restrained) to obtain and serve subpoena's falls below the prevailing professional norms of the criminal defense bar and hampered Amodeo's sentencing mitigation efforts.  Failure to present mitigation evidence is ineffective assistance of counsel. *Baker v. Thomas*, 45 F. 3d 1501 (11th Cir. 1995). *Horton v. Zant*, 941 F. 2d 1449 (11th Cir. 1990) *Griffen v. Warden*, 970 F. 2d 1355 (4th Cir. 1992); Defense counsel should present to the court any ground which will assist the court in reaching a proper disposition favorable to the accused. [Client] Standards 4-8.1 (Fla. Bar Rules 1979). ABA standards are an appropriate guide to expected conduct. *Nix v. Whiteside*, 475 U.S. 157 (1986).

### Failure to File A Motion For A Substantial Assistance Reduction

Amodeo's attorney's failed to file a motion requesting a substantial assistance departure either under 18 U.S.C. §3553 or because of the government's lack of good faith in filing a 5K1.1 motion, precluded Amodeo from receiving any benefit from Amodeo's efforts.

The foregoing and variety of other errors including not raising concerns about the government threatening witnesses, withholding exculpatory evidences or making misrepresentations to the Court (Appendix "5") are each so inadequate as to render the attorneys' representation beneath the prevailing professional norms.

Amodeo would not have entered the plea absent the inadequate representation. Alternatively, Amodeo would have received a lower sentence.

### Deprivation Of Counsel

As serious a problem as the actual performance of Amodeo's counsel during the criminal proceedings, the situation got even worse.

Amodeo was deprived of the assistance of counsel at critical stages of the criminal proceedings.

Before the commencement of the sentencing hearing, the government brought to the Court's and Amodeo's attention that Slaughter had a conflict of interest, because of Slaughter's role as a witness.[cv]

The government only raised Slaughter's attendance at the "Mock Deposition" as an issue and did not mention Slaughter's numerous other interactions regarding the businesses or unpaid taxes.[cvi]

The government did not want to proceed unless Amodeo waived the conflict.[cvii] Amodeo refused to waive the conflict.[cviii]

The Court asked Sands if Sands could represent Amodeo at the hearing. Sands said no; that a significant portion of the hearing would deal with mitigation, both psychological and polygraph. Sands was not prepared on either topic as Sands had been engaged for a limited purpose.[cix]

Further, Sands expressed concern that Sands had a conflict especially with advising Amodeo as to whether Slaughter had a conflict.[cx]

Amodeo asked the Court for time to consult another attorney on whether a waiver is appropriate, the implication of such a waiver and the effect of Slaughter's conflict.[cxi] The Court denied the request and proceeded to sentencing without conducting a hearing or explaining to Amodeo the conflict or implications.[cxii]

Amodeo has, subsequently, learned that an attorney who is a material witness has an unwaiveable conflict. Amodeo learned this by reading a case decided in the Middle District of Florida which involved the disqualification of Slaughter.[cxiii]

The Court should have stayed the sentencing hearing and conducted a "Garcia" hearing of Slaughter to develop a record and determine if Slaughter was actually a witness.

Thereafter, the Court should have inquired of Amodeo as to whether Amodeo was financially capable of obtaining an attorney to advise Amodeo how to proceed in light of the various conflicts of counsel and, if Amodeo was unable to afford counsel, appoint counsel to advise Amodeo of how to proceed. The court did not.

Because of the circumstances surrounding Slaughter's early involvement in the events which ultimately became the offense conduct; as well as the government's obvious concern about Amodeo obtaining different counsel.[cxiv] A new attorney may have advised Amodeo to "put the brakes" on the current proceedings and start over again.

Since Amodeo was not given the opportunity to obtain new counsel and both of Amodeo's attorneys would not advise or discuss the issue with Amodeo, the actual advice is unknown.

This situation was exacerbated when later in the sentencing process it became apparent that Slaughter had a financial interest in the outcome of certain civil actions.[cxv]

Slaughter had a contingency interest in certain civil malpractice actions. These actions were against some of the accountants and attorneys who advised Amodeo, that the tax deferment strategy was legal and advised that Amodeo had no duty to ensure payment of the taxes.

These lawsuits filed by Slaughter (cocounseled with other firms: The Maher Law Firm and the firm of Searcy, Denney, Scarola, Barnheadt and Shipley) were utilized by the government as a reason to try and deny Amodeo credit for acceptance of responsibility.[cxvi]

Again, Amodeo was not afforded an opportunity to consult with unconflicted counsel about the implications or alternatives[cxvii], of continuing with Slaughter as counsel.

In other words, Amodeo was not provided an opportunity to locate counsel. No counsel was appointed and no hearing conducted regarding the conflict.[cxviii]

Amodeo prepared a pro se motion to cancel the plea during the end of the sentencing process. Concerning this motion, Amodeo was told by Amodeo's attorneys to "hold up" and "let's see what the judge does". Attorneys told Amodeo no harm could come from waiting. The attorneys told Amodeo the judge seems to understand about your mental illness and how it caused these events.

