UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:08-BK-04681-KSJ
CHAPTER 11


IN RE:

AEM, INC.,

          DEBTOR.



DEPOSITION OF: KIRTUS BOCOX

TAKEN ON:        JUNE 18, 2010

TIME:            11:00 A.M. - 2:00 P.M.

LOCATION:        KPMG LLP
                 111 N. ORANGE AVENUE
                 SUITE 1600
                 ORLANDO FL 32801


REPORTER:        SANDRA A. MOSER, RPR, FPR
                 AND NOTARY PUBLIC

Page 2

```
 1              A P P E A R A N C E S

 2   CAROL KOEHLER IDE, ESQUIRE
     U.S. DEPARTMENT OF JUSTICE
 3   TAX DIVISION
     555-4TH STREET, NW
 4   ROOM 6915
     WASHINGTON D.C. 20001
 5              ASSISTANT UNITED STATES ATTORNEY

 6   ROBERT L.WELSH, ESQUIRE
     U.S. DEPARTMENT OF JUSTICE
 7   TAX DIVISION
     P.O. BOX 14198
 8   WASHINGTON D.C. 20044
                ASSISTANT UNITED STATES ATTORNEY
 9
     JUSTIN M. LUNA, ESQUIRE
10   LATHAM, SHUKER, EDEN & BEAUDINE, LLP
     390 N. ORANGE AVENUE
11   SUITE 600
     ORLANDO, FL 32801
12              ATTORNEY FOR DEBTOR

13   APPEARANCE BY PHONE:

14   DAVID G. RIZZO, ESQUIRE
     KPMG LLP
15   757 THIRD AVENUE, 11TH FLOOR
     NEW YORK, NY 10017
16              IN-HOUSE COUNSEL FOR KPMG LLP

17   ALSO PRESENT:

18              R. WILLIAM CUTHILL, JR.

19

20

21

22

23

24

25
```

Page 3

1                    I N D E X

2   TESTIMONY OF KIRTUS BOCOX

3        DIRECT EXAMINATION BY MS. IDE              4

4

5

6                  E X H I B I T S

7   32 -- WORK PAPERS                             17

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                    KIRTUS BOCOX