Amodeo was skeptical; especially since Amodeo's experts and treating psychiatrist from Harvard and McLean had not been called to testify.[cxix] Nor had Amodeo's numerous character witnesses who could testify to the more

obvious differences in Amodeo's behavior between the time of the offense conduct and the present.[cxx]

However, since Amodeo had already been admonished by the Court for directing the defense[cxxi] and because Amodeo was still medicated, albeit, at a lower level because of the toxicity detected in Amodeo's blood from the prior dosage (the week before Amodeo had received an urgent call from Amodeo's doctor telling Amodeo to temporarily cease taking the medication and then reduce the dosage because it was reaching toxic levels according to the laboratory) Amodeo again acquiesced to counsel's advice.[cxxii]

Immediately after the hearing, Amodeo was remanded to the U.S. Marshals. The Marshals took Amodeo to Orange County Jail based solely on the large quantity of medication, Amodeo was placed in the Acute Mental Health Unit. (AMHU).[cxxiii]

While in the AMHU, Amodeo was not permitted any communication with the outside world including with Amodeo's attorneys.[cxxiv]

After three days, Sands and Slaughter were permitted to visit. They told Amodeo they needed to withdraw from the case because each will certainly be a witness in the subsequent proceedings.

Amodeo said Amodeo could not agree to allow Sands or Slaughter to withdraw because of the pending motion to cancel the plea and the need to file a notice of appeal.

Not to mention, Amodeo was not even able to get reading materials (pleadings), let alone pen and paper while in the AMHU.

Sands tells Amodeo, the Court will not leave Amodeo without counsel, that one will be appointed, and that as soon as the notice of appeal is filed the District Court will have lost jurisdiction so the motion to cancel will be in abeyance.

Sands, ultimately, files the Notice of Appeal on behalf of Amodeo to protect Amodeo's rights, because of the incarceration and failure of the Court to appoint counsel.

Thereafter, Sands and Slaughter are permitted to withdraw, the Circuit Court appoints Thomas Dale to represent Amodeo on the appeal and no attorney is appointed to represent Amodeo with the pending motion and post-conviction process.

As a result, Amodeo is forced to act pro se in the criminal proceedings. Such deprivation of counsel is a violation of Amodeo's constitutional rights. An individual accused of a crime in the United States of America is entitled to representation by a competent attorney. The United States Constitution, Sixth Amendment; _Johnson v. Zebrst_, 304 U.S. 458 (1938); _Gideon v. Wainwright_, 372 U.S. 355 (1963); and Fed. R. Crim. P. 44.

This right commences at the first instance where the individual's liberty interest is at risk. _Kirby v. United States_, 406 U.S. 682 (1972); _Moore v. Illinois_, 434 U.S. 220 (1977); _Brewer v. Williams_, 403 U.S. 387 (1977); and _Stokes v. Singletary_, 952 F. 2d 1567 (11th Cir. 1992).

This right continues to exist through every stage of the criminal process including pretrial and post-trial. _Chessman v. Teets_, 354 U.S. 156 (1957); _Maine v. Moulton_, 474 U.S. 159 (1995).

The right extends to an individual's direct appeal of decisions made by the trial court. _Johnson v. United States_, 352 U.S. 565 (1957); _Douglas v. California_, 372 U.S. 353 (1963); _Evitts v. United States_, 469 U.S. 387 (1985); _Penson v. Ohio_, 488 U.S. 75 (1988); and _Halbert v. Michigan_, 545 U.S. 605 (2009).

The right to counsel further extends to post appeal actions rising directly out of the criminal proceedings such as resentencing or utilization of common law writs. *Lane v. Brown*, 372 U.S. 477 (1963); *United States v. Denedo*, 173 L. Ed. 2d 1235 (2009).

Deprivation of counsel is a structural error that requires vacating the judgment and granting relief.

### Forced Medication

Amodeo was not Amodeo's self during the entire course of the proceedings because of antipsychotic and mood altering medication. Amodeo was under court order to take this medication.

Because of this court order, the defense attorneys for Amodeo were prevented from presenting an essential defense or mitigation of Amodeo.

Amodeo's attorneys believed the Court, at sentencing, would not be able to effectively observe and evaluate Amodeo's illness. This because the Court ordered Amodeo to take the prescription medication[cxxv] which, particularly, in the dosages Amodeo was taking, had a sedating effect. This made Amodeo "manageable" and altered Amodeo's demeanor.

This medication, designed to suppress Amodeo's manic highs, had made little impact on Amodeo's delusions, but did affect Amodeo's behavior.[cxxvi]

The significance of Amodeo's demeanor was apparent at sentencing; when the Court commented during the sentencing hearing that the Court was observing Amodeo's behavior and demeanor in the hearing[cxxvii] and such would impact on the Court's decision.