 3   HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

 4   FOLLOWS:

 5                    DIRECT EXAMINATION

 6   BY MS. IDE:

 7       Q    GOOD MORNING, MR. BOCOX.  MY NAME IS CAROL IDE.

 8   WITH ME IS BOB WELSH, AND ALSO IN THE ROOM IS JUSTIN LUNA

 9   AND BILL CUTHILL, FOR YOUR DEPOSITION.  AND APPEARING BY

10   PHONE IS KPMG'S COUNSEL, DAVID RIZZO.  WE ARE HERE TODAY

11   TO TAKE YOUR DEPOSITION IN CONNECTION WITH AN OBJECTION TO

12   THE IRS CLAIM FILED IN THE AEM, INC. BANKRUPTCY CASE HERE

13   IN THE MIDDLE DISTRICT OF FLORIDA.  YOUR ATTENDANCE WAS

14   SUBPOENAED TODAY, CORRECT?

15       A    YES.

16       Q    OKAY.  PLEASE STATE YOUR NAME AND BUSINESS

17   ADDRESS?

18       A    KIRTUS BOCOX, BUSINESS ADDRESS IS 111 NORTH

19   ORANGE AVENUE, SUITE 1600, ORLANDO, FLORIDA 32801.

20       Q    JUST A FEW PRELIMINARIES, MR. BOCOX.  THIS

21   DEPOSITION IS TAKEN UNDER THE FEDERAL RULES OF EVIDENCE

22   AND CIVIL PROCEDURE.  ANY OBJECTIONS, OTHER THAN TO FORM

23   OF THE QUESTION OR FOUNDATION ISSUES, ARE PRESERVED UNTIL

24   TRIAL.  WE WOULD LIKE YOU TO READ A TRANSCRIPT OF YOUR

25   TESTIMONY TODAY AND REVIEW IT FOR ANY ERRORS.  THE COURT
```

1   REPORTER WILL CONTACT YOU TO ARRANGE FOR THAT.

2           PLEASE ANSWER YES OR NO.  DON'T SAY A-HAH OR NOD

3   IN RESPONSE TO QUESTIONS.  JUST MAKES IT EASIER FOR THE

4   RECORD.  ARE YOU TAKING ANY MEDICATION THAT WOULD PREVENT

5   YOU FROM UNDERSTANDING OUR QUESTIONS AND TRUTHFULLY

6   ANSWERING, TODAY?

7       A   NO.

8       Q   ARE YOU UNDER A DOCTOR'S CARE FOR ANY MEDICAL

9   CONDITION THAT WOULD MAKE IT DIFFICULT FOR YOU TO SIT

10  HERE, TODAY, AND ANSWER QUESTIONS?

11      A   NO.

12      Q   OKAY.  DID YOU REVIEW ANY DOCUMENTS IN

13  PREPARATION FOR YOUR DEPOSITION, TODAY?

14      A   I DID REVIEW THE INFORMATION THAT WAS PROVIDED

15  TO DAVID RIZZO.  DAVID RIZZO FORWARDED ME THE INFORMATION,

16  WHICH WAS THE PRIOR YEAR RETURNS AND THE WORK PAPERS THAT

17  YOU HAD.

18      Q   I HAD SENT MR. RIZZO THE WORK PAPERS THAT WERE

19  PROVIDED TO US BY MR. CUTHILL AND THE TWO FORM 941 TAX

20  RETURNS FOR AEM; AND YOU REVIEWED THOSE?

21      A   THAT IS CORRECT.

22      Q   DID YOU REVIEW ANY OTHER DOCUMENTS IN

23  PREPARATION FOR YOUR DEPOSITION, TODAY?

24      A   I DID LOOK AT SOME E-MAILS THAT I HAD SENT TO

25  OUR WASHINGTON NATIONAL EXPERTS AND TO BILL, JUST ABOUT,

1   YOU KNOW -- THEY WERE -- HOW WE FILED THE RETURNS.   SO --

2        Q    AND DO YOU STILL HAVE THOSE AVAILABLE?

3        A    YES.

4        Q    OKAY.  IF WE COULD TAKE A LOOK AT THOSE, AT SOME

5   POINT, PERHAPS AT A BREAK, THEN MAYBE ASK YOU SOME

6   QUESTIONS ABOUT THEM AFTERWARDS, I WOULD APPRECIATE THAT.

7             HAVE YOU HAD YOUR DEPOSITION TAKEN BEFORE?

8        A    NO.

9        Q    OKAY.  YOU'RE UNDER OATH.  THE COURT REPORTER

10  JUST SWORE YOU.  IT'S LIKE BEING IN COURT, BUT A LITTLE

11  LESS FORMAL.  IF YOU DON'T UNDERSTAND A QUESTION, ASK ME

12  TO REPHRASE IT.  IF YOU REALIZE, LATER, THAT YOU HAVE

13  GIVEN AN INCOMPLETE ANSWER AND WANT TO CLARIFY, JUST JUMP

14  RIGHT IN AND DO THIS.  THE POINT IS TO GET AN ACCURATE

15  RECOLLECTION OF WHAT HAPPENED IN THIS CASE, AND SO, IF YOU

16  DO WANT TO CORRECT SOMETHING OR WHATEVER, WE ARE HAPPY TO

17  DO THAT.

18             YOUR COUNSEL IS AVAILABLE BY PHONE.  AND SO, IF

19  HE MAKES AN OBJECTION TO ANYTHING, LISTEN TO IT.  WE WILL

20  RESOLVE IT.  I MAY INSTRUCT YOU TO GO AHEAD AND ANSWER THE

21  QUESTION, BUT WE WILL GO THROUGH THAT, IF WE NEED TO.

22             WE ARE HERE, TODAY, TO TALK ABOUT THE EMPLOYMENT

23  TAX RETURNS -- THE AMENDED EMPLOYMENT TAX RETURNS THAT

24  WERE FILED LAST FALL ON BEHALF OF AEM, INC. FOR THE FIRST

25  AND SECOND QUARTERS OF 2007.

1           ARE YOU FAMILIAR WITH THOSE RETURNS?

2      A    YES.

3      Q    SO, THAT'S GOING TO BE THE MAIN FOCUS, IS ON

4    THOSE RETURNS, BUT BEFORE WE GET STARTED, LET ME GET A

5    LITTLE BACKGROUND.  WHERE DID YOU GO TO SCHOOL?  WHAT

6    COLLEGE?

7      A    I WENT TO THE UNIVERSITY OF KANSAS.

8      Q    MAJORED IN?

9      A    MAJORED IN ACCOUNTING.

10     Q    WHEN DID YOU GRADUATE?

11     A    I GRADUATED WITH MY UNDERGRAD IN ACCOUNTING IN

12   1996 AND MASTER'S IN ACCOUNTING INFORMATION SYSTEMS,

13   SPECIALIZING IN TAX, IN 1997.

14     Q    YOU'RE A CPA?

15     A    YES.

16     Q    WHEN DID YOU GET YOUR CPA?

17     A    I'M GOING TO GUESS TEN YEARS AGO.  SORRY.

18     Q    THAT'S OKAY.  HAVE YOU TAKEN ANY CONTINUING

19   EDUCATION CLASSES SINCE YOUR MASTER'S?

20     A    YES.  MY CPA IS UP-TO-DATE.

21     Q    AND YOU'RE REQUIRED TO DO CONTINUING

22   PROFESSIONAL EDUCATION EVERY YEAR?

23     A    THAT'S CORRECT.  I JUST GOT DONE TAKING AN

24   ETHICS CASE YESTERDAY.  SO --

25     Q    EXCELLENT.  WHERE HAVE YOU WORKED SINCE COLLEGE?

1        A    MY FIRST JOB WAS WITH ARTHUR ANDERSON IN KANSAS

2    CITY.  I WAS THERE UNTIL MAY OF 2002, WHERE ARTHUR

3    ANDERSON AND KPMG COMBINED, IN KANSAS CITY. I WORKED IN

4    THE KANSAS CITY OFFICE UNTIL SEPTEMBER 15 OF 2005, AND

5    THEN TRANSFERRED DOWN TO THE ORLANDO KPMG OFFICE AND HAVE

6    BEEN THERE EVER SINCE.

7        Q    BRIEFLY DESCRIBE WHAT YOU DO HERE AT KPMG.

8        A    I'M A SENIOR TAX MANAGER IN THE ORLANDO OFFICE,

9    WHERE I HANDLE CORPORATE -- MAINLY CORPORATE CLIENT INCOME

10    TAX AND CONSULTING FOR MEDIUM SIZE AND LARGE CLIENTS.

11        Q    DO YOU GET INVOLVED IN EMPLOYMENT TAX RETURNS,

12    AS WELL?

13        A    WE DO HAVE CLIENTS THAT I DO EMPLOYMENT TAX

14    RETURNS FOR.

15        Q    WHEN DID YOU FIRST HAVE ANY PROFESSIONAL

16    INVOLVEMENT WITH AEM?

17        A    WITH AEM, I GUESS WE ARE TALKING ABOUT PAYROLL

18    TAXES, OR ANY TYPE OF TAXES?

19        Q    ANY.

20        A    IT WOULD HAVE BEEN IN THE FALL OF '09.

21        Q    OKAY.  AND WHAT WAS THE CONTEXT OF THAT?  HOW

22    WERE YOU APPROACHED?

23        A    OH, MR. CUTHILL HAD DISCUSSION WITH KPMG TO SEE

24    IF WE WOULD BE INTERESTED IN DOING SOME TAX WORK FOR

25    MIRABILIS.

1    Q    SO, HE APPROACHED YOU ON BEHALF OF -- THERE ARE

2    THREE DEBTORS; AEM, INC., MIRABILIS VENTURES, INC., AND

3    HOTH HOLDINGS.  DID HE APPROACH YOU ON BEHALF OF ALL

4    THREE, OR HOW WAS THAT DONE?

5    A    AT THE TIME, I BELIEVE IT WAS JUST MIRABILIS.

6    Q    PRIOR TO THE FALL OF '09, HAD YOU EVER HAD ANY

7    PROFESSIONAL INVOLVEMENT WITH MIRABILIS OR ANY OF ITS

8    SUBSIDIARIES?

9    A    NO.

10   Q    DO YOU KNOW WHETHER KPMG DID?

11   A    NO -- I DO NOT.

12   Q    SO, MR. CUTHILL APPROACHED YOU IN THE FALL, AND

13   WHAT WAS HIS REQUEST?  WHAT WAS HIS -- WHAT DID YOU TALK

14   ABOUT?

15   A    HE ASKED ME TO PREPARE SOME CORPORATE INCOME TAX

16   RETURNS FOR 2006, 2007, 2008.

17   Q    THE FORM 1120'S?

18   A    YES.

19   Q    DID HE ALSO ASK YOU TO PREPARE 941'S?

20   A    NOT AT THAT TIME, NO.

21   Q    OKAY.  DID YOU JUST TALK WITH MR. CUTHILL, THEN?

22   A    YES.

23   Q    HOW MANY TIMES DID YOU DISCUSS PREPARING THESE

24   INCOME TAX RETURNS?

25   A    WE PROBABLY HAD THREE OR FOUR MEETINGS.

1      Q      AND IN GENERAL, WHAT KINDS OF INFORMATION WERE

2   YOU PROVIDED TO DO THE 1120'S?

3      A      I WAS PROVIDED INCOME STATEMENTS, TRIAL

4   BALANCES, BALANCE SHEETS.

5      Q      FOR WHAT COMPANIES?

6      A      ALL OF THE SUBSIDIARIES OF MIRABILIS.

7      Q      THEIR 1120 INCLUDED A NUMBER OF SUBSIDIARIES.

8   DO YOU RECALL ABOUT HOW MANY? ON THE 1120'S?

9      A      IT WAS PROBABLY, YOU KNOW, 60 TO 70 DEPENDING ON

10  THE YEAR.

11     Q      I'M SORRY. TELL ME AGAIN WHICH YEARS WERE YOU

12  GOING TO DO THE 1120'S FOR?

13     A      ORIGINALLY 2006, 2007, 2008.

14     Q      DID YOU PREPARE THOSE RETURNS?

15     A      YES.

16     Q      DID YOU PREPARE AN 1120 FOR AEM?

17     A      IT WAS A PART OF THE CONSOLIDATED RETURN, SO --

18     Q      AND SO, YOU HAD -- THE INFORMATION YOU HAD,

19  THEN, WAS INCOME STATEMENTS AND WHAT ELSE?

20     A      INCOME STATEMENTS, BALANCE SHEETS, ADJUSTING

21  JOURNAL ENTRIES THAT WERE MADE. THAT KIND OF INFORMATION.

22     Q      WAS IT THE KIND OF INFORMATION THAT YOU WOULD

23  NORMALLY EXPECT TO SEE IF SOMEONE ASKED YOU TO DO AN 1120

24  FOR COMPANIES -- A COMPANY OF THIS SIZE?

25     A      YES.

1       Q     WAS THERE ANYTHING THAT YOU ASKED FOR IN

2  PREPARING THOSE RETURNS THAT YOU WEREN'T ABLE TO OBTAIN?

3       A     I DON'T REMEMBER.

4       Q     WHAT WOULD YOU NORMALLY ASK FOR, IF YOU WERE

5  PREPARING AN 1120 FOR A CORPORATION?  AGAIN, WE ARE

6  TALKING ABOUT PREPARING THE RETURN, NOT DOING AN AUDIT,

7  RIGHT?

8       A     RIGHT. EXACTLY.

9       Q     MY UNDERSTANDING IS THAT YOU DIDN'T DO AN AUDIT

10  OF THESE COMPANIES. IS THAT CORRECT?

11      A     NO. THAT'S CORRECT.

12      Q     OKAY. SO, WE ARE TALKING PREPARING A RETURN.

13  WHAT KIND OF STUFF -- WHAT KIND OF DATA WOULD YOU NORMALLY

14  SEE?

15      A     TRIAL BALANCE, INCOME STATEMENTS, BALANCE

16  SHEETS, DEPRECIATION REPORTS -- THAT TYPE OF INFORMATION.

17      Q     AS BEST YOU CAN RECALL, YOU HAD ALL OF THAT --

18      A     YES.

19      Q     -- FOR THE MIRABILIS RETURNS?

20      A     YES.

21      Q     WHEN WERE YOU ASKED TO -- WELL, HOW DID IT COME

22  ABOUT THAT YOU DID THE 941'S?

23      A     BILL HAD CONTACTED ME.

24      Q     BILL, MEANING MR. CUTHILL?

25      A     YES. HE CONTACTED ME SAYING THAT HE NEEDED TO

Page 12

1    AMEND SOME RETURNS THAT WERE FILED INCORRECTLY, AND ASKED

2    ME IF KPMG WOULD BE ABLE TO PREPARE AMENDED RETURNS.

3         Q    WAS THIS ALSO IN THE FALL OF '09, OR LATER?

4         A    YES.

5         Q    AND WAS IT JUST YOU WORKING DIRECTLY WITH MR.

6    CUTHILL, OR ARE THERE OTHER KPMG EMPLOYEES THAT WORKED ON

7    THIS?

8         A    THERE'S OTHER KPMG EMPLOYEES.

9         Q    WHO?

10        A    THE STAFF WAS CAROL PRYTULA.

11        Q    WOULD YOU SPELL THE LAST NAME, PLEASE?

12        A    P R Y T U L A.

13        Q    OKAY. WHO ELSE?

14        A    THE MANAGING DIRECTOR WAS MATT DONNELLY.

15        Q    D O --?

16        A    N N E L L Y.  AND THERE WAS A WASHINGTON

17   NATIONAL EXPERT THAT WAS CONSULTED. STEVE FRIEDMAN.

18        Q    F R I E D?

19        A    YES.

20        Q    WHAT IS WASHINGTON NATIONAL?

21        A    THAT'S OUR EXPERTS IN KPMG THAT HANDLE SPECIALTY

22   PRACTICES -- SPECIAL, YOU KNOW, ISSUES.

23        Q    SUCH AS?

24        A    CORPORATE TAX, PAYROLL TAX. YOU KNOW, THEY'RE

25   OUR, YOU KNOW, THE GUYS THAT WE TALK TO IF WE HAVE A

1   QUESTION THAT YOU KNOW I MAY NOT BE ABLE TO ANSWER, OFF

2   THE TOP OF MY HEAD.

3        Q    SO, WHAT DID YOU CONSULT THEM REGARDING, IN THIS

4   CASE?

5        A    I CONSULTED THEM TO FIND OUT IF AEM SHOULD FILE

6   BY THEMSELVES OR IF THEY SHOULD FILE A CONSOLIDATED 941.

7        Q    DID YOU TALK TO -- ONLY TO MR. FRIEDMAN --

8        A    YES.

9        Q    -- IN THAT GROUP?  OKAY.  WHEN DID YOU FIRST

10  TALK WITH MR. FRIEDMAN ABOUT THE AEM MATTERS?

11       A    MAY HAVE BEEN IN THE FALL.

12       Q    HOW MANY TIMES DID YOU TALK TO HIM?

13       A    TWO OR THREE.

14       Q    AND WHAT PARTICULAR -- DID YOU DISCUSS THE

15  INCOME TAX ISSUES WITH MR. FRIEDMAN?

16       A    NO. NO.

17       Q    SO, IT WAS JUST THE 941 -- THE EMPLOYMENT TAX

18  ISSUES?

19       A    YES.

20       Q    OKAY. AND TELL ME WHAT KIND OF THINGS YOU TALKED

21  ABOUT. WHAT YOU ASKED ABOUT AND WHAT HIS VIEWS ARE?

22       A    WE DISCUSSED WHETHER AEM SHOULD BE -- HAD A

23  LEGAL OBLIGATION TO FILE WITH THE OTHER ENTITIES; AND HIS,

24  YOU KNOW, CONCLUSIONS -- OR, HIS DISCUSSIONS WITH ME SAID,

25  IF THERE WAS A FORM 2678, I BELIEVE, THAT WAS FILED, THAT

1    THEY WOULD PAY TOGETHER WITH THE OTHER ENTITIES, THEN THEY

2    WOULD LEGALLY BE BOUND TO FILE; OR IF THERE WAS A LEGAL

3    CONTRACT THAT WAS SIGNED BETWEEN THE OTHER COMPANIES, THAT

4    THEY WOULD BE -- THEY COULD REPORT ALL TOGETHER.  IF NOT,

5    THEN THEY PROBABLY SHOULD FILE BY THEMSELVES, BECAUSE

6    THEY'RE NOT LEGALLY OBLIGATED TO FILE.

7         Q    WHEN YOU TALK ABOUT THE OTHER ENTITIES, WHAT

8    OTHER ENTITIES ARE WE TALKING ABOUT?

9         A    THAT WOULD BE THE PRESIDION AND THE, I BELIEVE,