The inability to present Amodeo in a non-drugged state (the way Amodeo was at the time of the alleged offense conduct) significantly impacted the defense's presentation. This damaged the Court's understanding

of the severity of the illness at the time of the offense conduct; thus the
Court's understanding of the mitigating effect of the disease.

A bipolar person behaves significantly different when medicated.[cxxviii]

The Court, by requiring medication, presented Amodeo in a false light
during the proceedings.

Amodeo's normal behavior was suppressed during the proceeding.
The Court could not properly observe how the disease diminishes Amodeo's
capacity or affected Amodeo's competency.

An observation of Amodeo's unmedicated behavior for even a short
time has an impact on a person's perception of Amodeo and Amodeo's
ability to form specific subject intent.[cxxix]

The attorneys did not remove Amodeo from the medication because
of the Court's order. As a result Amodeo's defense was precluded from
presenting a significant mitigation defense for Amodeo.

Testimony of expert witnesses alone is insufficient to inform the jury,
as the trier of fact, of the effects of an antipsychotic drug on the defendant.
*Riggins v. Nevada*, 504 U.S. 127 (1992).

The Court in Riggins recognized that under certain circumstances
forced administration of medication may serve essential state purposes to
warrant violation of the defendant's Sixth and Fourteenth Amendment
rights. However, a court in requiring such medications should establish a
clear record of those reasons. Further, the court must explore reasonable
alternatives to administering the drugs.

This permits the Court to determine if the government's objectives can
be obtained by less intrusive means than forced medication.

The Supreme Court recognized that because effects or side-effects of
the drug have an affect on both the defendant's demeanor and mental state,

any hope of determining the prejudice to the defendant is futile; therefore posing an unacceptable risk of prejudice.

The Court noted that the futility would extend to trying to determine if the outcome of the proceeding would have been different absent the antipsychotic medication. Realizing any such determination would be simply a guess, thus speculation. Riggins Id.

The consequence is of the Supreme Court's determination is: absent a thorough record of the legitimate state interest and on exploration of no medication alternatives, requiring antipsychotic medication violates a defendant's constitutional rights and requires a reversal of a conviction.

This result is consistent with other Supreme Court decisions which have held that actions affecting the defendant's appearance and demeanor violate the constitutional rights to a fair trial and due process. This has occurred most prominently in cases where the defendant was shackled. *Deck v. Missouri*, 544 U.S. 622 (2005); *Holbrook v. Flynn*, 475 U.S. 560 (1986); *Illinois v. Allen* 397 U.S. 337 (1970).

The principle evoked in the shackling cases: The jury or the court may perceive the defendant as a greater risk than is warranted and the defendant's altered appearance impacts the impression the defendant makes on the judge and jury. Deck supra; *Monge v. California*, 524 U.S. 721 (1998).

In this case the principle is equally applicable. The defense was unable to present Amodeo in the same manner as occurring during the time period of the alleged offense.

The medication also masked the prominence and consequence of Amodeo's delusions on the understanding of the events in which Amodeo was involved.

The Court's observations of Amodeo, while medicated, left the Court with an inaccurate impression of how Amodeo's disease affects Amodeo's demeanor and thought processes.

As such, the order requiring the medication violated Amodeo's constitutional liberty interest.

### Conclusion

Amodeo's plea agreement should be vacated for any or all of the foregoing reasons, but especially since a criminal proceeding must not only be fair but must also appear fair.

This is especially true when the mentally ill are involved. *Wheat v. United States*, 486 U.S. 153 (1988); *Dusky v. United States*, 362 U.S. 402 (1960).

Amodeo does not want to "just walk away"; Amodeo does not want a "better deal"; Amodeo wants an opportunity to present Amodeo's story to a jury and a judge.

Amodeo requests the plea be vacated and the case be remanded to the District Court for trial on the merits and such other and further relief as the Court deems appropriate or fair.

_____

Frank L. Amodeo

Pro Se

## Certificate of Compliance

Amodeo has never previously prepared an appellate brief and has attempted to comport this brief to certain examples Amodeo had available to Amodeo at the Federal Correction Complex.

Amodeo respectfully requests the Court's indulgence for any formatting errors or other mistakes as well as for the use of endnotes for citation to the record.

Neither Amodeo's In Forma Pauperis application nor Amodeo's motion to appoint counsel were approved by this Court or the District Court. As such, Amodeo was without access to most of the transcripts of the relevant cases or hearings.

This combined with the lack of resources available at Coleman made this choice of citation more practical and hopefully made the brief easier to read.

_____

Frank L. Amodeo

Pro Se

## Certificate Of Service

I HEREBY CERTIFY, that on January 14, 2010, a copy of the appellant's initial brief was mailed to the Clerk of the Court by priority mail service of the United States Postal Service and a copy was sent by first class mail to:

Peggy Morris Ronca

United States Attorney's Office

501 West Church Street

Orlando, Florida 32805

Frank L. Amodeo

Pro Se