10   NATIONAL STAFFING.

11        Q    NATIONAL MEDSTAFF?

12        A    NATIONAL MEDSTAFF.  YES.

13        Q    THERE WERE TWO PRESIDIONS?

14        A    PRESIDION VI AND VII, I BELIEVE.

15        Q    SO, IT WAS YOUR UNDERSTANDING THAT, ORIGINALLY,

16   AEM, THE TWO PRESIDIONS, AND NATIONAL MEDSTAFF HAD FILED A

17   941 TOGETHER?

18        A    YES.

19        Q    AND YOU CONSULTED WITH MR. FRIEDMAN ABOUT

20   WHETHER THEY -- WHETHER AEM SHOULD HAVE FILED A SEPARATE

21   941?

22        A    THAT IS CORRECT.

23        Q    DID YOU DISCUSS -- SO, HE SAID IF THEY HAD A

24   FORM 2678. WHAT IS THAT?

25        A    I BELIEVE IT'S AN EMPLOYEE -- OR, EMPLOYER AGENT

1    CONTRACT WHERE THEY WOULD ALL FILE TOGETHER.

2        Q    DID YOU LOCATE SUCH A THING?

3        A    I DID NOT LOCATE SUCH A THING.

4        Q    WHERE DID YOU LOOK?

5        A    I CONTACTED BILL TO ASK IF THAT FORM HAD BEEN

6    FILED.

7        Q    AND?

8        A    HE SAID THE FORM HAD NOT BEEN FILED.

9        Q    OKAY. THEN A LEGAL CONTRACT. DID YOU FIND ANY

10   CONTRACTS BETWEEN AEM AND ANY OF THE OTHER ENTITIES?

11       A    NO.

12       Q    WHO DID YOU ASK?

13       A    I ASKED MR. CUTHILL.

14       Q    HE SAID THAT HE LOCATED NONE?

15       A    THAT IS CORRECT.

16       Q    WHAT ELSE DID YOU DISCUSS WITH MR. FRIEDMAN?

17       A    THAT WAS -- THAT WAS THE BASIS OF OUR

18   CONVERSATION.

19       Q    ONCE YOU HAD THAT INFORMATION FROM MR. FRIEDMAN,

20   THEN WHAT WAS YOUR NEXT STEP IN PREPARING THE 941 THAT MR.

21   CUTHILL ASKED YOU TO DO -- 941'S, PLURAL. SORRY.

22       A    WE REQUESTED INFORMATION FROM MR. CUTHILL.

23       Q    WHAT INFORMATION DID YOU REQUEST?

24       A    WE REQUESTED THE PRIOR YEAR RETURNS AND ANY

25   INFORMATION THAT SUPPORTED THOSE RETURNS.

Page 16

1      Q      AND RETURNS FOR --

2      A      THE 941'S.

3      Q      JUST FOR AEM?

4      A      YES. WELL, YES, JUST FOR AEM.

5      Q      AND ANY OTHER SUPPORTING DOCUMENTATION. WHAT

6   WERE YOU EXPECTING? WHAT WOULD YOU EXPECT TO RECEIVE?

7      A      I WOULD HAVE EXPECTED TO SEE THE DEPOSITS AND

8   THE EMPLOYEE LIABILITY -- THE WAGES AND LIABILITY.

9      Q      IN WHAT KIND OF FORMAT -- WHAT DO YOU NORMALLY

10   SEE, IF YOU'RE DOING A 941 FOR A COMPANY LIKE THIS?

11      A      IT CAN VARY.  YOU KNOW, SPREADSHEETS ARE USUALLY

12   THE -- WHAT WE SEE FROM OUR CLIENT.

13      Q      YOU ASKED MR. CUTHILL FOR THIS DATA; AND WHAT

14   DID YOU RECEIVE?

15      A      WE RECEIVED A SPREADSHEET THAT BROKE OUT EACH OF

16   THE ENTITIES, THEIR EMPLOYEES, AND THE DEPOSITS THAT CAME

17   FROM EACH OF THOSE ENTITIES.

18      Q      AND WAS THAT SUFFICIENT INFORMATION TO PREPARE

19   THE 941'S?

20      A      YES.

21      Q      AND DID YOU PREPARE THE 941'S FOR THE FIRST AND

22   SECOND QUARTER OF 2007, OR DID SOMEBODY ELSE HERE DO THAT?

23      A      SOMEONE ELSE DID THAT.

24      Q      WHO DID THAT?

25      A      CAROL PRYTULA.

1       Q       DID YOU REVIEW HER WORK?

2       A       YES.

3       Q       WHAT DO YOU DO IN THE REVIEW PROCESS? WHAT KIND

4    OF THINGS DID YOU LOOK AT?

5       A       I REVIEWED -- MADE SURE THE NUMBERS WERE

6    CORRECT, IN THE CORRECT FORM, DEPOSITS WERE CORRECT --

7    OVERALL REVIEW OF JUST THE FORM LOOKED COMPLETE AND THE

8    QUESTIONS ANSWERED PROPERLY.

9       Q       I'M GOING TO SHOW YOU WHAT WE WILL MARK. AND WE

10   STARTED NUMBERING DEPOSITIONS -- WE STARTED NUMBERING

11   EXHIBITS IN THE PRIOR DEPOSITION OF MR. CUTHILL, AND ENDED

12   WITH EXHIBIT 31.  SO, LET'S START WITH EXHIBIT 32.  THESE

13   ARE WORK PAPERS THAT WERE PROVIDED TO US BY MR. CUTHILL

14   AND WE HAVE BATES NUMBERED THEM AEM OO2312 THROUGH AEM

15   OO2365.

16          (WHEREUPON, THE REFERRED TO DOCUMENTS WERE

17       MARKED FOR IDENTIFICATION AS EXHIBIT 32).

18          MS. IDE:  MR. RIZZO, I HAVE HANDED MR. BOCOX

19       WHAT WE MARKED EXHIBIT 32, WHICH IS THE WORK --

20       THE FIRST PAGE SAYS: WORK PAPERS DOT PDF,

21       GENERATED 12/15/2009, 2:69.P.M. I SENT THOSE TO

22       YOU, I BELIEVE, LAST WEEK.

23   BY MS. IDE:

24       Q       MR. BOCOX, COULD YOU JUST REVIEW THOSE WORK

25   PAPERS AND THEN WE WILL GO THROUGH AND DISCUSS THEM.

1          MR. BOCOX, THESE ARE SOME OF THE DOCUMENTS YOU

2    REVIEWED PRIOR TO YOU BEEN DEPOSITION TODAY?

3          A    YES.

4          Q    LET'S JUST WALK THROUGH THESE AND EXPLAIN TO ME

5    WHAT THESE THINGS ARE.   LET'S START WITH THE DOCUMENT THAT

6    BEGINS WITH BATES NUMBER AEM OO2314, WHICH IS A 941 FOR

7    THE FIRST QUARTER OF 2007.   HAVE YOU SEEN THIS -- YOU HAVE

8    SEEN THIS DOCUMENT BEFORE?

9          A    YES.

10         Q    AND WHAT IS YOUR UNDERSTANDING OF WHERE THIS

11   CAME FROM?

12         A    I DON'T UNDERSTAND THE QUESTION.

13         Q    THIS IS NOT THE 941 YOU PREPARED. THIS WAS THE

14   ORIGINAL 941, CORRECT?

15         A    YES.

16         Q    AND DID YOU REVIEW THIS FORM 941 PRIOR TO

17   PREPARING THE 941 FOR -- THAT MR. CUTHILL ASKED YOU TO DO?

18         A    I DID LOOK OVER THE FORM, YES.

19         Q    DID YOU GO BEHIND ANY OF THE NUMBERS? DID YOU

20   LOOK TO SEE IF ANY OF THESE NUMBERS WERE ACCURATE?

21         A    NO, I DID NOT.

22         Q    AND, IT SHOWS ON LINE TWO, FOR EXAMPLE, WAGES IN

23   EXCESS OF $98 MILLION. DO YOU KNOW WHAT THAT PERTAINS TO?

24   IS THAT FROM ALL FOUR COMPANIES THAT WE WERE TALKING ABOUT

25   BEFORE: AEM, THE TWO PRESIDIONS, AND NATIONAL MEDSTAFF?

1    A    YES.

2    Q    HOW DID YOU AGAIN THAT UNDERSTANDING? WHO TOLD

3  YOU?

4    A    THAT WAS IN A SCHEDULE PROVIDED BY MR. CUTHILL

5  THAT BROKE OUT ALL FOUR COMPANIES.

6    Q    AND THEY TOTALED THE 98?

7    A    THAT IS CORRECT.

8    Q    IS THAT SCHEDULE IN THIS EXHIBIT -- PART OF THIS

9  EXHIBIT 32?

10    A    YES.

11    Q    AT WHICH PAGE, IF YOU COULD LOOK AT NUMBERS?

12    A    IT WOULD BE OO2328.

13    Q    AND THAT'S TITLED: MIRABILIS HR CONSOLIDATED 941

14  1ST QUARTER 2007 AS OF 6/5/2007, 2:59 P.M.?

15    A    YES.

16    Q    OKAY.  DO YOU KNOW THE SOURCE OF THIS CHART AT

17  2328?

18    A    OFF THE TOP OF MY HEAD, I DO NOT.

19    Q    MR. CUTHILL PROVIDED IT TO YOU?

20    A    YES.

21    Q    DO YOU KNOW WHO ORIGINALLY PREPARED IT?

22    A    I'M GUESSING MR. CUTHILL.

23    Q    BUT, YOU DON'T KNOW FOR SURE?

24    A    I DON'T KNOW.

25    Q    OKAY. AND DID YOU HAVE ANY BACKUP DATA? DID YOU

1    SEE ANY BACKUP DATA FOR ANY NUMBERS ON 2328?

2         A    I DON'T RECALL.

3         Q    WOULD THAT BE SOMETHING THAT, MAYBE, MS. PRYTULA

4    WOULD HAVE INVESTIGATED?

5         A    PERHAPS.

6         Q    YOU DON'T KNOW FOR SURE?

7         A    I DON'T KNOW.

8         Q    OKAY.  LOOKING AT CLOSER TO THE BEGINNING OF

9    THIS EXHIBIT, AEM OO2317, IT SHOWS A LITTLE -- A CHART OF

10   TAX PAYMENTS.  WERE YOU ABLE TO VERIFY ANY OF THESE

11   DEPOSITS -- THESE TAX PAYMENTS?

12        A    WHERE ARE YOU AT, AGAIN?

13        Q    2317.

14        A    NONE OF THOSE WAS PAYMENTS THAT WE RECEIVED.

15             THE REPORTER:  I'M SORRY.  WOULD YOU REPEAT

16        THAT, PLEASE?

17             THE WITNESS:  WE WERE GIVEN THESE PAYMENTS

18        BY THE CLIENT.

19   BY MS. IDE:

20        Q    MR. CUTHILL PROVIDED THIS. IT'S PART --

21        A    YES.

22        Q    -- AS PART OF THE DOCUMENT YOU --

23        A    WE DID NOT VERIFY THAT THOSE PAYMENTS WERE MADE.

24        Q    YOU DIDN'T REQUEST TRANSCRIPTS FROM THE IRS OF

25   AEM'S ACCOUNT FOR THAT QUARTER?

Page 21

1        A    NO.

2        Q    DID MR. CUTHILL PROVIDE YOU ANY IRS TRANSCRIPTS

3   OF ACCOUNT FOR AEM FOR THAT QUARTER -- FOR THE FIRST

4   QUARTER OF 2007?

5        A    I DON'T RECALL THAT HE DID.

6        Q    IF YOU WERE PROVIDED THAT DATA, WOULD THAT BE IN

7   THE KPMG FILE? WOULD THAT BE IN YOUR WORK PAPERS?

8        A    YES, IT WOULD.

9        Q    LOOKING AT THE NEXT PAGE, WHICH IS THE 941C,

10  SUPPORTING STATEMENT TO CORRECT INFORMATION.  THIS ALSO

11  APPEARS TO BE SOMETHING -- NOT SOMETHING YOU DID.  YOU

12  DIDN'T PREPARE THIS, RIGHT?

13       A    THAT IS CORRECT.

14       Q    NOW, ALSO PART OF EXHIBIT 32, BEGINNING AT AEM

15  002320, IS A FORM 944 FOR 2006.  MR. CUTHILL PROVIDED THIS

16  TO YOU?

17       A    YES.

18       Q    AND WHAT IS YOUR UNDERSTANDING OF WHAT THIS

19  RETURN WAS?

20       A    THIS IS THE ANNUAL 2006 EMPLOYEE RETURN --

21  EMPLOYEE PAYROLL TAX RETURN.

22       Q    IT'S JUST FOR AEM? THIS ISN'T A SO-CALLED

23  CONSOLIDATED RETURN? OR IS IT A CONSOLIDATED RETURN?

24       A    I DON'T KNOW.

25       Q    ON THE THIRD PAGE OF THIS, FOR 2006 -- IT'S AEM

1   OO2322 -- IT'S A TYPED LIST THAT SAYS: ENTITIES INCLUDED

2   IN CONSOLIDATED 941; AND IT LISTS AEM, INC., PRESIDION

3   SOLUTIONS VII, PRESIDION SOLUTIONS VI, AND NATIONAL

4   MEDSTAFF INC.

5        A    IT IS A CONSOLIDATED -- IT DOES LOOK LIKE A

6   CONSOLIDATED RETURN.

7        Q    TURNING TO THE NEXT PAGE, AEM 2323 AND 2324,

8   THESE ALWAYS APPEAR TO BE PART OF -- WELL, I DON'T KNOW

9   WHAT THEY'RE PART OF. DO YOU KNOW WHAT THESE ARE? WHAT

10  THESE CHARTS ARE THAT SAY: MIRABILIS HR CONSOLIDATED 941

11  1ST QUARTER 2007?

12       A    THESE LOOK TO BE THE DEPOSITS THAT WERE MADE.

13       Q    IT LOOKS LIKE IT'S JUST DEPOSITS FOR AEM AND

14  NATIONAL MEDSTAFF ON THESE TWO PAGES, 2323 AND 2324.

15  RIGHT?

16       A    YES.

17       Q    DID YOU USE THESE IN PREPARING THE 941'S THAT

18  YOU PREPARED?

19       A    WE USED THE INFORMATION THAT BILL GAVE ON THE

20  SPREADSHEET, SO, IF THAT INFORMATION WAS ON THERE, THEN WE

21  WOULD HAVE USED IT.

22       Q    TURNING TO THE NEXT PAGE, 2325, YOU WERE ALSO

23  PROVIDED WITH THAT.  DID YOU USE THIS DATA? THIS IS FOR

24  THE SECOND QUARTER OF 2007, BEGINNING WITH 2325 AND THEN

25  SECOND QUARTER INFORMATION GOES THROUGH --

1        A    YES. WE USED THIS INFORMATION, THEN.

2        Q    -- GOES THROUGH 2327.  LOOKING THROUGH THE REST

3   OF THIS EXHIBIT, YOU TALKED ABOUT THE SPREADSHEET THAT MR.

4   CUTHILL PROVIDED. IS THAT IN HERE?

5        A    THAT'S 2328.

6        Q    THAT'S FOR THE FIRST QUARTER OF 2007.  IS THERE

7   A SIMILAR SPREADSHEET FOR THE SECOND QUARTER OF 2007,

8   PROVIDED BY MR. CUTHILL?

9        A    YES.

10       Q    AND WHAT IS THE NUMBER ON THAT PAGE?

11       A    THAT'S 2354.

12       Q    SO, WHEN YOU REFERRED TO THE SPREADSHEETS

13  PROVIDED BY MR. CUTHILL, YOU REFERRED TO JUST THOSE TWO

14  PAGES, AEM 2328 AND 2354? IS THAT CORRECT?

15       A    YES.

16       Q    YOU GOT THE OTHER INFORMATION, BUT WHEN YOU WERE

17  TALKING ABOUT SPREADSHEETS, IT WAS JUST THOSE TWO PAGES,

18  CORRECT?

19       A    THAT IS CORRECT.

20       Q    OKAY.  LOOKING AT 2328, HOW DID YOU -- OR, DID

21  YOU VERIFY THE ACCURACY OF THESE NUMBERS?

22       A    WE WERE GIVEN THE NUMBERS BY THE CLIENT.  SO,

23  THAT'S WHAT, YOU KNOW -- HE BROKE OUT THE NUMBERS THAT HE

24  HAD AND THAT'S THE NUMBERS THAT WE USED ON THE RETURNS.

25       Q    DID YOU ASK FOR ANY SUBSTANTIATION FOR ANY OF

1   THESE NUMBERS?

2       A   WE HAVE ANY SCHEDULES THAT WE HAD WOULD HAVE

3   BEEN IN THE WORK PAPERS THAT WERE PROVIDED.

4       Q   OKAY.  SO, IF THERE'S ANYMORE DETAIL, IT SHOULD

5   BE IN THIS EXHIBIT 32?

6       A   RIGHT. THAT IS CORRECT.

7       Q   DO YOU -- IS THAT FAIRLY TYPICAL THAT THE CLIENT

8   GIVES YOU A SPREADSHEET AND THE KIND OF BREAKOUTS THAT WE

9   SEE IN EXHIBIT 32? IF YOU'RE JUST PREPARING A RETURN, IS

10  THAT ALL YOU LOOK FOR?

11      A   YES. WE ARE NOT AUDITING THE INFORMATION.

12  THAT'S CLEARLY IN THE ENGAGEMENT.

13      Q   SO, YOU BASICALLY TOOK THE DATA PROVIDED ON THE

14  SPREADSHEET -- WELL, LET ME GO BACK.  THE OTHER

15  SPREADSHEET, WHICH WAS AEM 002354, FOR THE SECOND QUARTER

16  OF 2007, SAME ANSWERS? YOU TOOK THE SPREADSHEET. YOU

17  TRANSFERRED THE NUMBERS TO THE 941?

18      A   YES.

19      Q   AND THAT'S WHAT YOU DO WITH THIS KIND OF LIMITED

20  ENGAGEMENT TO FILE A -- TO JUST PREPARE A TAX RETURN,

21  CORRECT?

22      A   YES.

23      Q   NOW, THERE'S -- A FEW PAGES IN -- PAGE AEM 2331,

24  IF YOU COULD TURN TO THAT, THERE IS A PAGE THAT HAS ENTER

25  AMOUNTS FROM YEAR END WAGE REPORT.  DO YOU KNOW WHOSE

Page 25

```
 1    HANDWRITING THIS IS ON THIS PAGE?

 2         A    I DO NOT.

 3         Q    IS IT YOURS?

 4         A    NO.

 5         Q    DO YOU -- IS IT MS. PRYTULA'S, IF YOU RECOGNIZE

 6    HER HANDWRITING?

 7         A    I DON'T KNOW.

 8         Q    LOOKING AT THE NEXT PAGE, AEM 2332, THERE'S A

 9    NOTATION ON THE YEAR END EMPLOYEE WAGE REPORT THAT SAYS:

10    NEED TO ADJUST USING 941C FOR PRIOR YEARS ADJUSTMENTS

11    REFLECTED IN CONSOLIDATED RETURN, FIRST QUARTER 2007.  DO

12    YOU KNOW WHO WROTE THAT?

13         A    NO, I DON'T.

14         Q    IS IT YOUR HANDWRITING?

15         A    NO.

16         Q    DO YOU KNOW WHAT THAT MEANS?

17         A    I'M GUESSING THAT WE NEEDED TO ADJUST THIS 4285.

18    THAT WOULD BE -- THIS IS ON THE 2314, 7E. THAT'S THE 4285.

19         Q    LOOKING AT PAGE AEM 2314, THE 941 -- THE

20    ORIGINAL 941 FOR 2007 -- THAT'S THE ADJUSTMENT THAT WAS

21    MADE?

22         A    YES.

23         Q    OKAY.  YOU DIDN'T PREPARE THAT RETURN.

24         A    NO.

25         Q    THAT WAS BACK IN 2007 AND YOU WEREN'T ENGAGED?
```

Page 26

1       A    THAT IS CORRECT.

2       Q    NOW, NEAR THE END OF EXHIBIT 32, AT PAGE AEM

3   2362, IS WHAT LOOKS LIKE ANOTHER VERSION OF A SPREADSHEET.

4   DO YOU SEE THAT?  THIS ONE IS TITLED MIRABILIS HR

5   CONSOLIDATED 941, 1ST QUARTER 2007, AS OF 12/2/2009, 4:57

6   P.M. DO YOU KNOW WHO PREPARED THIS?

7       A    THAT WOULD BE -- WELL, THE ORIGINAL SCHEDULES

8   WERE ALL PREPARED BY MR. CUTHILL OR SOMEONE.

9       Q    OR PROVIDED BY MR. CUTHILL?

10      A    YES. YES.

11      Q    BUT THEN, THERE'S A BOX AEM, INC., ABOVE THE

12  COLUMN HEADED HR O3, AND THEN THERE'S A NOTATION 941X,

13  PAGE, COLUMN ONE, THAT POINTS DOWN TO --

14      A    YES.

15      Q    -- LINE 10 OR 11. IS THAT SOMETHING THAT SOMEONE

16  AT KPMG ADDED TO THIS SPREADSHEET?

17      A    YES.

18      Q    WOULD THAT HAVE BEEN YOU?

19      A    NO.

20      Q    MS. PRYTULA?

21      A    YES.

22      Q    WHAT DOES THAT INDICATE TO YOU, THOUGH? THOSE

23  ADDITIONS?

24      A    JUST KIND OF REFERENCING WHERE THE NUMBERS, YOU

25  KNOW -- WHERE THE NUMBERS ARE GOING ON THE RETURN.

1      Q    TURN TO THE NEXT PAGE, AEM 2363, WHICH IS THE

2    941 FOR 2007. IT LOOKS LIKE THE ORIGINAL ONE. AND THERE

3    ARE SIMILAR NOTATIONS; ONE THAT SAYS 941X, PAGE TWO,

4    COLUMN TWO. THERE ARE ACTUALLY FOUR OF THOSE NOTATIONS. IS

5    THAT SOMETHING THAT MS. PRYTULA WOULD HAVE ADDED TO THAT

6    941, AS REFERENCE POINTS?

7      A    YES.

8      Q    WOULD THERE BE A SIMILAR -- WOULD YOU EXPECT

9    THERE TO BE A SIMILAR KIND OF NOTATION DONE TO THE OLD 941

10   FOR THE SECOND QUARTER?  I DIDN'T SEE ONE IN THIS PACKAGE.

11     A    I DON'T UNDERSTAND THE QUESTION.

12     Q    WOULD MS. PRYTULA TYPICALLY HAVE DONE THESE KIND

13   OF REFERENCES FOR THE SECOND QUARTER 941?

14     A    THIS SCHEDULE IS THE SECOND QUARTER 941. 2364?

15     Q    NO. I'M LOOKING AT 2363. I APOLOGIZE. THE 941

16   FOR 2007 1ST QUARTER -- IT LOOKS LIKE THERE ARE NOTATIONS

17   IN THE LITTLE BLOCKS -- THE SORT OF COMMENT BLOCKS. AND

18   THOSE WOULD HAVE BEEN MADE BY MS. PRYTULA?

19     A    YES.

20     Q    AND WOULD YOU EXPECT THAT SHE DID THE SAME THING

21   FOR THE SECOND QUARTER RETURN?

22     A    SO, ON 2365? YES, I WOULD EXPECT THAT.

23     Q    OKAY. SO THAT'S -- ON PAGE, AEM 2365, THOSE ARE

24   THE SAME -- THOSE ARE ALSO HER NOTATIONS -- MS. PRYTULA'S

25   NOTATIONS?

1       A      YES. YES.

2       Q      THEN, TELL ME, WHAT IS AEM 2364?

3       A      THAT IS HER TAKING THE NUMBERS FROM THAT

4    SCHEDULE AND SHOWING WHERE THE NUMBERS ARE GOING.

5       Q      SO, THE ORIGINAL SCHEDULE WAS AMONG THE PAPERS

6    PROVIDED BY MR. CUTHILL, AND THEN --

7       A      YES.

8       Q      -- THEN MS. PRYTULA MADE THE ANNOTATIONS TO

9    REFERENCE WHERE THINGS GO ON THE NEW 941, CORRECT?

10      A      YES.

11      Q      NOW, ON LINES 5A, 5B, AND 5C, ON PAGE AEM 2364,

12   THERE'S A LITTLE A, B, C, AND THERE'S SOME TYPED-IN

13   NOTATIONS. EXPLAIN THAT TO ME.

14      A      THAT WOULD BE --

15      Q      I'M JUST TRYING TO TIE OUT THOSE NUMBERS. WE CAN

16   START WITH "A," WHICH IS THE AMOUNT OF 568,228.22. THEN,

17   UP IN THE UPPER, RIGHT-HAND CORNER OF THE DOCUMENT, IT

18   SHOWS THAT DIVIDED BY .124. WHAT ARE WE SHOWING, HERE?

19      A      TRYING TO GET THE NUMBERS TO BE LIKE -- THE

20   NUMBERS MAY HAVE BEEN IN GROSS DETAIL, AND THESE WOULD BE

21   TO BREAK THEM OUT INTO, YOU KNOW, NET OF THE TAXES. YOU

22   KNOW, THE FICA TAXES PAID. SO, THEY'RE KIND OF A

23   GROSSED-UP NUMBER TO ACTUALLY BE ON THE SCHEDULE.

24      Q      SO, WHAT DO YOU MEAN BY THAT? SO, THE GROSSED-UP

25   NUMBER IS WHAT?

1      A     THE GROSSED-UP NUMBER IS THIS 21,495 -- OFF TO

2   THE SIDE, THERE.  THOSE ARE -- WE ARE TAKING THE NUMBER --

3   THE 568,228 IS THE SOCIAL SECURITY WAGES. WE ARE DIVIDING

4   IT BY THE, YOU KNOW, THE EMPLOYER'S PERCENT -- THE .124 --

5   COMING UP WITH -- IT COMES UP WITH THE 4582. IS THAT

6   COMING ON TO -- THAT WAS JUST TO SHOW WHERE SHE GOT -- HOW

7   SHE GOT -- DETERMINED THOSE NUMBERS. SO, WE WERE GIVEN --

8   MUST HAVE BEEN THE 4582 -- THAT'S 568,228 DIVIDED BY THE

9   POINT -- THE FICA.

10              (WHEREUPON, A DISCUSSION WAS HELD OFF THE

11       RECORD.)

12   BY MS. IDE:

13      Q     MR. BOCOX, LOOKING AT AEM 2364, WE WERE TALKING

14   ABOUT THE NOTATIONS IN THE COLUMN HEADED AEM, INC., HR O3.

15   AND WE WERE LOOKING DOWN TO TAXABLE SOCIAL SECURITY WAGES

16   ON LINE 5A, IN THE AMOUNT OF $568,228.22; AND THERE'S A

17   NOTATION ON THIS PAGE THAT WAS DIVIDED BY .124 TO GET

18   $4,582,486.  WAS IT THE 4.5 MILLION FIGURE THAT WAS

19   PROVIDED BY MR. CUTHILL? THAT'S WHAT I'M CONFUSED ABOUT?

20   WHERE DID THAT NUMBER COME FROM?

21      A     I DON'T KNOW, OFF THE TOP OF MY HEAD.

22      Q     WHY WAS THAT COMPUTATION DONE?

23      A     I DON'T RECALL, RIGHT NOW.

24      Q     MS. PRYTULA WOULD KNOW?

25      A     YES.

1      Q      LOOKING AT THE SECOND NUMBER IN LINE 5B:

2   $8,336.17, REFERENCING TAXABLE SOCIAL SECURITY TIPS, AND

3   THAT HAS A NOTATION THAT THAT WAS ALSO DIVIDED BY .124 TO

4   GIVE $67,227. WHAT DOES THAT REPRESENT?

5      A      I'D HAVE TO GO BACK AND LOOK AT THE FILES AGAIN.

6      Q      AND THE SAME FOR ITEM --

7      A      YES. YES.

8      Q      -- 3C.

9      A      YES.

10     Q      IS IT JUST A CHECK, OR ARE YOU BACKING INTO

11  NUMBERS, OR -- I KNOW I'M ASKING FOR SORT OF AN EDUCATED

12  GUESS HERE, BUT --

13     A      I DON'T KNOW.

14     Q      WHY WOULD YOU RUN A COMPUTATION LIKE THAT IN

15  PREPARING A 941?

16     A      I DON'T KNOW. SEEMS LIKE WE ARE MISSING SOME

17  SCHEDULES, SO --

18     Q      THE ADDITIONAL SCHEDULES MIGHT BE IN YOUR FILES?

19     A      YES, COULD BE.

20     Q      DID YOU PROVIDE THOSE TO MR. CUTHILL? YOUR OTHER

21  SCHEDULES?

22     A      YES. YES. EVERYTHING I PROVIDED. YES.

23     Q      SO, YOU PROVIDED MR. CUTHILL WITH EVERYTHING --

24     A      YES.

25     Q      -- KPMG HAD TO PREPARE THESE TWO 941'S?

Page 31

1      A    YES.

2      Q    STILL LOOKING AT PAGE 2364, IN THE AEM, INC., HR

3   O3 COLUMN -- AT THE VERY BOTTOM, LINE 13 SHOWS OVERPAYMENT

4   OF NEGATIVE $1,191,056.18.  WAS THAT FIGURE PROVIDED BY

5   MR. CUTHILL?

6      A    YES.

7      Q    ON THE ORIGINAL CHART?

8      A    NOW, THIS MAKES -- THIS WAS THE OLD. OKAY. THIS

9   WAS THE OLD -- I GUESS THIS IS THE OLD RETURN. SO, WE HAD

10  NOTHING -- YEAH. SO, SORRY. THESE NUMBERS WOULD HAVE --

11  NOW I UNDERSTAND.

12     Q    OKAY. YOU WERE LOOKING AT PAGE --

13     A    I WAS LIKE -- THIS IS SOMETHING -- WE DIDN'T

14  PREPARE THIS. AND I'M LIKE, WE WERE GETTING -- DETERMINING

15  THE NUMBERS FOR THIS BASED OFF OF, YOU KNOW, HOW THESE

16  NUMBERS CAME OUT ON THE ORIGINAL RETURN. SO, I APOLOGIZE.

17  I WAS LIKE, THIS DOESN'T LOOK LIKE ANYTHING THAT I

18  ACTUALLY PREPARED, SO --

19     Q    OKAY.

20     A    SO, NOW. OKAY.

21     Q    LET'S GO BACK, THEN. YOU WERE LOOKING AT PAGE

22  AEM 2365, WHICH IS THE ORIGINAL 941 FOR --

23     A    SORRY.

24     Q    THAT'S OKAY. LET'S TRY TO CLARIFY.

25     A    THE ORGANIZE --

1      Q      THE ORIGINAL 941 FOR THE SECOND QUARTER OF

2      2007--

3      A      YES.

4      Q      WHICH WAS THE ORIGINAL ONE THAT YOU FOLKS DID

5      NOT PREPARE, CORRECT?

6      A      YES.

7      Q      BUT, THERE ARE NOTATIONS ON PAGE --

8      A      YES.

9      Q      -- 2365 THAT YOU DID PUT ON THERE.

10     A      YES. WE WERE BACKING -- YES. BASICALLY, THESE

11     NUMBERS PROVE THAT THESE ARE ALL THE CONSOLIDATED NUMBERS

12     THAT WAS ORIGINALLY FILED. WE WERE BACKING IN TO SAY, YOU

13     KNOW, THIS WAS AEM'S SHARE OF THE ORIGINAL NUMBERS THAT

14     WERE FILED. IF YOU ADD THESE UP, TAKE THEM TIMES THE, YOU

15     KNOW, PERCENTS, THEY WOULD BACK OUT INTO THESE NUMBERS,

16     SO--

17     Q      SO, WHEN YOU'RE REFERENCING -- YOU'RE LOOKING,

18     NOW, AT AEM 2364 --

19     A      YES.

20     Q      -- TALKING ABOUT THE LITTLE COMPUTATIONS UNDER

21     A, B, AND C --

22     A      YES.  YES.

23     Q      -- AND IT LOOKS LIKE WHAT YOU'RE DOING FOR THERE

24     IS -- WHAT YOU'RE SAYING, IF I HAVE IT RIGHT, IS THAT YOU

25     RAN THOSE COMPUTATIONS TO FIGURE -- TO DOUBLE CHECK AEM'S

1   SHARE OF WHAT WAS REPORTED ON THE ORIGINAL 941?

2       A    WELL, YES. IT WOULD BASICALLY SAY, YOU KNOW,

3   WHETHER THOSE, YOU KNOW -- THOSE NUMBERS ARE AGREEING IN

4   TOTAL, SO, WE ARE BREAKING THOSE OUT, NOW, TO SAY: DOES

5   THAT MAKE SENSE AND THAT OUR COMPUTATION IS CORRECT; AND,

6   YES.

7       Q    SO, ON 2364 YOUR COMPUTATIONS ON THAT

8   SPREADSHEET ARE KIND OF YOUR SELF-CHECK --

9       A    YES.

10      Q    -- AGAINST THE ORIGINAL RETURN.

11      A    YES.

12      Q    I'M SORRY?

13      A    THAT'S ALL RIGHT. I WAS JUST -- IT DIDN'T LOOK

14  FAMILIAR, AT ALL. SO, I WAS LIKE -- IT WAS CONFUSING ME TO

15  BE LIKE -- THESE NUMBERS DON'T TIE TO ANYTHING THAT I

16  WOULD EXPECT THEM TO TIE TO, AND NOW I KNOW WHY THEY DON'T

17  TIE.

18      Q    LOOKING, AGAIN, AT 2364, THEN -- LOOKING AT THAT

19  LINE A, THE $4,582,486 FIGURE. WHAT DOES THAT REPRESENT?

20      A    THE 4,582,486?  THAT WOULD BE THE GROSS NUMBER

21  THAT WE WOULD PUT FOR AEM IN COLUMN 6A.

22      Q    I'M NOT SURE WHAT YOU MEAN BY COLUMN 6A. I WAS

23  LOOKING AT THE 941, AND IT'S NOT THERE. WHAT ARE YOU

24  TALKING ABOUT?

25      A    CAN I SEE THE 941 THAT WE FILED?

Page 34

1     Q    THAT'S AN ATTACHMENT TO EXHIBIT 17, AT PAGE AEM

2  2373; AND YES, I'M SORRY. IT DOES TIE OUT, I THINK. RIGHT?

3     A    YES.

4     Q    AND THEN LINE B, FROM EXHIBIT 32, PAGE AEM

5  2364 -- THAT'S 67,227. WHERE DID THAT GET --

6     A    THAT WAS LINE 9 ON THE AMENDED RETURN.

7     Q    AND THEN, LINE C, THE $4,469,713 -- THAT GOES ON

8  LINE WHAT -- OF THE 941 THAT YOU PREPARED?

9     A    LINE 10.

10     Q    YOU SAID YOU THINK YOU HAVE SOME ADDITIONAL WORK

11  PAPERS AND SCHEDULES IN YOUR FILES, OR DO YOU THINK THIS

12  IS IT?

13     A    NO. THAT IS IT.

14     Q    EXHIBIT 32.

15     A    YES, SORRY. I WAS LIKE, I DON'T KNOW WHY --

16     Q    LET ME GO BACK A LITTLE BIT.  HAD YOU -- BACK TO

17  THE BEGINNING OF YOUR ENGAGEMENT IN THIS MATTER -- HAVE

18  YOU WORKED WITH MR. CUTHILL BEFORE ON ANY CASES?

19     A    NO.

20     Q    DID YOU KNOW HIM SOCIALLY, PROFESSIONALLY,

21  BEFORE THE FALL OF '09?

22     A    NOPE.

23     Q    DID YOU HAVE ANY CONTACT WITH AEM'S BANKRUPTCY

24  COUNSEL -- EITHER MR. SHUKER, OR MR. LUNA, OR MS.

25  DORRIS -- PRIOR TO KPMG'S ENGAGEMENT?

REALTIME REPORTERS, INC.                          407-884-4662
E-MAIL: REALTIME_RPRS@YAHOO.COM         FAX: 407-884-4664
483d2cf6-0d2a-4510-86d0-0a13d1887c4b

Page 35

1       A    NO.

2       Q    WERE YOU INVOLVED AT ALL IN, OR CONSULTED AT

3   ALL, IN AEM'S OR MIRABILIS' DECISION TO FILE BANKRUPTCY?

4       A    NO.

5       Q    HAVE -- OTHER THAN PREPARING THE 1120'S AND THE

6   TWO 941'S WE HAVE BEEN TALKING ABOUT, HAVE YOU DONE ANY

7   OTHER ACCOUNTING WORK FOR MIRABILIS OR AEM?

8       A    NO.

9       Q    HAVE YOU BEEN CONSULTED BY MR. CUTHILL OR

10  COUNSEL ON ANY MATTERS OTHER THAN FILING THESE TAX

11  RETURNS?

12      A    WE HAVE HAD GENERAL CONVERSATIONS ABOUT --

13  GENERAL CONVERSATIONS ABOUT FUTURE PREPARATION OF TAX

14  RETURNS.

15      Q    WHAT DO YOU MEAN FUTURE?

16      A    SO, NEXT YEAR'S TAX RETURNS.

17      Q    HAS KPMG BEEN RETAINED TO DO THE TAX RETURNS IN

18  THE FUTURE?

19      A    NOT AT THE MOMENT.

20      Q    HAVE YOU HAD ANY DISCUSSIONS ABOUT ANY TAX

21  PLANNING ISSUES, OTHER THAN PREPARATION OF RETURNS?

22      A    WE HAVE DISCUSSED WHETHER OR NOT THE BANKRUPTCY

23  WOULD CAUSE A SHORT YEAR RETURN FOR MIRABILIS.

24      Q    WHO DID YOU HAVE THESE CONVERSATIONS WITH?

25      A    WITH MR. CUTHILL.

1      Q      HAVE YOU HAD ANY CONVERSATIONS WITH ANY OF

2   THE -- ANY COUNSEL -- MR. SHUKER, MS. DORRIS, MR. LUNA?

3      A      NO.

4      Q      NO?

5      A      NO.

6      Q      OTHER THAN THE WORK PAPERS WE WERE LOOKING AT

7   TODAY, IN CONNECTION WITH PREPARING THE TWO 941'S, HAVE

8   YOU SEEN ANY OTHER PAPER OR ELECTRONIC RECORDS OF AEM?

9   ANY SPREADSHEETS?  YOU KNOW, QUICKBOOKS -- ANY OF THOSE

10  KIND OF THINGS THAT THEY MAY HAVE USED?

11     A      ONLY INFORMATION TO PREPARE THE TAX RETURNS FOR

12  '06, '07, '08.

13     Q      JUST FOR THE INCOME TAX RETURNS?

14     A      THAT IS CORRECT.

15     Q      AND THAT WAS ALL PROVIDED BY MR. CUTHILL?

16     A      YES.

17     Q      WHAT IS YOUR UNDERSTANDING OF THE KIND OF

18  BUSINESS AEM WAS IN?

19     A      THEY WERE A PEO BUSINESS.

20     Q      A PEO?

21     A      PROFESSIONAL EMPLOYEE. SO, THEY A LOT OF

22  EMPLOYERS THAT THEY -- OR, PEOPLE THAT THEY, YOU KNOW, DID

23  THE PAYROLL.  SO, THEY WERE LIKE THEIR -- THEY THEM ON

24  THEIR PAYROLL. IT WAS KIND OF STAFFING.

25     Q      HAVE YOU DONE TAX RETURNS FOR ANY OTHER

1    PROFESSIONAL EMPLOYER ORGANIZATIONS?

2         A    NO.

3         Q    HOW DID YOU BE BECOME FAMILIAR WITH PEO'S?

4         A    MR. CUTHILL.

5         Q    AND WHAT -- DID HE TELL YOU ANYTHING ABOUT THE

6    WAY AEM OPERATED, OTHER THAN WHAT YOU JUST EXPLAINED? I

7    MEAN, THE NATURE OF THE BUSINESS?

8         A    WE HAVE HAD CONVERSATIONS ABOUT THE BUSINESS.

9    YES.

10        Q    WHAT IS YOUR UNDERSTANDING OF HOW AEM AND THE

11   OTHER THREE PEO'S THAT WERE ON WHAT WE WILL CALL THE

12   ORIGINAL CONSOLIDATED 941'S OPERATED? JUST BROADLY.

13        A    I DON'T UNDERSTAND THE QUESTION.

14        Q    I MEAN HOW DID THE MONEY FLOW GO?

15        A    I HAVE NO IDEA.

16        Q    DID MR. CUTHILL EXPLAIN HIS UNDERSTANDING OF HOW

17   THE PEO'S WORKED?

18        A    I DIDN'T REALLY GET A WHOLE LOT INVOLVED INTO

19   THE DISCUSSIONS OF HOW THE MONEY FLOWED.

20        Q    IS THAT SOMETHING THAT MAYBE MS. PRYTULA WOULD

21   HAVE DISCUSSED HAD WITH MR. CUTHILL?

22        A    NO. NO.

23        Q    WAS THAT EVEN ON YOUR RADAR? DID YOU EVEN --

24   DOES THAT MATTER IN PREPARING THE 941'S?

25        A    I MEAN, WE KNEW THAT MONEY WAS COMING IN, YOU

1    KNOW.

2         Q    FROM THESE CLIENT COMPANIES?

3         A    YES. AND THEN THEY WERE PAYING THE PAYROLL.

4         Q    MONEY WOULD BE COMING IN TO WHERE, FROM WHERE?

5         A    I DON'T KNOW.  YOU KNOW, IT'S PROBABLY A

6    QUESTION FOR MR. CUTHILL.

7         Q    DO YOU HAVE ANY UNDERSTANDING HOW IT WORKED?

8         A    YEAH. YEAH. I MEAN, YOU KNOW, BASICALLY, THEY'RE

9    PAYING THESE GUYS AND THESE GUYS ARE PAYING THE MONEY OUT.

10   SO -- TO THE GOVERNMENT. YES. SO, THEY'RE THE ONES

11   COLLECTING -- I DON'T KNOW. I'M NOT EXPLAINING VERY WELL.

12   SO, I APOLOGIZE.

13        Q    THE PEO'S COLLECT THE MONEY FROM THE CLIENT

14   COMPANIES AND THEN THE PEO'S PAY OVER THE TAXES AND THE

15   WAGES. IS THAT WHAT YOU'RE TALKING ABOUT?

16        A    YES. YES. YES.

17        Q    THE EXPERTS -- THE WASHINGTON NATIONAL

18   EXPERTS -- DO THEY KNOW MORE ABOUT HOW THESE PEO'S WORK?

19        A    I'M SURE THEY DO.

20        Q    DID THEY TALK TO YOU -- DID YOU DISCUSS WITH MR.

21   FRIEDMAN, OR ANY OF THE OTHER WASHINGTON NATIONAL PEOPLE,

22   HOW PEO'S WORK AND IF THERE'S ANYTHING UNIQUE ABOUT THEM?

23        A    WE DID NOT GET INTO THOSE DISCUSSIONS.

24        Q    DO YOU KNOW -- SO, DO YOU KNOW ANYTHING ABOUT --

25   OR, DID YOU GET ANY INFORMATION ABOUT HOW PRESIDION VII

1    OPERATED DURING THE 2007 TIME PERIOD?

2         A    NO.

3         Q    DID YOU OR MS. PRYTULA DISCUSS THAT WITH ANYONE,

4    AS FAR AS YOU KNOW?

5         A    NO. NO.

6         Q    DID YOU DISCUSS WITH ANYONE HOW PRESIDION VI

7    OPERATED?

8         A    NO.

9         Q    AND HOW ABOUT NATIONAL MEDSTAFF? ANY

10   DISCUSSIONS?

11        A    NO.

12        Q    DID YOU ATTEMPT TO VERIFY HOW MUCH MONEY -- HOW

13   MUCH WAS PAID OVER TO THE UNITED STATES BY AEM, IN FEDERAL

14   TAX DEPOSITS OR PAYMENTS, FOR THE FIRST QUARTER OF 2007?

15        A    NO. WE HAD THE RECORDS FROM THE RETURN, AND IT

16   WAS THEN PROVIDED ON THE SCHEDULE, WHICH COMPANY PAID OUT.

17        Q    SO, THE SCHEDULES THAT WE TALKED ABOUT ALREADY

18   IN EXHIBIT 31 -- THAT'S AS FAR AS YOU WENT?

19        A    YES.

20        Q    AND THE SAME THING FOR THE SECOND QUARTER OF

21   2007. YES? YOU JUST LOOKED AT THE SCHEDULES -- THE

22   SPREADSHEETS YOU WERE PROVIDED BY MR. CUTHILL.

23        A    YES.

24        Q    DID YOU HAVE -- DID YOU ASSIST MR. CUTHILL IN

25   ANY WAY, OR MR. CUTHILL'S COUNSEL, IN PREPARING THE

Page 40

1   OBJECTION TO CLAIM THAT WAS FILED IN THE BANKRUPTCY CASE?

2        A    NO.

3        Q    DID YOU REVIEW IT? LET ME HAND IT TO YOU. IT IS

4   EXHIBIT SIX. HAVE YOU SEEN THIS DOCUMENT BEFORE?

5        A    I HAVE SEEN THIS. I BELIEVE I HAVE SEEN THIS

6   DOCUMENT. YES. THEY USUALLY SEND OVER ANY PAPERWORK THAT

7   THEY HAVE SENT IN.

8        Q    BUT, YOU DIDN'T HELP DRAFT THIS?

9        A    NO. I DID NOT HELP -- NO, I DID NOT HELP DRAFT

10  THIS.

11       Q    DID YOU PUT TOGETHER THE ATTACHMENTS?  DID YOU

12  OR KPMG PUT TOGETHER THE ATTACHMENTS?

13       A    WE WOULD HAVE GIVEN THEM ANY INFORMATION WE HAD;

14  AND IF THEY USED THE INFORMATION THAT WE HAD, THEY WOULD

15  HAVE SENT IT IN. SO, WE DID NOT ATTACH ANYTHING. WE MAY

16  HAVE GIVEN THEM INFORMATION WE HAD, BUT I DON'T BELIEVE

17  THIS IS ANYTHING WE HAD.

18       Q    THAT THE EXHIBIT -- OR, THE ATTACHMENT TO THE

19  OBJECTION TO CLAIM AT EXHIBIT SIX -- YOU DIDN'T

20  SPECIFICALLY COMPILE THAT FOR THEM.

21       A    NO. NO.

22       Q    I THINK YOU TESTIFIED EARLIER -- I JUST WANT TO

23  CLARIFY -- THAT ANY WORK PAPERS YOU HAD USED IN PREPARING

24  THE TWO 941'S, YOU GAVE COPIES TO MR. CUTHILL. IS THAT

25  CORRECT?

1      A     YES.

2      Q     AND DOES HE ALSO HAVE A COPY OF YOUR ENGAGEMENT

3  LETTER?

4      A     I BELIEVE SO.

5      Q     DO YOU HAVE A COPY OF THAT?

6      A     YES.

7      Q     IN YOUR FILES?

8      A     YES.

9      Q     THAT WOULD BE USEFUL, AS WELL. WE MAY SEND

10  ANOTHER SUBPOENA, JUST TO CLEAN UP THOSE LAST THINGS.  I

11  DON'T THINK THERE SHOULD BE ANY ISSUES.  DID YOU HAVE ANY

12  WRITTEN OPINION ON THE 941 ISSUES FROM THE WASHINGTON

13  NATIONAL EXPERT -- FROM MR. FRIEDMAN?

14     A     NO. JUST AN E-MAIL THAT SAYS IF THEY HAVE --

15  ASKED THEM IF THEY HAVE THOSE DOCUMENTS.

16     Q     ASK WHO IF THEY HAVE WHAT DOCUMENTS?

17     A     ASKED MR. CUTHILL IF THEY SIGNED A LEGAL,

18  BINDING CONTRACT, OR FILED THE 2687 -- OR, 2678 FORM.  I

19  DON'T KNOW THE FORM, OFF THE TOP OF MY HEAD.

20     Q     SO, JUST A COUPLE OF E-MAILS?

21     A     YES.

22     Q     WE WILL TAKE A LUNCH BREAK, SHORTLY, BUT I WANT

23  TO GO THROUGH THE TWO TAX RETURNS THAT YOU DID PREPARE.

24  THEY'RE ATTACHED TO EXHIBIT NUMBER EIGHT. IF YOU COULD

25  TAKE A LOOK AT THAT AND TELL ME IF YOU RECOGNIZE THE TWO

Page 42

1   TAX RETURNS, PLEASE?

2       A    I DO RECOGNIZE THEM.

3       Q    ARE THEY THE RETURNS THAT YOU PREPARED?

4       A    YES.

5       Q    LOOKING AT THE TAX RETURN ON EXHIBIT A, FOR THE

6   FIRST QUARTER OF 2007 -- IN PART TWO, LINE 3, IT'S

7   CHECKED: I CERTIFY THAT I HAVE FILED OR WILL FILE FORMS

8   W-2, WAGE AND TAX STATEMENT, OR FORMS W-2C, CORRECTED WAGE

9   AND TAX STATEMENT, AS REQUIRED.

10           WHY IS THAT CHECKED?

11      A    IT IS CHECKED TO SAY THAT THEY WILL FILE ANY

12  CORRECTED FORMS THAT NEED TO BE FILED.

13      Q    DID AEM FILE THE W-2'S, EITHER PRIOR TO OR AFTER

14  YOU FILED THESE 941'S?

15      A    I'M NOT AWARE THAT THEY HAVE.

16      Q    IS THAT SOMETHING THAT YOU WOULD TYPICALLY

17  VERIFY?

18      A    I DON'T KNOW THAT WE WOULD VERIFY IT, BUT, YOU

19  KNOW, THEY WOULD BE EXPECTED TO, YOU KNOW, IF THEY COULD,

20  FILE THOSE FORMS. YES.

21      Q    DO YOU KNOW WHETHER AEM FILED -- OR, ISSUED

22  W-2'S FOR 2007?

23      A    YOU MEAN CORRECTED W-2'S.

24      Q    EITHER ORIGINAL OR CORRECTED.

25      A    I'M NOT AWARE.

1      Q      YOU DON'T KNOW ONE WAY OR THE OTHER. IS THAT

2   CORRECT?

3      A      THAT'S CORRECT.

4      Q      OKAY.  LET'S LOOK AT LINE 21, WHICH IS THE THIRD

5   PAGE OF THE 941.  THAT'S THE SECTION THAT HAS AN

6   EXPLANATION OF THE CORRECTIONS.  DO YOU SEE THAT ON THE

7   THIRD PAGE OF THE 941?

8      A      YES.

9      Q      DID YOU WRITE THIS -- COMPOSE THIS?

10      A      I PROBABLY HAD A HAND IN WRITING THAT.  I DON'T

11   KNOW IF I WROTE EVERY SINGLE THING ON THERE, BUT --

12      Q      IN THE SECOND SENTENCE IT SAYS: IN FILING THE

13   ORIGINAL FORM 941, AEM, INC. INADVERTENTLY INCLUDED THE

14   ABOVE WAGES AND INCOME AND PAYROLL TAX LIABILITIES OF THE

15   FOLLOWING ENTITIES.  THEN IT LISTS THE OTHER THREE

16   ENTITIES WE HAVE BEEN DISCUSSING.

17          DID YOU COMPOSE THAT SENTENCE?

18      A      I DON'T KNOW IF I COMPOSED IT, BUT I APPROVED

19   THE SENTENCE.

20      Q      WHAT DOES IT MEAN -- INADVERTENTLY INCLUDED.

21   WHAT IS YOUR UNDERSTANDING OF THAT?

22      A      THEY SHOULD NOT HAVE INCLUDED THOSE WAGES.

23      Q      WAS THAT YOUR CONCLUSION, MR. CUTHILL'S, MS.

24   PRYTULA'S, MR. FRIEDMAN'S? WHO MADE THAT CONCLUSION?

25      A      I WOULD SAY THAT EVERYONE MADE THAT CONCLUSION.

1      Q      WHOSE IDEA WAS IT FIRST?

2      A      YOU KNOW, IT WAS PROBABLY -- I HATE TO

3  SPECULATE. I DON'T KNOW WHOSE IDEA IT WAS FIRST.

4      Q      DID YOU ORIGINALLY THINK OF IT -- OR, CONCLUDE

5  IT, I SHOULD SAY?

6           MR. LUNA:  OBJECTION TO FORM. ASKED AND

7      ANSWERED.

8           MS. IDE:  I DON'T THINK IT WAS.

9  BY MS. IDE:

10     Q      WERE YOU THE ONE THAT CAME UP WITH THE IDEA?

11     A      NO.

12     Q      COULD IT HAVE BEEN MR. FRIEDMAN?

13     A      NO. PROBABLY NOT.

14     Q      WHO DO YOU THINK IT WAS?

15     A      IT WAS PROBABLY MR. CUTHILL.

16     Q      WHY DO YOU SAY THAT?

17     A      HE BROUGHT -- YOU KNOW, HE WAS THE ONE THAT

18  WANTED THE RETURNS AMENDED. BECAUSE THEY, YOU KNOW, WERE

19  FILED WITH COMPANIES THAT HE DIDN'T THINK WERE -- SHOULD

20  BE FILING WITH AEM. AND WE CONCLUDED THAT THEY SHOULD NOT

21  BE FILING WITH AEM.  SO, YOU KNOW -- SO, EVERYONE CAME TO

22  THE CONCLUSION AFTER A WHILE THAT, YES, THIS IS -- SHOULD

23  NOT BE FILED ALL TOGETHER.

24     Q      IT SAYS: FURTHERMORE, ALL TAX DEPOSITS WERE

25  DRAWN OUT OF AEM, INC.'S BANK ACCOUNT.  WHERE DID YOU GET

1   THAT INFORMATION?

2        A    THAT WAS FROM MR. CUTHILL AND THE SPREADSHEETS

3   THAT WERE PROVIDED.

4        Q    SO, HOW DID YOU COME TO THAT UNDERSTANDING? WHAT

5   DID HE TELL YOU ABOUT THAT? ALL THE TAX DEPOSITS WERE

6   DRAWN OUT OF AEM'S BANK ACCOUNT?

7        A    HE SAID ALL THE DEPOSITS CAME FROM AEM'S

8   ACCOUNTS; AND THAT'S HOW THEY WERE SHOWN ON THE SCHEDULES

9   HE GAVE US.

10       Q    DID YOU HAVE ANY DISCUSSIONS ABOUT WHETHER THOSE

11  TAX DEPOSITS COULD BE KIND OF PARSED OUT?  THAT CERTAIN

12  CAME -- CERTAIN DEPOSITS WERE FROM CLIENTS OF ONE PEO OR

13  THE OTHER?  DID YOU DISCUSS THAT AT ALL?

14       A    WE DIDN'T DISCUSS HOW TO BREAK OUT ANY ACCOUNTS.

15  THEY WERE, YOU KNOW, WE TOOK THE ACCOUNTS THAT CAME OUT OF

16  AEM'S ACCOUNT.

17       Q    THE DEPOSITS?

18       A    YES.

19       Q    DID YOU DO ANY TRACINGS TO SEE IF YOU COULD

20  TRACE THE DEPOSITS INTO THE BANK ACCOUNT BACK TO

21  PARTICULAR CLIENTS?

22       A    NO. I DID NOT.

23       Q    ON LINE 18, THE PREVIOUS PAGE OF THE 941 FOR THE

24  FIRST QUARTER OF 2007, IT SHOWS THE SUM OF NEGATIVE

25  $20,755,838.  WHAT DOES THAT REPRESENT?

1      A    SO, THAT REPRESENTS THE DIFFERENCE IN WHAT WAS

2   ORIGINALLY REPORTED IN WAGES, LESS INCOME TAX WITHHELD,

3   LESS ANY ADDITIONAL PAYMENTS THAT NEED TO BE ADJUSTED.

4   SO, THAT WOULD REPRESENT THE REFUND THAT THEY WOULD BE

5   CLAIMING.

6      Q    DID YOU VERIFY THAT ACTUALLY -- THAT AMOUNT HAD

7   BEEN PAID OVER TO THE IRS?

8      A    I DON'T UNDERSTAND THE QUESTION.

9      Q    DID YOU VERIFY THAT --

10     A    THE 20 MILLION --

11     Q    -- THAT THE 20 MILLION -- THAT AT LEAST

12   20 MILLION HAD BEEN PAID OVER TO THE IRS BY AEM FOR THIS

13   QUARTER?

14     A    WE TOOK THE SCHEDULES THAT HAD THE DEPOSITS AND

15   THEY MADE AT LEAST 20 MILLION IN DEPOSITS TO THE -- BASED

16   OFF THE ORIGINAL SCHEDULE.

17     Q    THE SCHEDULES THAT WERE PART OF EXHIBIT 32?

18     A    YES. EXACTLY.

19     Q    YES?  OKAY.  AND LET'S LOOK VERY BRIEFLY TO THE

20   941X FOR THE SECOND QUARTER OF 2007. THERE'S -- AT LINE

21   21 -- THERE'S THE SAME EXPLANATION AND SIMILAR

22   COMPUTATIONS. IF WE WENT THROUGH THE SAME QUESTIONS ON THE

23   SECOND QUARTER 941, WOULD YOU GIVE THE SAME ANSWERS AS YOU

24   DID ON THE FIRST QUARTER?

25     A    YES, I WOULD.

1          MS. IDE:  LET'S TAKE A LUNCH BREAK.  DO YOU

2     GUYS WANT A BREAK?  I'M SURE THAT MR. RIZZO NEEDS

3     A BREAK.  WE WILL BE BACK IN AN HOUR.  IS THAT

4     OKAY WITH EVERYONE?

5          MR. LUNA:  YES.

6          MS. IDE:  MR. RIZZO?

7          MR. RIZZO:  YES, I'M HERE.

8          MS. IDE:  WE WILL TAKE AN HOUR BREAK AND

9     CALL YOU BACK AT 1:20.

10         MR. RIZZO:  PERFECT.

11         (WHEREUPON, A LUNCHEON RECESS WAS TAKEN FROM

12     12:20 TO 1:20 P.M.)

13         MS. IDE:  WE'RE BACK ON THE RECORD.

14   BY MS. IDE:

15     Q    MR. BOCOX, YOU'RE STILL UNDER OATH.  I WANT TO

16   LOOK AGAIN AT EXHIBIT 17. BEFORE, THAT'S THE ONE WHERE WE

17   WALKED THROUGH THE TWO TAX RETURNS.  BUT, AT THE BACK OF

18   THAT, THERE'S A CHART WITH CIRCLES. IF YOU COULD LOOK TO

19   THE NEXT-TO-THE-LAST PAGE.  IT'S A DOCUMENT MARKED AEM

20   2375.  HAVE YOU SEEN THAT BEFORE? IT'S A DOCUMENT ENTITLED

21   AEM, INC., MOVEMENT OF CASH STRUCTURE, 2006.

22     A    I BELIEVE I HAVE SEEN THIS.  I DON'T -- I DON'T.

23     Q    WOULD THAT HAVE BEEN WITH THE DOCUMENTS MR.

24   CUTHILL PROVIDE TO YOU DURING THE ENGAGEMENT?

25     A    IT MAY HAVE BEEN. YOU KNOW, I CAN'T REMEMBER.

1       Q     BUT, IT LOOKS -- YOU STARTED TO SAY IT LOOKS --

2       A     IT LOOKS LIKE SOMETHING I WOULD HAVE SEEN. MAYBE

3  SPENT FIVE MINUTES LOOKING AT IT, YOU KNOW. THAT'S ABOUT

4  IT.

5       Q     WHAT ABOUT THE NEXT PAGE, AEM 2376, WHICH IS A

6  LIST OF BANK ACCOUNTS OF AEM, INC -- ALTHOUGH THE "A" IS

7  CUT OFF THERE ON THE COPY.

8       A     YEAH, AGAIN, I MAY HAVE SEEN IT, BUT IT HAD

9  NOTHING TO DO WITH ME LOOKING -- OR, PREPARING THE

10 RETURNS.

11           MR. LUNA:  YOU DON'T HAPPEN TO HAVE EXTRA

12      COPIES OF THOSE, DO YOU?

13           MS. IDE:  MARIANE SHOULD HAVE FULL COPIES OF

14      EVERYTHING.

15 BY MS. IDE:

16      Q     IF YOU COULD TAKE A LOOK AT EXHIBITS 18, 19, 20,

17 AND 21.  YOU HAVE 18 THERE.  THEY ARE RESPECTIVELY: AEM'S

18 RESPONSES TO OUR FIRST INTERROGATORIES, FIRST REQUEST FOR

19 PRODUCTION; SECOND INTERROGATORIES, SECOND REQUEST FOR

20 PRODUCTION.  HAVE YOU SEEN THESE BEFORE? THESE FOUR

21 DOCUMENTS?

22      A     IF SO, BRIEFLY. I MEAN, I DON'T REMEMBER. I

23 WOULD HAVE -- AGAIN, I WOULD HAVE GLANCED AT THEM TWO OR

24 THREE MINUTES, AND THAT WOULD HAVE BEEN ABOUT THE EXTENT

25 OF IT.

1      Q     DID YOU ASSIST IN THE PREPARATION OF ANY OF

2   THESE FOUR RESPONSES?

3      A     NOT THAT I RECALL.  I MEAN, I BELIEVE MR.

4   CUTHILL WAS HANDLING AEM STUFF. THE ONLY THING I WOULD

5   HAVE DONE WOULD HAVE BEEN THE -- FOR THE TAX RETURNS --

6   THE 1120'S.

7      Q     LOOKING ON EXHIBIT 18, THE FIRST INTERROGATORY,

8   WHICH IS ON PAGE FOUR. WE ASKED THE QUESTION: STATE THE

9   LEGAL AND FACTUAL BASIS FOR AEM, INC.'S CONTENTION THAT IT

10   ERRONEOUSLY OR INADVERTENTLY FILED ITS ORIGINAL FORM 941

11   TAX RETURNS BASED ON FOUR COMPANIES. AND THERE IS A

12   ONE-PARAGRAPH ANSWER.

13          DID YOU ASSIST IN CRAFTING THAT ANSWER, IN ANY

14   MANNER?

15      A     NO. NO.

16      Q     THE SECOND INTERROGATORY ASKS ABOUT MAKING

17   FEDERAL TAX DEPOSITS. DID YOU ASSIST IN PREPARING THAT

18   ANSWER?

19      A     NO.

20      Q     THE SECOND ANSWER REFLECTS -- REFERENCES A

21   SCHEDULE OF ALL TAX DEPOSITS BY COMPANY BANK STATEMENTS.

22   ARE YOU FAMILIAR WITH EITHER THAT SCHEDULE OF TAX DEPOSITS

23   OR THE BANK STATEMENTS REFERENCED? DOES THAT RING ANY

24   BELLS?

25      A     NO.

1      Q      DID YOU ASSIST IN THE PREPARATION OF THE ANSWER

2    TO INTERROGATORY NUMBER THREE?

3      A      NO.

4      Q      DID YOU ASSIST IN THE PREPARATION OF THE ANSWER

5    TO INTERROGATORY NUMBER FOUR, IN ANY WAY?

6      A      NO. NO.

7      Q      WHAT ABOUT NUMBER FIVE? DID YOU HELP WITH THAT

8    ONE?

9      A      I DID NOT HELP WITH ANY OF THE INTERROGATORIES

10   ON THIS.

11     Q      OKAY. SO, NOT SIX, EITHER, CORRECT?

12     A      YES.

13     Q      LOOKING AT EXHIBIT 19, WHICH IS THE RESPONSES

14   AND OBJECTIONS TO THE REQUEST FOR THE PRODUCTION OF

15   DOCUMENTS, DID YOU ASSIST THE DEBTOR IN PUTTING TOGETHER

16   ANY DOCUMENTS TO RESPOND TO OUR REQUEST?

17     A      NO.

18     Q      TURNING TO EXHIBIT 20. THOSE INTERROGATORIES --

19   THE SECOND SET OF INTERROGATORIES, THERE ARE SIX

20   INTERROGATORIES, HERE. DID YOU ASSIST IN THE PREPARATION

21   OF THE ANSWER TO ANY OF THESE SIX INTERROGATORIES?

22     A      NO. NO. I DID NOT.

23     Q      HAVE YOU SEEN A YEAR END EMPLOYEE WAGE REPORT

24   FOR AEM OR ANY OF THE OTHER THREE PEO'S THAT WERE ON THE

25   ORIGINAL 941?

1        A     NOT THAT -- NO.

2        Q     WHAT IS A YEAR END EMPLOYEE WAGE REPORT?

3        A     I'M GUESSING IT'S A REPORT THAT HAS ALL THE

4    EMPLOYEE WAGES FOR THE END OF THE YEAR.

5        Q     IF YOU LOOK AT EXHIBIT 22, THIS IS THE FIRST

6    PAGE OF ONE.  IS THAT THE KIND OF DOCUMENT YOU HAVE SEEN

7    BEFORE, THAT YOU UNDERSTAND AS AN EMPLOYEE WAGE REPORT?

8        A     THIS WOULD LOOK LIKE, YOU KNOW --

9        Q     IT'S JUST THE FIRST AND LAST PAGE OF A MULTIPAGE

10   REPORT.  BUT, HAVE YOU SEEN THESE KINDS OF DOCUMENTS

11   BEFORE?

12       A     I HAVE SEEN THEM BEFORE, BUT, I DON'T PROFESS TO

13   BE AN EXPERT ON THE SCHEDULE.

14       Q     TURNING TO EXHIBIT 21, WHICH IS THE RESPONSES

15   AND OBJECTION TO OUR SECOND REQUEST FOR PRODUCTION OF

16   DOCUMENTS.  DID YOU ASSIST IN THE PREPARATION OF THE

17   RESPONSES TO THIS REQUEST FOR PRODUCTION OF DOCUMENTS?

18       A     WHICH ONE WAS THAT?

19       Q     EXHIBIT 21.

20       A     NO. I DID NOT HELP IN ANY OF THESE RESPONSES.

21       Q     HAVE YOU SEEN ANY 941'S FOR THE FIRST OR SECOND

22   QUARTER OF 2007 FOR NATIONAL MEDSTAFF?

23       A     NOT THAT I RECALL.

24       Q     WERE YOU ASKED TO PREPARE A 941 FOR NATIONAL

25   MEDSTAFF?

Page 52

1    A   NO.

2    Q   HAVE YOU SEEN ANY 941'S FOR PRESIDION SOLUTIONS

3  VI FOR THE FIRST TWO QUARTERS OF 2007?

4    A   NO.

5    Q   WERE YOU ASKED TO PREPARE ANY?

6    A   NO.

7    Q   HAVE YOU SEEN ANY 941'S FOR THE FIRST TWO

8  QUARTERS OF 2007, FOR PRESIDION SOLUTIONS VII?

9    A   NO.

10    Q   WERE YOU ASKED TO PREPARE ONE?

11    A   NO.

12    Q   DID YOU EVER DO A RECONCILIATION BETWEEN THE

13  YEAR END WAGE REPORTS AND THE W-2'S FOR ANY -- FOR AEM?

14    A   NO.

15    Q   WAS THAT WITHIN YOUR -- WITHIN KPMG'S ENGAGEMENT

16  WITH THE DEBTOR? IS THAT SOMETHING REQUESTED?

17    A   NO.

18    Q   OTHER THAN DISCUSSIONS WITH MR. CUTHILL AND

19  MR. FRIEDMAN -- OTHER THAN TALKING TO THE TWO OF THEM --

20  OH, AND, I SUPPOSE, MS. --

21    A   PRYTULA AND MATT DONNELLY.

22    Q   YES. DID YOU DISCUSS THE 941'S FOR AEM WITH

23  ANYONE ELSE?

24    A   NO.

25    Q   WHEN YOU WERE PREPARING THESE TWO TAX RETURNS --

REALTIME REPORTERS, INC.                    407-884-4662
E-MAIL: REALTIME_RPRS@YAHOO.COM         FAX: 407-884-4664
483d2cf6-0d2a-4510-86d0-0a13d1887c4b

1  I APOLOGIZE -- I MAY HAVE ASKED THIS BEFORE, BUT WAS THERE

2  ANY DOCUMENTATION THAT -- ANY ADDITIONAL DOCUMENTATION YOU

3  WANTED, THAT YOU WEREN'T ABLE TO RECEIVE?

4       A    NO.

5       Q    AND DID YOU RECEIVE ANY DOCUMENTATION FROM

6  ANYONE OTHER THAN MR. FRIEDMAN AND MR. CUTHILL, IN ORDER

7  TO PREPARE THE 941'S?

8       A    NO.

9       Q    DID YOU HAVE ANY E-MAIL CORRESPONDENCE WITH

10 ANYONE, OTHER THAN MR. CUTHILL AND MR. FRIEDMAN, REGARDING

11 THE PREPARATION OF THESE 941'S?

12      A    I WOULD HAVE E-MAILED MR. DONNELLY AND MS.

13 PRYTULA ABOUT THE RETURNS, AS WELL.

14      Q    JUST THE FOUR OF THEM?

15      A    YES.

16      Q    OKAY.  IN THE COURSE OF YOUR PROFESSIONAL

17 CAREER, HAVE YOU HAD A SITUATION LIKE THIS, BEFORE, WHERE

18 YOU WERE ASKED TO KIND OF PREPARE AN AMENDED 941 TO

19 UNCONSOLIDATE A 941?

20      A    NO.

21      Q    HAVE YOU EVER FACED THAT ISSUE BEFORE?

22      A    NO.

23      Q    IS THAT SOMETHING THAT -- I THINK YOU TESTIFIED,

24 EARLIER, THAT YOU DON'T DO THAT MANY 941'S.  YOU DON'T

25 PREPARE THAT MANY EMPLOYMENT TAX RETURNS.

1        A     I DO NOT PREPARE A LOT OF 941'S, MYSELF. NO.

2        Q     IS THAT PART OF THE REASON WHY YOU CONSULTED

3     WITH THE WASHINGTON PEOPLE?

4        A     YES. YES.

5        Q     NOW, IN YOUR LETTERS TO MR. CUTHILL, ENCLOSING

6     THE COMPLETED 941'S -- IN EXHIBIT 17, YOU ENCLOSED -- YOU

7     DID ONE LETTER FOR EACH 941. NO. I'M SORRY.  YOU DID ONE

8     LETTER FOR THE TWO -- EXHIBIT 17.

9        A     YES.

10        Q     TAKE A LOOK AT THAT.  AND IN THERE, YOU NOTE

11     THAT THESE RETURNS WERE PREPARED FROM INFORMATION PROVIDED

12     BY YOU OR YOUR REPRESENTATIVE. THAT'S CORRECT?

13        A     THAT IS CORRECT.

14        Q     THE PREPARATION OF TAX RETURNS DOES NOT INCLUDE

15     THE INDEPENDENT VERIFICATION OF INFORMATION USED. IS THAT

16     CORRECT?

17        A     THAT IS CORRECT.

18        Q     YOU RECOMMENDED THAT MR. CUTHILL REVIEW THE

19     RETURNS BEFORE SIGNING.

20        A     YES.

21        Q     IS THAT A STANDARD RECOMMENDATION TO THE CLIENT?

22        A     YES.

23        Q     AND THE LAST SENTENCE IN THAT PARAGRAPH I WAS

24     READING SAYS: IF YOU NOTE ANYTHING WHICH MAY REQUIRE A

25     CHANGE TO THE RETURNS, PLEASE CONTACT US BEFORE FILING

Page 55

1    THEM. DID MR. CUTHILL CONTACT YOU BEFORE FILING THE

2    RETURNS?

3        A    NO, HE DID NOT.

4        Q    YOU ALSO RETURNED THE SOURCE DOCUMENTS. WHEN WE

5    WERE LOOKING AT EXHIBIT 32, THAT'S BEEN REPRESENTED TO US

6    AS WHAT WAS RETURNED. IS THAT YOUR UNDERSTANDING?

7        A    YES.

8        Q    YOUR RECOLLECTION?

9        A    THAT'S MY UNDERSTANDING. YES.

10       Q    MR. CUTHILL, IN HIS DEPOSITION, SAID THAT HE

11   THOUGHT HE HAD GIVEN YOU A CD OR A THUMB DRIVE WITH THE

12   DATA ON IT. DO YOU RECALL IF IT WAS PAPER OR IF IT WAS IN

13   ELECTRONIC FORM -- WHAT HE PROVIDED TO YOU?

14       A    IT COULD HAVE BEEN IN A CD OR -- THAT WOULDN'T

15   SURPRISE ME.

16       Q    MR. CUTHILL ALSO HAD INDICATED THAT YOU ADVISED

17   HIM THAT THESE FOUR COMPANIES ARE NOT ALLOWED TO FILE A

18   CONSOLIDATED RETURN.  IS THAT YOUR RECOLLECTION?

19       A    YES. IF THEY WEREN'T LEGALLY BOUND TO FILE, THEN

20   THEY SHOULD NOT BE FILING TOGETHER.

21       Q    AND THAT'S BASED -- THAT STATEMENT IS BASED ON

22   WHAT?

23       A    THAT WAS BASED ON DISCUSSIONS WITH MR. FRIEDMAN.

24       Q    DO YOU KNOW WHETHER AEM EVER ADVANCED FUNDS TO

25   ITS CLIENT COMPANIES TO MEET PAYROLL?

1      A    NO, I DON'T.

2      Q    DO YOU KNOW IF ANY OF THE OTHER THREE PEO'S,

3    THAT WERE ON THE ORIGINAL SO-CALLED CONSOLIDATED 941, EVER

4    ADVANCED FUNDS TO THEIR CLIENTS TO PAY PAYROLL?

5      A    NO. I DON'T.

6      Q    DID YOU LOOK AT ANY OF AEM'S PAYROLL RECORDS?

7      A    NO.

8      Q    ARE YOU FAMILIAR WITH A SOFTWARE PROGRAM CALLED

9    THINKWARE?

10     A    NO.

11     Q    DID YOU EVER TALK TO SOMEONE NAMED MR. RAMOS --

12    R A M O S -- REGARDING ANY OF THE AEM RECORDS, OR

13    ANYTHING?

14     A    NO.

15     Q    DO YOU KNOW WHO HE IS?

16     A    NO.

17     Q    DID YOU CREATE, OR DID YOUR STAFF CREATE, ANY

18    WORK PAPERS IN PREPARING THE TWO 941'S WE HAVE BEEN

19    TALKING ABOUT TODAY? OTHER THAN WHAT MAY HAVE BEEN IN

20    EXHIBIT 32?

21     A    I DON'T RECALL.  WE MAY HAVE MODIFIED SOME OF

22    THE SPREADSHEETS, AS YOU -- AS YOU NOTICED. BUT, I DON'T

23    BELIEVE WE RECREATED OR CREATED OUR OWN SPREADSHEETS FOR

24    INFORMATION.

25     Q    WHEN WE WERE LOOKING AT EXHIBIT 32, THERE WERE A

1   COUPLE OF PAGES THAT HAD ANNOTATIONS ON THE OLD 941, OR

2   ANNOTATIONS ON THE SPREADSHEET. IS THAT WHAT YOU'RE

3   REFERRING TO AS SOME OF THE CHANGES YOU MIGHT HAVE MADE,

4   OR SOMETHING ELSE?

5        A    YEAH. THAT'S PROBABLY -- THAT'S WHAT I WOULD BE

6   SAYING. CHANGES WOULD HAVE BEEN TO SCHEDULES PROVIDE BY

7   MR. CUTHILL.

8        Q    AS WE DISCUSSED THIS MORNING, WHEN WE WERE

9   TALKING ABOUT EXHIBIT 32?

10       A    YES.

11       Q    OKAY.

12            MS. IDE:  LET'S TAKE FIVE MINUTES AND SEE IF

13       I HAVE FORGOTTEN ANYTHING.  WE WILL BE RIGHT BACK.

14            (WHEREUPON, A BRIEF RECESS WAS TAKEN.)

15   BY MS. IDE:

16       Q    MR. BOCOX, JUST A FEW OTHER THINGS.  IF WE

17   NEEDED TO GET IN TOUCH, OR SCHEDULE SOMETHING WITH MR.

18   FRIEDMAN, DO YOU HAVE CONTACT INFORMATION FOR HIM? OF

19   COURSE, WE WILL GO THROUGH COUNSEL.

20       A    YES.

21       Q    CAN YOU GIVE ME HIS ADDRESS AND PHONE NUMBER,

22   THERE?

23       A    I WOULD HAVE TO LOOK IT UP.

24       Q    BUT, HE IS IN THE D.C -- THE WASHINGTON, D.C,

25   OFFICE?

1      A    YES. THE D.C. OFFICE. YES.

2      Q    NOW, DID THAT OFFICE HAVE ANY OTHER WORK PAPERS

3  OR DOCUMENTATION THAT YOU -- OTHER THAN WHAT YOU HAVE?

4      A    NO.

5      Q    DID THEY PROVIDE AN OPINION LETTER REGARDING THE

6  RETURNS?

7      A    NO. NO.

8      Q    WHAT DID THEY PROVIDE?

9      A    WE JUST HAD E-MAIL CONVERSATIONS. AND, BASED ON

10  E-MAIL CONVERSATIONS AND THE ANSWERS BILL GAVE ME ABOUT

11  HAD THEY FILED, YOU KNOW, A LEGAL DOCUMENT OR THE FORM, WE

12  BASED THIS CONCLUSION OFF OF THAT.

13     Q    YOU HAD PHONE CONVERSATIONS, AS WELL AS E-MAIL

14  BACK AND FORTH?

15     A    YES.

16     Q    YES?

17     A    YES.

18          MS. IDE:  DO YOU HAVE ANYTHING, JUSTIN.

19          MR. LUNA:  NO.

20          MS. IDE:  OKAY.  THANK YOU.

21          THE REPORTER:  AND I UNDERSTAND HE'S GOING

22     TO READ.

23          THE REPORTER:  MR. RIZZO, HOW WOULD YOU LIKE

24     TO HANDLE THE READING AND SIGNING, OR SHALL I CALL

25     YOU LATER?

1        MR. RIZZO:  I WOULD LIKE TO HAVE THE WITNESS

2   READ AND SIGN IT.

3        THE REPORTER:  ARE YOU GOING TO ORDER A

4   COPY?

5        MR. RIZZO:  I AM NOT.  BUT, IF YOU FORWARD A

6   COPY TO ME, I CAN HAVE HIM READ SIGN IT.

7        THE REPORTER:  I'LL CALL YOU NEXT WEEK.

8   HOW'S THAT?

9        MR. RIZZO:  OKAY.

10        THE REPORTER:  WOULD YOU LIKE A COPY, MR.

11   LUNA?

12        MR. LUNA:  YES, PLEASE.

13        THE REPORTER:  AND YOU WOULD LIKE TO ORDER

14   THIS, CAROL?

15        MS. IDE:  YES, PLEASE.

16        (WHEREUPON THE PROCEEDINGS WERE CONCLUDED AT

17   2:00 P.M.)

18

19

20

21

22

23

24

25

Page 60

1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA)

3    COUNTY OF ORANGE)

4          I, THE UNDERSIGNED AUTHORITY, CERTIFY THAT

5    KIRTUS BOCOX, PERSONALLY APPEARED BEFORE ME AND

6    WAS DULY SWORN.

7          WITNESS MY HAND AND OFFICIAL SEAL THIS 24TH

8    DAY OF JUNE, 2010.

9          I, SANDRA A MOSER, REGISTERED PROFESSIONAL

10   REPORTER, CERTIFY THAT I WAS AUTHORIZED TO AND DID

11   STENOGRAPHICALLY REPORT THE FOREGOING PROCEEDINGS

12   AND THAT THE TRANSCRIPT IS A TRUE RECORD.

13         I FURTHER CERTIFY THAT I AM NOT A RELATIVE,

14   EMPLOYEE, ATTORNEY OR COUNSEL OF ANY OF THE

15   PARTIES, NOR AM I FINANCIALLY INTERESTED IN THE

16   ACTION.

17         DATED THIS 24TH DAY OF JUNE, 2010.

18

19         _Sandra A. Moser_

20   SANDRA A. MOSER, RPR, FPR
     NOTARY PUBLIC - STATE OF FLORIDA
21   MY COMMISSION NO. DD0525811
     MY COMMISSION EXPIRES:  5/6/2014
22

23            SANDRA A. MOSER
              MY COMMISSION # DD989349
24            EXPIRES: May 06, 2014
     1-800-3-NOTARY  Fl. Notary Discount Assoc. Co.

25

Page 62

1                    REALTIME REPORTERS, INC.
                     1188 FOXFORREST CIRCLE
2                    APOPKA, FLORIDA 32712

3                         407-884-4662

4

5    JUNE 24, 2010

6

7    DAVID G. RIZZO, ESQUIRE
     KPMG LLP
8    757 THIRD AVENUE
     11TH FLOOR
9    NEW YORK NY 10017

10   RE:        AEM, INC., DEBTOR
                CASE NO. 6:08-BK-04681-KSJ
11              DEPOSITION OF KIRTUS BOCOX

12   DEAR MR. RIZZO:

13         THE DEPOSITION OF KIRTUS BOCOX TAKEN IN THE
     ABOVE-REFERENCED MATTER IS READY FOR READING AND
14   SIGNING.

15         PLEASE HAVE THE DEPONENT READ THE TRANSCRIPT
     AND SIGN THE ERRATA SHEET.

16

17         IF YOU HAVE ANY QUESTIONS, PLEASE DO NOT
     HESITATE TO CALL.

18

19   SINCERELY,

20

21

22   SANDRA A. MOSER,, RPR, FPR

23

24

25